**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Firstbase.io, Inc. | : | Case No. 24-11647(LGB) |
| | : | |
| Debtor. | : | |
| | : | |

**[PROPOSED] DISCLOSURE STATEMENT WITH RESPECT TO HARBOR BUSINESS COMPLIANCE CORPORATION'S CHAPTER 11 PLAN OF <u>REORGANIZATION FOR DEBTOR FIRSTBASE.IO, INC.</u>**

**Dated: September __, 2025**

**This is not a solicitation of acceptance or rejection of the plan. Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Court. This disclosure statement is being submitted for approval but has not been finally approved by the Court.**

**ROYER COOPER COHEN BRAUNFELD LLC**
Marc E. Hirschfield, Esquire
1120 Avenue of the Americas, 4th Floor
New York, New York 10036-6700
Telephone: (212) 994-0451
Marc Skapof, Esquire
Telephone: (212) 994-0452
Email: mskapof@rccblaw.com

Matthew Faranda-Diedrich, Esquire*
Three Logan Square
1717 Arch Street, 47th Floor
Philadelphia, PA 19103
Telephone: (215) 839-1000
Email: mfd@rccblaw.com
*Admitted *Pro Hac Vice*

*Counsel to Creditor, Harbor Business
Compliance Corporation*

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND THE OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS AND EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR. NONE OF THE DEBTOR, HARBOR COMPLIANCE, OR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO

**AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTOR OR HARBOR COMPLIANCE, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR HARBOR COMPLIANCE, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY HARBOR BUSINESS COMPLIANCE CORPORATION IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENT OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................................... 1

II.     OVERVIEW OF THE PLAN AND SUMMARY OF THE TREATMENT OF CLAIMS AND
        INTERESTS ................................................................................................................ 8

III.    OVERVIEW OF CHAPTER 11 ................................................................................. 11

IV.     DESCRIPTION OF THE DEBTOR'S BUSINESSES ............................................. 12

V.      THE CHAPTER 11 CASE ........................................................................................ 14

VI.     SUMMARY OF THE PLAN OF REORGANIZATION .......................................... 23

VII.    CONFIRMATION PROCEDURE ............................................................................ 69

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...... 80

IX.     CERTAIN RISK FACTORS TO BE CONSIDERED ............................................. 81

X.      SECURITIES LAW MATTERS ............................................................................... 96

XI.     RECOMMENDATION AND CONCLUSION ......................................................... 97

## I.    INTRODUCTION

On September 25, 2024 (the "Petition Date"), Firstbase.io, Inc. (the "Debtor") filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Contemporaneously herewith, Harbor Business Compliance Corporation ("Harbor Compliance" or the "Plan Proponent") filed the *Chapter 11 Plan of Firstbase.io, Inc. Proposed by Harbor Business Compliance Corporation* (as may be amended, revised, modified, or supplemented, the "Plan"). A copy of the Plan is annexed as Exhibit A. The Plan, among other things, sets forth the manner in which Claims of, and Equity Interests in, the Debtor will be treated. This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan (including the treatment of creditor Claims under the Plan), the Debtor's business, and related matters. Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to them in the Plan.

The circumstances which led the Debtor to file its chapter 11 petition include an almost $30 million judgment owed to Harbor Compliance due to a jury's finding of breach of contract, trade secret misappropriation, and unfair competition by the Debtor. The Debtor's chief executive officer, Mark Milastsivy, led the Debtor at all times relevant to the actions underlying that judgment and this chapter 11 proceeding. The Debtor's current chief operations officer, Filipe Senna, held various leadership roles with the Debtor before being named COO, and was heavily involved in the Debtor's presentation of evidence at the trial leading to the judgment precipitating the Debtor's chapter 11 case. Based on the affirmative testimony of Messrs. Milastsivy and Senna, the jury found the Debtor willfully and maliciously misappropriated Harbor Compliance's trade secrets and punitive damages were warranted for their unfair competition with Harbor Compliance.

1

During this chapter 11 case, still under Messrs. Milastsivy and Senna's leadership, the Debtor has continued to be mismanaged and squandered its opportunity to propose a viable plan of reorganization under chapter 11 in favor of exclusively attempting to overturn Harbor Compliance's judgment and maintaining their ownership and management of the Debtor over the interests of Creditors. Accordingly, Harbor Compliance now proposes the Plan, which among other things, will preserve the Debtor's business as an ongoing concern and maximize recoveries for the Debtor's Creditors.

The Plan is predicated on Harbor Compliance's receipt, in satisfaction of the Harbor Compliance Claim, of up to one hundred percent (100%) of the equity interests in the Reorganized Debtor, as described in further detail in Section VI herein and Article III of the Plan. The Plan also provides that those creditors who hold Allowed Secured Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims will receive, on the Effective Date or as otherwise agreed-to by and between such Holder and the Plan Proponent, Payment in Full in Cash on account of such Allowed Claims in accordance with the Bankruptcy Code. General Unsecured Creditors holding Allowed General Unsecured Claims against the Debtor, other than Harbor Compliance, will receive, at such Creditor's election, either of its Pro Rata share of the Debtor's available Cash, the New Equity Plan Trust Contribution of up to $300,000, and the other Trust Assets or its Pro Rata percentage of equity interests in the Reorganized Debtor. As provided in the Plan, in connection with the issuance of New Firstbase Equity Interests to the Class 4 member (Plan Proponent) and to those members of Class 3 that elect to receive New Firstbase Equity Interests in lieu of a cash distribution under the Plan, "Pro Rata" shall mean the proportion that an Allowed Claim in both of Class 3 or Class 4 bears to the aggregate amount of Allowed Claims in Classes 3 and 4. The New Equity Plan Trust Contribution will also provide sufficient funds for the Debtor to satisfy

Allowed Administrative Expense Claims, including Professional Fee Claims, in accordance with the requirements of the Bankruptcy Code. Taken as a whole, the Plan will provide for Creditor recoveries in excess of what Creditors would otherwise receive if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7). The New Equity Plan Trust Contribution to be provided by Harbor Compliance and Class 3 Creditors electing to receive New Firstbase Equity Interests is not on account of any preexisting obligation, is indisputably substantial, and is necessary to make the distributions and payments required by the Plan.

Further, the Plan Proponent Settlement confers additional value to the Debtor's Estate and Creditors by resolving all of the pending disputes between the Plan Proponent and the Debtor. Specifically, on the Effective Date, Harbor Compliance will agree to: (i) dismiss with prejudice, the Reorganized Debtor's appeal styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, Case No. 25-1278 pending in the United States Court of Appeals for the Third Circuit; (ii) the Plan Proponent's appeal styled *In re Firstbase.io, Inc. (Harbor Business Compliance Corporation v. Firstbase.io, Inc.)*, Case No. 1:25-cv-04717-LAK pending in the United States District Court for the Southern District of New York and (iii) the Plan Proponent's adversary complaint styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc. et al.*, Case No. 25-01032-lgb pending in the United States Bankruptcy Court, Southern District of New York. In addition, as a component of the Plan Proponent Settlement, the Plan Proponent shall waive any right to payment from the Debtor under section 503(b)(3)(D) of the Bankruptcy Code. Absent the Plan Settlement, the Debtor will have to expend estate funds otherwise available to Creditors to defend against, *inter alia*, the Harbor Compliance Adversary Action which seeks a declaration that valuable assets purportedly owned by the Debtor are in fact owned by the Plan Proponent. Should the Plan Proponent succeed in this litigation, the value of those assets will no longer be available

3

for the benefit of the Debtor's Estate and Creditors. Accordingly, the Plan Proponent's willingness to enter into the Plan Proponent Settlement as a component of its Plan will allow the Debtor to emerge from this Chapter 11 Case without the need for further protracted litigation and with a greater pool of assets available to pay Creditor distributions.

Pursuant to the terms and conditions of the Plan and largely through the funding provided by Harbor Compliance, all Allowed Administrative Expense Claims will be Paid in Full, including Allowed Professional Fees as determined by a Final Order the Bankruptcy Court. Priority Tax Claims will also be Paid in Full. These claims will all be paid by the Plan Trustee on the later of the Effective Date or the date that they become Allowed (or as reasonably as practicable thereafter). The Clearco Secured Claim will be Paid in Full on the Effective Date or as otherwise agreed to by the Plan Proponent and Clearco and is Unimpaired under the Plan. Priority Non-Tax Claims will also be Paid in Full up to their Allowed amounts on the Effective Date and such Claims are also unimpaired under the Plan. General Unsecured Claims (estimated by the Debtor's Schedules to be approximately $4 million, net of the Harbor Compliance Claim and inclusive of the Novel Claim) will receive their Pro Rata share of the equity interests to be issued by the Reorganized Debtor (*i.e.*, the proportion that an Allowed Claim in both of Class 3 or Class 4 bears to the aggregate amount of Allowed Claims in Classes 3 and 4) or their Pro Rata Share of the New Equity Plan Trust Contribution, the Debtor's available Cash and the other Trust Assets, including the Debtor's Causes of Action. General Unsecured Claims are Impaired and entitled to vote on the Plan. The Harbor Compliance Claim will be Allowed in the amount of $31,232,127.11 and will be satisfied in full by the receipt of 100% of the equity interests to be issued by the Reorganized Debtor, subject to Pro Rata dilution by Holders of Allowed General Unsecured Claims that elect to receive equity interests in the Reorganized Debtor in lieu of a Cash distribution. The Harbor

4

Compliance Claim is Impaired and entitled to vote on the Plan. Finally, the Debtor's SAFE and Equity Interests will be cancelled, and the Holders of such interests will receive no distribution under the Plan. Holders of SAFE and Equity Interests are impaired, deemed to have rejected the Plan, and are ineligible to vote on the Plan. As discussed more fully below, Harbor Compliance, after careful analysis and discussion with its advisors, has concluded that recoveries to creditors will be maximized under the Plan, as contrasted with other possible alternatives.

This Disclosure Statement is submitted to Holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan ("Confirmation Hearing") presently scheduled for October 16, 2025 at 10:00 a.m. (Prevailing Eastern Time).

Attached to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A)

- An Order of the Court dated _____, 2025 ("Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B)

In addition, a Ballot for the acceptance or rejection of the Plan is being transmitted with this Disclosure Statement to the Holders of Impaired Claims that are entitled to accept or reject the Plan.

On _____, 2025, after notice and a hearing, the Court determined that the Disclosure Statement contained adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to Confirmation of the Plan, the record date for voting purposes, and the appliable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. **Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the other Exhibits hereto, and the instructions accompanying the Ballot(s) in their entirety before voting. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of a vote to accept the Plan may be made without giving the voter a copy of the Court approved Disclosure Statement.**

A.      **Holders of Claims and Equity Interests Entitled to Vote**

Only Impaired Holders of Allowed Claims or Interests are entitled to vote to accept or reject a proposed chapter 11 plan. Unimpaired Classes are deemed to have accepted the Plan and are not entitled to vote. Classes of Claims or Interests that will not receive any distribution under a reorganization plan are deemed to have rejected such plan and also are not entitled to vote.

Under the Plan, Classes 3, 4, and 5 are Impaired and entitled to vote on the Plan. Classes 1 and 2 are Unimpaired and conclusively deemed to have accepted the Plan. Class 6 is Impaired and conclusively deemed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by non-Insider creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that vote for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section VII herein, "Confirmation Procedure."

B.      **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for that purpose. If you hold a Claim or an Interest in more than one Class and you are entitled to vote in more than one Class, you will receive separate Ballots that must be used for each separate Class.

Please vote and return your Ballot(s) by one of the following methods: (i) first-class U.S. mail, (ii) overnight courier, or (ii) by electronic mail to the attention of the Voting Agent at the following email address: **Firstbaseballots@rccblaw.com**.

**DO NOT RETURN ANY OTHER INSTRUMENTS OR AGREEMENTS WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED NO LATER THAN __:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2025.**

Each Holder of an Allowed Claim in an Impaired Class that receives or retains property under the Plan will be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other controlling order or orders of the Bankruptcy Court.

If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, **lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call the Plan Proponent's Voting Agent, Royer Cooper Cohen Braunfeld LLC, Attn: Alexandra Pittinsky at (484) 539-1927**.

C.      **Confirmation Hearing**

The Confirmation Hearing will be held on October 16, 2025 at 10:00 a.m. (Prevailing Eastern Time) via Zoom for Government or in-person, as directed by the Bankruptcy Court, before

7

the Honorable Lisa G. Beckerman, United States Bankruptcy Judge, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before _____, 2025 at __:00 __.m. (Prevailing Eastern Time). Service of any objection to confirmation must be served upon (i) counsel for the Debtor, Kirby Aisner & Curley, LLP, 700 Post Rd Suite 237, Scarsdale, New York 10583, Attn: Dawn Kirby, Esq. (dkirby@kacllp.com) and Dana Brescia, Esq. (dbrescia@kacllp.com); (ii) counsel for Harbor Compliance, Royer Cooper Cohen Braunfeld LLC, 1717 Arch St. Suite 4700, Philadelphia, PA 19103, Attn: Matthew Faranda-Diedrich, Esq. (mfd@rccblaw.com) and Royer Cooper Cohen Braunfeld LLC 1120 Avenue of the Americas, 4th Floor, New York, New York 10036-6700, Attn: Marc Skapof, Esq. (mskapof@rccblaw.com); (iii) the Office of the United States Trustee, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn: Andrew Velez-Rivera, Esq.; and (iv) all entities which have filed a notice of appearance and demand for service of documents in these cases (the foregoing, collectively, the "Objection Notice Parties"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**HARBOR COMPLIANCE BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF THE DEBTOR AND ITS CREDITORS AND URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.**

II.     **OVERVIEW OF THE PLAN AND SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS**

The Plan is a plan of reorganization. Upon the Effective Date of the Plan, the Debtor will emerge from its Chapter 11 Case as the Reorganized Debtor. Pursuant to the Plan, a combination

of the New Equity Plan Trust Contribution, the Debtor's Cash on hand and the other Trust Assets will be transferred to the Plan Trust to enable the Plan Trustee to make required distributions under the Plan. Additionally, upon the Effective Date, equity interests in the Reorganized Debtor will be issued to Harbor Compliance and any Holder of an Allowed General Unsecured Claim that elects to receive such New Firstbase Equity Interests in lieu of a Cash distribution. Finally, the existing Equity Interests in the Debtor will be irrevocably cancelled, extinguished and expunged and Holders of such Equity Interests will receive no distributions under the Plan on account of such Equity Interests.

To the best of the Plan Proponent's knowledge, the Debtor has not received any other offer from any person or entity to provide funding for the Plan. The exclusive period for the Debtor to file a plan expired on or about May 27, 2025. None of the Debtor, another person, or another entity has proposed another plan. There are five Classes of Claims provided under the Plan, and one Class of Equity Interests. Claims and Interests in Classes 3 (General Unsecured Claims), 4 (Harbor Compliance Claim), and 5 (Convenience Class Claims) are Impaired under the Plan and entitled to vote to accept or reject the Plan. Claims and Interests in Classes 1 (Clearco Secured Claim) and 2 (Priority Non-Tax Claims) are Unimpaired by the Plan and are deemed to have accepted the Plan. Interests in Class 6 (Firstbase Equity Interests) are Impaired under the Plan and deemed to have rejected the Plan.

The table below briefly summarizes the specific classification and treatment of Claims and Equity Interests under the Plan. Holders of Claims are strongly encouraged to review the full treatment provisions of the Plan. As provided in the Plan, Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

9

| Class | Type of Claim or Equity Interest | Treatment | Estimated Claim Amount (by Class) | Estimated Recovery[1] |
|---|---|---|---|---|
| 1 | Clearco Secured Claim | Unimpaired. The Clearco Secured Claim will be deemed Allowed hereunder and either (i) Paid in Full in Cash on the Effective Date; (ii) Reinstated; or (iii) satisfied by agreement of the Plan Proponent and the Class 1 Creditor. | $230,494.75 | 100% |
| 2 | Priority Non-Tax Claims | Unimpaired. The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims. To the extent not previously paid, and except to the extent that a Holder of a Priority Non-Tax Claim agrees in writing with the Plan Proponent (or the Plan Trustee) to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Non-Tax Claim will become Allowed (or as soon as reasonably practicable thereafter), the Debtor (or the Plan Trustee), in full and final satisfaction of such Priority Non-Tax Claim, will (i) Pay in Full in Cash to each Holder of an Allowed Priority Non-Tax Claim, the Allowed amount of such Allowed Non-Priority Tax Claim, or (ii) satisfy and discharge such Allowed Non-Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Priority Non-Tax Claim and the Debtor (or the Plan Trustee). | $16,104.79 | 100% |
| 3 | General Unsecured Claims | Impaired. In full and final satisfaction, release and discharge of the Debtor's obligations with respect to General Unsecured Claims, and except to the extent that a Holder of a General Unsecured Claim agrees in writing with the Plan Proponent (or the Plan Trustee) to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a General Unsecured Claim will become Allowed (or as soon as reasonably practicable thereafter), each Holder of an Allowed General Unsecured Claim in Class 3 will receive, in full and complete settlement, satisfaction and discharge of such Allowed General Unsecured Claim, at such Holder's election, (x) its Pro Rata share of the Trust Assets on the terms and conditions of the Plan and the Plan Trust Agreement; or (y) its Pro Rata (*i.e.*, the proportion that an Allowed Claim in both of Class 3 or Class 4 bears to the aggregate amount of Allowed Claims in Classes 3 and 4) share of the New Firstbase Equity Interests. Any Holder of an Allowed General Unsecured Claim in Class 3 that elects to receive its Pro Rata share of the New Firstbase Equity Interests will be obligated to contribute its Pro Rata share of both the New Equity Capitalization Contribution and the New Equity Plan Trust Contribution Any Holder of an Allowed General Unsecured Claim in Class 3 that returns an otherwise properly completed, executed, and timely returned Ballot, but (i) without making an election as to form of distribution, or (ii) electing both forms of distribution will be deemed to have elected the "Cash and Trust Assets on the terms and conditions of the Plan Trust Agreement" option on its Ballot. Further, Holders of Allowed General Unsecured Claims in Class 3 that elect to receive New Firstbase Equity Interests in satisfaction of their Claims will also be eligible to participate in the Put Option. Under the Put Option, Plan Proponent will agree to repurchase such New Firstbase Equity Interests in exchange for a Cash payment equal to three (3%) of the face amount of such Holder's Allowed General Unsecured Claim. The Put Option may | $4,068,953 | $0.05-$0.19 |

---

[1] The estimated recoveries listed herein are based on the information available to the Plan Proponent as of the date hereof and a number of assumptions discussed in this Disclosure Statement and are not presented or intended as a guarantee of a certain recovery. Actual recoveries on Allowed Claims may vary from the estimates provided herein.

be exercised at any time within one (1) year following the later of (i) the Effective Date or (ii) the date on which such Holder receives the New Firstbase Equity Interests on account of its Allowed General Unsecured Claim. The New Firstbase Equity Interests to be issued to electing Holders of Allowed General Unsecured Claims under the Plan shall be subject to customary and typical minority and majority equity interest holder protections, including so-called 'Drag-Along' rights. 'Drag-Along Rights' shall permit a majority of equity interest holders to require minority equity interest holders to participate in any sale of the Reorganized Debtor on the same terms and conditions. In addition, the New Firstbase Equity Interests shall be subject to a 'call option' right, allowing the Reorganized Debtor or a designated holder (or group of holders) of a majority of equity interests to repurchase shares from minority equity interest holders upon demand or under other customary triggering events, at a value that will be further specified in the Reorganized Debtor's governing documents, which will be included in the Plan Supplement.

| | | | | |
|---|---|---|---|---|
| 4 | Harbor Compliance Claim | Impaired. In full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Harbor Compliance Claim, on the Effective Date, Harbor Compliance will receive one hundred percent (100%) of the New Firstbase Equity Interests subject to Pro Rata dilution by any Class 3 Creditor that elects to receive New Firstbase Equity Interests on account of its General Unsecured Claim. | $31,232,127 | Speculative, but not less than $0.03 per $1.00 pursuant to the Put Option[2] |
| 5 | Convenience Class Claims | Impaired. Each holder of an Allowed Convenience Class Claim will receive on the Effective Date or as soon thereafter as practicable, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, Cash in an amount equal to the lesser of (i) the Allowed amount of such Claim or (ii) $5,000. Any portion of a General Unsecured Claim that exceeds $5,000 and is voluntarily classified by the holder as a Convenience Class Claim will be deemed extinguished as of the Effective Date, and the Holder will have no further right to recover any portion of such extinguished amount. Holders of Allowed Convenience Class Claims will not be entitled to any further or additional distributions under the Plan other than that provided herein. | $30,099 | Up to $5,000 |
| 6 | Firstbase Equity Interests | Impaired. Upon the Effective Date, the Firstbase Equity Interests will be deemed canceled, null, and void without any further action by the Debtor and the Holders of such Firstbase Equity Interests will receive no distribution on account of the Firstbase Equity Interests. From and after the Effective Date, the Class 6 Equity Interest Holders will have no rights or Claims on account of their equity interests in the Debtor against the Debtor, the Debtor's Estate, the Reorganized Debtor (and its successors and assigns), the Plan Trustee, or the Plan Trust. | N/a | 0% |

## III.   OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of interested parties, including its creditors and equity interest holders. In addition to permitting rehabilitation of a

---

[2] See Section IX.A.6.a for a discussion of the difficulty of the valuing the New Firstbase Equity Interests and the risks associated with electing to receive distributions of such interests in lieu of Cash and other Trust Assets.

debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, the holders of claims against or interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponent is submitting this Disclosure Statement to Holders of Claims against or Equity Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.    DESCRIPTION OF THE DEBTOR'S BUSINESSES

The Debtor is a technology company providing business formation services to the public through its website (https://www.firstbase.io/). The Debtor was founded in 2019 and offers an "all-in-one" online platform to establish, grow, and maintain a business. Among an array of products

12

ranging from mail support to tax-filing software, the Debtor currently offers Firstbase Start, a web-based application that allows clients to form new businesses, and Firstbase Agent, a companion application through which users can obtain registered-agent and filing services nationwide.

In February 2022, the Debtor was offering business formation services only in Delaware and Wyoming. The Debtor approached Harbor Compliance about forming a partnership whereby the Debtor would white label Harbor Compliance's national filing and registered-agent services. The Debtor executed a confidentiality agreement with Harbor Compliance in March 2022, and by May 2022, the Debtor and Harbor Compliance executed the partnership agreement. By the end of 2022, the Debtor had breached the partnership agreement, and, as it became apparent to Harbor Compliance, was utilizing Harbor Compliance's trade secrets and confidential information to compete with Harbor Compliance.

In March 2023, Harbor Compliance instituted an action in the Eastern District of Pennsylvania styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, 5:23-cv-00802-JFL alleging the Debtor breached the partnership agreement, misappropriated Harbor Compliance's trade secrets, and unfairly competed with Harbor Compliance ("Harbor Compliance Action"). After a ten-day jury trial, the jury returned a verdict finding that the Debtor engaged in willful and malicious trade secret misappropriation and unfair competition, and awarded Harbor Compliance compensatory damages of $1,090,271 for the Debtor's breach of the partnership agreement, $11,068,044 for the Debtor's willful and malicious trade secret misappropriation of Harbor Compliance's trade secrets, $14,757,399 for the Debtor unfairly competing with Harbor Compliance, and $1,000,000 in punitive damages for the Debtor's willful and malicious unfair competition. In total, the jury awarded Harbor Compliance $27,915,714. Following Harbor Compliance's domestication of the judgment and an imminent auction of the Debtor's assets, the

13

Debtor instituted this chapter 11 case. The Bankruptcy Court modified the automatic stay to permit the District Court to rule on the post-trial briefing, which led to the District Court entering a final judgment of $29,321.262.40 ("Harbor Compliance Judgment"). The Bankruptcy Court's modification also allowed an appeal pending a final judgment, which the Debtor instituted on February 18, 2025. [As of the date of this Disclosure Statement, the case has been fully briefed, orally argued, and it submitted to the Third Circuit Court of Appeals.]

As of the Petition Date, according to the *List of Equity Security Holders* [ECF No. 1], Mark Milastsivy owned the majority of the equity in the Debtor. He has, at all relevant times, held the majority of the equity in the Debtor, including during the events leading to the Harbor Compliance Judgment. Mr. Milastsivy also served as the Debtor's chief executive officer at all relevant times. Harbor Compliance has learned, through its discovery efforts, that Filipe Senna is also an equity holder of the Debtor. Mr. Senna, in addition to serving as the chief operating officer of the Debtor since early 2024, has been intimately involved in the Debtor's chapter 11 case and the Debtor's day-to-day operations. The mismanagement of the Debtor, which led to the breach of the partnership agreement with Harbor Compliance, the misappropriation of Harbor Compliance's trade secrets, and unfair competition with Harbor Compliance, occurred under their stewardship.

## V.    THE CHAPTER 11 CASE

### A.    Motions and Orders

***First Day Motions.*** Upon the commencement of the Chapter 11 Case, the Debtor filed the following "first day" motions: (i) *Motion to Approve Use of Cash Collateral* and (ii) *Motion of the Debtor for an Order re Payment of Wages*.

***The Cash Collateral Motion.*** The Debtor filed a motion seeking interim approval for the use of cash and cash equivalents as cash collateral. According to the motion, the use of cash

14

collateral was necessary to prevent immediate and irreparable harm to the Debtor's estate and ability to sustain its operations and meet it current necessary and integral business obligations. As adequate protection, the Debtor agreed to grant replacement liens to its pre-petition secured creditors of the same nature, extent, and validity of their pre-petition liens.

***The Wage Motion.*** Because obligations to employees typically constitute pre-petition claims, the Debtor, as is customary in chapter 11 cases, sought and obtained an order authorizing, but not directing, the Debtor's payment of pre-petition obligations to its employees. As of the Petition Date, the Debtor had approximately eight full-time employees paid semi-monthly with a total average payroll of approximately $40,000 and employed thirty-six contractors on a full-time basis paid monthly with a total average payroll of approximately $140,000. The employee obligations included the payment of (i) accrued pre-petition payroll; and (ii) all withholding taxes and deductions owed to various third parties. The Debtor shortly thereafter filed a supplement to the Wage Motion to remit payment to a third-party for pre-petition commissions and fees earned.

***Filing of Schedules and Statement of Financial Affairs.*** On October 10, 2024, the Debtor filed it schedules [ECF No. 14] (as thereafter amended, the "Schedules") and statement of financial affairs [ECF No. 14] ("Statement of Financial Affairs") pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules").

***Application to Retain Bankruptcy Counsel.*** On October 24, 2024, the Debtor filed an application seeking to retain Kirby Aisner & Curley LLP ("KAC") as its principal bankruptcy counsel which was thereafter granted by order entered on November 19, 2024.

***Bar Date Motion.*** On October 31, 2024, the Debtor filed a motion seeking to set the last date for creditors to file proofs of claim as January 16, 2025. The motion was thereafter granted by order entered on November 26, 2024.

***Application to Retain Special Litigation Counsel.*** On October 31, 2024, the Debtor filed an initial application seeking to retain Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") and Dilworth Paxson LLP ("Dilworth") as special litigation counsel in connection with the Harbor Compliance Action and any appeals thereof [ECF No. 30]. The retention of Quinn Emanuel and Dilworth was granted by orders of the Bankruptcy Court on December 2, 2024 [ECF No. 45 and 46, respectively]. The Debtor subsequently filed a supplemental application to (i) expand the scope of Quinn Emanuel and Dilworth's retention to include the Harbor Compliance Adversary Proceeding (as defined *infra*) and (ii) alter the fee arrangement with Quinn Emanuel. Harbor Compliance objected to the supplemental application. The supplemental application to expand the scope of Quinn Emanuel and Dilworth's retention to include the Harbor Compliance Adversary Action was granted on March 26, 2025 [ECF Nos. 109[3] and 110, respectively]. On June 6, 2025, the Debtor made its second supplemental application to expand the scope of Quinn Emanuel's retention to include Harbor Compliance's appeal of the Preference Adversary Proceeding (as defined *infra*). Harbor Compliance objected to the supplemental application. On July 11, 2025, the second supplemental application to expand the scope of Quinn Emanuel's retention was granted. [ECF No. 167].

***Preference Adversary Proceeding.*** On December 12, 2024, the Debtor commenced an adversary proceeding styled *Firstbase.io, Inc. v. Harbor Business Compliance Corporation*, Case No. 24-11647-lgb against Harbor Compliance seeking to avoid the Harbor Compliance Judgment as an avoidable preference ("Preference Adversary Proceeding"). Harbor Compliance and the Debtor cross-moved for summary judgment with the Debtor arguing the Harbor Compliance Judgment constituted a preference, and Harbor Compliance arguing the Harbor Compliance

---

[3] As set forth in ECF No. 109, Quinn Emanuel's fee agreement was not altered.

Judgment was a statutory lien and therefore not an avoidable preference. On March 6, 2025, the Bankruptcy Court ruled in favor of the Debtor and entered a judgment to that effect on March 12, 2025 ("Preference Judgment"). On March 27, 2025, Harbor Compliance timely appealed the Preference Judgment, which is currently pending before the United States District Court for the Southern District of New York and styled *In re: Firstbase.io, Inc.*, Case No. 1:25-cv-04717-LAK. Pursuant to a stipulation entered into by Harbor Compliance and the Debtor, which was "so ordered" by the district court on August 1, 2025, the briefing on the appeal in the Preference Judgment has been adjourned pending further proceedings in the Chapter 11 Case.

***First Motion to Extend Exclusive Periods.*** On December 23, 2024, the Debtor filed its first motion to extend the period during which it had the exclusive right to file a plan [ECF No. 53] which was set to expire on January 23, 2025. Harbor Compliance filed an opposition to the motion [ECF No. 56]. Following a hearing, on January 22, 2025, the Bankruptcy Court entered an order extending the Debtor's period of exclusivity to May 23, 2025 [ECF No. 60].

***Application for Order re Lease Agreement.*** On February 10, 2025, the Debtor file an application to enter into a new lease agreement and resolve any outstanding claims with its current landlord [ECF No. 64]. When the Debtor filed its petition, it was leasing space from 449 Broadway LLC ("449 Broadway"), who had filed proof of Claim 17 in this Chapter 11 Case. The Debtor negotiated and sought to enter into a lease with 425 Bway, LLC ("425 Bway"), an affiliated entity of 449 Broadway. The Debtor's lease with 449 Broadway cost approximately $29,000 per month, while the lease with 425 Bway cost approximately $16,000 per month. In addition, 449 Broadway held a security deposit of $84,000 from the Debtor. In exchange for entering into the lease with 425 Bway, the Debtor and 449 Broadway agreed that among other things, 449 Broadway would keep the $84,000 security deposit in full and final satisfaction of any and all claims it may have

against the Debtor pursuant to the 449 Broadway lease, including proof of Claim 17, ultimately reducing its obligations to its creditors by more than $40,000. The Debtor's application was thereafter granted by order entered on February 25, 2025 [ECF No. 82].

**Harbor Compliance Motions for Rule 2004 Discovery.** On February 11, 2025, Harbor Compliance filed a motion [ECF No. 69] seeking discovery from the Debtor related to the Debtor's financial condition and acts or conduct. The Debtor object to Harbor Compliance's motion [ECF No. 71]. Following a hearing on February 20, 2025, the Bankruptcy Court granted Harbor Compliance's motion and entered an order [ECF No. 81] requiring the Debtor to produce documents and submit to an oral examination. On March 25, 2025, Harbor Compliance conducted four hours of on-the-record oral examination of the Debtor and learned that additional responsive documents existed in response to its Rule 2004 discovery requests. Upon the Debtor's failure to timely produce the additional documents, Harbor Compliance filed a letter [ECF No. 112] with the Bankruptcy Court requesting an order that the Debtor produce the additional documents. The Debtor replied [ECF No. 114] and following a status conference held by the Bankruptcy Court on April 14, 2025, the Bankruptcy Court ordered [ECF No. 115] the Debtor to produce the additional documents and submit to further oral examination. On May 1, 2025, Harbor Compliance conducted three additional hours of on-the-record oral examination of the Debtor, where it once again learned that the Debtor failed to produce additional documents responsive to its Rule 2004 requests. On May 24, 2025, the Debtor produced additional documents responsive to Harbor Compliance's requests for the additional documents it first learned of on May 1. On June 20, 2025, Harbor Compliance requested additional financial and business information in connection with drafting a plan of reorganization. After receiving little response from Debtor, Harbor Compliance filed its Second Motion for a Rule 2004 Order [ECF No. 160] which the Bankruptcy Court granted

on July 2, 2025 and ordered the Debtor to produce the documents within twenty days of the entry of the order [ECF No. 162]. The Debtor produced documents in response to Harbor Compliance's June 20, 2025 requests on July 18, 2025. Harbor Compliance then sought the Debtor's cooperation in accessing the Debtor's books and records to assist in its analysis of the Plan. After reaching an agreement in principle, the Debtor then sought to impose additional restrictions counter to the previous agreement. On August 8, 2025, Harbor Compliance filed its Third Application for Ex Parte Relief for a Third Rule 2004 Order, which will be heard on August 12, 2025.

*Harbor Compliance Adversary Proceeding.* On February 12, 2025, Harbor Compliance initiated an adversary proceeding styled *Harbor Compliance v. Firstbase.io, Inc., Filipe Senna, and Mark Milastsivy*, Case No. 25-01032-lbg against the Debtor and insiders Mark Milastsivy and Filipe Senna ("Harbor Compliance Adversary Action"). The Harbor Compliance Adversary Action sought a declaratory judgment as to the Debtor's legal ownership and rights (or lack thereof) in the trade secrets it misappropriated from Harbor Compliance, as found by the jury in the Harbor Compliance Action. Harbor Compliance sought a declaration that certain assets of the Debtor are not part of the bankruptcy estate and must be turned over to Harbor Compliance because the Harbor Compliance Judgment effectively limits the Debtor's legal and equitable rights in the trade secrets to an implied and limited license, and so the Debtor cannot convey greater title in those trade secrets. The Harbor Compliance Adversary Action also brought claims against Marm Milastsivy and Filipe Senna for tortious interference with the Debtor's contracts with Harbor Compliance. The Debtor, Mr. Senna, and Mr. Milastsivy filed a motion to dismiss the Harbor Compliance Adversary Action, which Harbor Compliance opposed. The motion to dismiss was fully brief, argued, and submitted to the Bankruptcy Court on May 21, 2025. [As of the date hereof, the Bankruptcy Court has not ruled on the motion to dismiss and the matter remains *sub judice*.]

***Second Motion to Extend Exclusive Periods.*** On April 25, 2025, the Debtor filed its second motion to extend the period during which it had the exclusive right to file a plan [ECF No. 118] which was set to expire on May 23, 2025. Harbor Compliance again filed an opposition to the motion [ECF No. 126]. On May 27, 2025,[4] the Bankruptcy Court held a hearing on the motion. The Bankruptcy Court stated the Debtor's progress toward a plan of reorganization was insufficient to warrant a further extension of the exclusive period and denied the Debtor's motion and entered an order to that effect on May 29, 2025 [ECF No. 142].

***Harbor Compliance's Motion to Appoint an Examiner.*** On May 8, 2025, Harbor Compliance filed a motion to appoint an examiner to investigate a number of the Debtor's transactions, including significant pre-petition payments to the Debtor's executives [ECF No.123]. The Debtor filed an opposition to the motion [ECF No. 128]. On May 27, 2025, the Bankruptcy Court held a hearing on the motion, and deferred ruling on the motion until such a time that Harbor Compliance and the Debtor provided additional briefing on the cap on fees on the limited scope of investigating potential preference claims against the Debtor's executives. [As of the date of this Disclosure Statement, no additional briefing on the cap on fees and limited scope has been submitted by the Debtor or Harbor Compliance.]

***Motion to Approve Mediation Agreement.*** On May 28, 2025, the Debtor filed a motion seeking the Bankruptcy Court's approval on a mediation agreement between the Debtor and Harbor Compliance [ECF No. 139]. The Debtor and Harbor Compliance agreed to attempt to mediate a global resolution to the following disputes: (i) the Debtor's appeal in the Third Circuit Court of Appeals of the Harbor Compliance Judgment, (ii) Harbor Compliance's outstanding Rule

---

[4] The Bankruptcy Court entered an order dated May 20, 2025 [ECF No. 131] keeping the terms of its first order extending exclusivity [ECF No. 60] in place until the May 27 hearing on the Debtor's second motion to extend its exclusive periods after the Debtor and Harbor Compliance agreed to adjourn the hearing set on May 22, 2025 to May 27, 2025 for extenuating circumstances.

2004 requests, (iii) Harbor Compliance's appeal of the Preference Judgment, (iv) Harbor Compliance's Adversary Proceeding, (v) the appointment of an examiner to investigate the Debtor's potential preferential transfers to its insiders, and (vi) anticipated competing bankruptcy plans. On June 10, 2025, the Bankruptcy Court granted the motion without opposition [ECF No. 149]. [As of the date hereof, the mediation remains pending.]

*Application for Interim Professional Compensation of Bankruptcy Counsel.* On June 13, 2025, KAC filed its first interim application for allowance of compensation and reimbursement of expenses from the Petition Date through May 31, 2025 [ECF No. 151]. KAC sought compensation for professional services in the amount of $231,840.00 and reimbursement of $11,844.71 in expenses, totaling $243,684.71. On July 2, 2025, the United States Trustee filed a general response [ECF No. 163] expressing concern that the Debtor would have little cash left over if KAC's, Quinn Emanuel's, and Dilworth's fees were paid in full, and requested that the Court only allow payments up to the amount of escrowed for such purposes and held as retainers. Harbor Compliance filed an Omnibus Objection [ECF No. 164] that objected to the mounting administrative costs in the case, which in part, included KAC's fees. The Debtor replied [ECF No. 166] arguing KAC's fees were reasonable and necessary. The Bankruptcy Court held a hearing on KAC's fee application and entered an Order [ECF No. 168] allowing KAC's fees and expenses, and current payment of KAC's fees and expenses in the amounts of $67,980.10 and $11,844.71 respectively.

*Application for Interim Professional Compensation of Special Litigation Counsel.* On June 16, 2025, Quinn Emanuel filed its first interim application for allowance of compensation and reimbursement of expenses from October 1, 2024 through April 30, 2025 [ECF No. 156]. Quinn Emanuel sought compensation for professional services in the amount of $946,260.00 and reimbursement of $2,496.44 in expenses, totaling $948,756.44. On July 2, 2025, the United States

Trustee filed a general response [ECF No. 163] expressing concern that the Debtor would have little cash left over if KAC's, Quinn Emanuel's, and Dilworth's fees were paid in full, and requested that the Court only allow payments up to the amount of escrowed for such purposes and held as retainers. The United States Trustee also specifically objected that Quinn Emanuel should (1) disclose the fee allocation among defendants in the Harbor Compliance Adversary Action and (2) not be allowed fees for pursuing sanctions in the Harbor Compliance Adversary Action. Harbor Compliance filed an Omnibus Objection [ECF No. 164] that objected to the mounting administrative costs in the case, which in part, included Quinn Emanuel's fees, and specifically complained that Quinn Emanuel's fees were included services that were unauthorized and duplicative of KAC's services. The Debtor replied [ECF No. 166] arguing Quinn Emanuel's fees were reasonable in seeking sanctions in the Harbor Compliance Adversary Action, and were not unauthorized or duplicative. The Bankruptcy Court held a hearing on Quinn Emanuel's fee application and entered an Order [ECF No. 168] allowing Quinn Emanuel's fees in the amount of $840,736.94 and expenses in the amount of $2,496.44, and current payment of Quinn Emanuel's fees and expenses in the amounts of $137,911.66 and $2,496.44 respectively.

***Application for Interim Professional Compensation of Special Litigation Counsel.*** On June 16, 2025, Dilworth filed its first interim application for allowance of compensation and reimbursement of expenses from October 1, 2024 through April 30, 2025 [ECF No. 153]. Dilworth sought compensation for professional services in the amount of $24,775.50 and reimbursement of $0 in expenses, totaling $24,775.50. On July 2, 2025, the United States Trustee filed a general response [ECF No. 163] expressing concern that the Debtor would have little cash left over if KAC's, Quinn Emanuel's, and Dilworth's fees were paid in full, and requested that the Court only allow payments up to the amount of escrowed for such purposes and held as retainers. Harbor

Compliance filed an Omnibus Objection [ECF No. 164] that objected to the mounting administrative costs in the case, which in part, included Dilworth's fees. The Debtor replied [ECF No. 166] arguing Dilworth's fees were reasonable. The Bankruptcy Court held a hearing on Dilworth's fee application and entered an Order [ECF No. 168] allowing Dilworth's fees in the amount of $24,000.50 and expenses in the amount of $0, and current payment of Dilworth's fees in the amount of $4,008.28.

**B.**      **Disclosure Statement/Plan Confirmation Hearings**

Harbor Compliance has moved the Court for an order approving this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of the Holders of Claims in Classes eligible to vote on the Plan to make an informed judgment as to whether to accept or reject the Plan. On _____, 2025, the Bankruptcy Court entered an order approving the Disclosure Statement and scheduling a hearing on confirmation of the Plan for _____, 2025.

**VI.      SUMMARY OF THE PLAN OF REORGANIZATION**

**A.**      **Introduction**

Harbor Compliance believes that confirmation of the Plan provides the best opportunity for maximizing recoveries for the Debtor's Creditors. The centerpiece of the Plan is the Plan Proponent's agreement to convert its claim into up to one hundred percent (100%) of the equity in the Reorganized Debtor. Through the equitization of the Harbor Compliance Claim and any Claims of Class 3 Creditors electing to receive New Firstbase Equity Interests, the Plan Proponent and such electing Class 3 Creditors will forgo any Cash distribution under the Plan, with that value reallocated to the Debtor's other Creditors. The Plan Proponent and such electing Class 3 Creditors will also make the New Equity Plan Trust Contribution to the Plan Trust in an amount sufficient,

when combined with the Debtor's transfer to the Plan Trust of its Cash, Causes of Action and any other Trust Assets to: (i) satisfy in full Allowed Administrative Expense Claims, Allowed Priority Tax Claims, the Clearco Secured Claim and Allowed Priority Non-Tax Claims; and (ii) provide a Cash distribution to Holders of Allowed General Unsecured Claims in the anticipated range of $0.05–$0.19 on the dollar. Further, the Plan Proponent Settlement is an integral component of the Plan. Under the Plan Proponent Settlement, the Plan Proponent (or the Reorganized Debtor, as applicable), upon the Effective Date of the Plan, agrees to: (i) dismiss with prejudice, the Reorganized Debtor's appeal styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, Case No. 25-1278 pending in the United States Court of Appeals for the Third Circuit; (ii) the Plan Proponent's appeal styled *In re Firstbase.io, Inc. (Harbor Business Compliance Corporation v. Firstbase.io, Inc.)*, Case No. 1:25-cv-04717-LAK pending in the United States District Court for the Southern District of New York and (iii) the Plan Proponent's adversary complaint styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc. et al.*, Case No. 25-01032-lgb pending in the United States Bankruptcy Court, Southern District of New York. In addition, as a component of the Plan Proponent Settlement, the Plan Proponent will waive any right to payment from the Debtor under section 503(b)(3)(D) of the Bankruptcy Code. In total, it is anticipated that the value of Harbor Compliance's contributions to the Plan will confer millions of dollars of value to the Debtor's Estate for the benefit its Creditors.

The Plan provides for the payment of all Allowed unclassified Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims in full on the Effective Date or as soon thereafter as such claims are Allowed or as reasonably practicable. The Plan further provides for the payment of Allowed Class 2 Priority Non-Tax Claims in full in Cash on the Effective Date or as soon thereafter as is reasonably practicable. Other Classes to receive partial or full payment on

24

account of their Allowed Claims on the Effective Date include Class 1 (Clearco Secured Claim), which will be Paid in Full, Reinstated or otherwise satisfied by agreement of the Plan Proponent and the Class 1 Creditor; Class 3 (General Unsecured Claims) whose Holders will receive either of their Pro Rata share of the Trust Assets or equity interests in the Reorganized Debtor. Any cure payments required to be made by the Plan Proponent in connection with the Reorganized Debtor's assumption of executory contracts or unexpired leases will also be paid on the Effective Date or as otherwise provided in the Confirmation Order.

Members of Class 3, General Unsecured Creditors, who elect to receive Cash distributions on account of their Allowed Claims, will receive an Initial Distribution on the Effective Date and one or more periodic distributions subsequent to the Effective Date from the monetization of remaining Trust Assets, including the Causes of Action.

Prior to the Effective Date, the Plan Distribution Reserve will be fully funded through the transfer of the Trust Assets to the Plan Trust. Contemporaneously therewith, the Plan Proponent and Class 3 Creditors electing to receive New Firstbase Equity Interests will make the New Equity Plan Trust Contribution to the Plan Trust. The assets received by the Plan Trust will be sufficient to make all initial distributions and payments required to be made on the Effective Date. Post-Effective Date periodic payments to Holders of Allowed Class 3 Claims will be paid from Cash received by the Plan Trust on account of the remaining Trust Assets. The Plan Trustee will act as the Plan Proponent's distribution agent.

As set forth in Section VII herein, Harbor Compliance will demonstrate that the Debtor's unsecured creditors will receive more under the Plan than they would in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.

The following is a summary of the Plan. The Plan is attached as <u>Exhibit A</u> to this Disclosure Statement and the Plan Proponent urges Creditors to read the Plan in full. The terms of the Plan will govern in the event of any discrepancies between the Plan and this summary.

**B.**      <u>**Treatment of Administrative Expenses and Priority Tax Claims**</u>

     **1.**      **Administrative Expenses**

         (a)      <u>Administrative Expense Bar Date; Treatment of Administrative Expense Claims</u>

To the extent not previously paid, all Administrative Expense Requests for Administrative Expense Claims arising on or after the Petition Date (other than with respect to Professional Fee Claims) and accruing through the Effective Date and not otherwise paid in the ordinary course of business will be filed with the Bankruptcy Court by no later than thirty (30) days after the Effective Date (the "<u>Administrative Expense Bar Date</u>"), and objections (if any) to such Administrative Expense Requests must be filed no later than sixty (60) days after the Administrative Expense Bar Date. Any Holder of an Administrative Expense Claim arising on or after the Petition Date (other than Professional Fee Claims) who fails to file a timely Administrative Expense Request that is required to be filed on or before the Administrative Expense Bar Date: (a) will be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtor and the Debtor's Estate, (or filing a request for the allowance thereof), and the Debtor and the Debtor's Estate, will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim; and (b) such Holder will not be permitted to participate in any distribution under the Plan on account of such Administrative Expense Claim.

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which an Administrative Expense Claim will become Allowed (or as soon as reasonably practicable thereafter), the Debtor (or the Plan

26

Trustee), in full and final satisfaction of such Administrative Expense Claim, will (i) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Allowed Administrative Expense Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Administrative Expense Claim, on the one hand, and the Debtor (or the Plan Trustee) and the Plan Proponent, on the other hand.

**2.      Professional Fee Applications; Treatment of Professional Fees**

Notwithstanding anything in the Plan or in any prior order of the Bankruptcy Court to the contrary, all Professional Fee Applications for Professional Fees through the Effective Date, for Allowance on a final basis, will be filed on or before the date that is sixty (60) days after the Effective Date.

To the extent not previously paid, Allowed Professional Fees will be paid in accordance with an order of the Bankruptcy Court allowing such Professional Fees.

**3.      Priority Tax Claims**

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Tax Claim will become Allowed (or as soon as reasonably practicable thereafter), the Debtor (or the Plan Trustee), in full and final satisfaction of such Priority Tax Claim, will (i) pay to each Holder of an Allowed Priority Tax Claim, in Cash, the full amount of such Allowed Priority Tax Claim, or (ii) satisfy and discharge such Allowed Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Priority Tax Claim and the Debtor (or the Plan Trustee).

**C.      Classification and Treatment of Claims and Equity Interests**

**1.      Summary**

The categories listed below classify Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest will be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Equity Interests**

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| Class 1 | Clearco Secured Claim | Unimpaired | None, deemed to accept |
| Class 2 | Priority Non-Tax Claims | Unimpaired | None, deemed to accept |
| Class 3 | General Unsecured Claims | Impaired | Entitled to vote |
| Class 4 | Harbor Compliance Claim | Impaired | Entitled to vote |
| Class 5 | Convenience Class Claims | Impaired | Entitled to vote |
| Class 6 | Firstbase Equity Interests | Impaired | None, deemed to reject |

2.      **Classification, Treatment and Voting**

**Class 1 Clearco Secured Claim**

(a)     *Classification*: Class 1 is comprised of the Clearco Secured Claim.

(b)     *Treatment*: The Clearco Secured Claim will be deemed Allowed hereunder and either (i) Paid in Full in Cash on the Effective Date; (ii) Reinstated; or (iii) satisfied by agreement of the Plan Proponent and the Class 1 Creditor.

(c)     *Voting*: Class 1 is Unimpaired, and the Class 1 Creditor is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Class 1 Creditor is not entitled to vote to accept or reject the Plan.

28

**Class 2 Priority Non-Tax Claims**

(a)     *Classification*: Class 2 is comprised of the Priority Non-Tax Claims.

(b)     *Treatment*: The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims. To the extent not previously paid, and except to the extent that a Holder of a Priority Non-Tax Claim agrees in writing with the Plan Proponent (or the Plan Trustee) to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Non-Tax Claim will become Allowed (or as soon as reasonably practicable thereafter), the Debtor (or the Plan Trustee), in full and final satisfaction of such Priority Non-Tax Claim, will (i) Pay in Full in Cash to each Holder of an Allowed Priority Non-Tax Claim, the Allowed amount of such Allowed Non-Priority Tax Claim, or (ii) satisfy and discharge such Allowed Non-Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Priority Non-Tax Claim and the Debtor (or the Plan Trustee).

(c)     *Voting*: Class 2 is Unimpaired, and Class 2 Creditors are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Class 2 Creditors are not entitled to vote to accept or reject the Plan.

**Class 3 General Unsecured Claims**

(a)     *Classification*: Class 3 is comprised of all General Unsecured Claims except for the Harbor Compliance Claim. Based on the prior cash collateral orders entered by the Bankruptcy Court that found, *inter alia*, that the Novel Claim was not a

Secured Claim, the Novel Claim is deemed under the Plan to be a General Unsecured Claim and classified in Class 3.

(b)   *Treatment*: In full and final satisfaction, release and discharge of the Debtor's obligations with respect to General Unsecured Claims, and except to the extent that a Holder of a General Unsecured Claim agrees in writing with the Plan Proponent (or the Plan Trustee) to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a General Unsecured Claim will become Allowed (or as soon as reasonably practicable thereafter), each Holder of an Allowed General Unsecured Claim in Class 3 will receive, in full and complete settlement, satisfaction and discharge of such Allowed General Unsecured Claim, at such Holder's election, (x) its Pro Rata share of the Trust Assets on the terms and conditions of the Plan and the Plan Trust Agreement; or (y) its Pro Rata (*i.e.*, the proportion that an Allowed Claim in both of Class 3 or Class 4 bears to the aggregate amount of Allowed Claims in Classes 3 and 4) share of the New Firstbase Equity Interests. Any Holder of an Allowed General Unsecured Claim in Class 3 that elects to receive its Pro Rata share of the New Firstbase Equity Interests will be obligated to contribute its Pro Rata share of both the New Equity Capitalization Contribution and the New Equity Plan Trust Contribution. Any Holder of an Allowed General Unsecured Claim in Class 3 that returns an otherwise properly completed, executed, and timely returned Ballot, but (i) without making an election as to form of distribution, or (ii) electing both forms of distribution will be deemed to have elected the "Cash

and Trust Assets on the terms and conditions of the Plan Trust Agreement"
option on its Ballot. Each Holder of an Allowed General Unsecured Claim in
an amount greater than $5,000 may affirmatively elect, on a timely submitted
Ballot and in accordance with this Plan and the Disclosure Statement, to reduce
such claim to $5,000 and such claim will be treated as a Convenience Class
Claim. Any such election will be irrevocable upon the Effective Date. Any
portion of an Allowed General Unsecured Claim that exceeds $5,000 and is
designated as a Convenience Class Claim by the Holder of such claim will be
deemed waived and will be extinguished upon the Effective Date.

(c)     *Put Option*: Any Holder of an Allowed General Unsecured Claim in Class 3
that elects to receive New Firstbase Equity Interests pursuant to option (y)
above will also receive a Put Option (as defined in Article I of the Plan) from
the Plan Proponent with respect to such New Firstbase Equity Interests. The Put
Option will entitle such Holder, for a period of one (1) year following the later
of the Effective Date or the date of distribution of such New Firstbase Equity
Interests to the Holder, to require the Plan Proponent to repurchase all of such
New Firstbase Equity Interests in exchange for a Cash payment equal to three
percent (3%) of the face amount of such Holder's Allowed General Unsecured
Claim, subject to the terms and conditions set forth in Article IV of the Plan.

(d)     *Shareholder Rights*: The New Firstbase Equity Interests to be issued to electing
Holders of Allowed General Unsecured Claims under the Plan shall be subject
to customary and typical minority and majority equity interest holder
protections, including so-called 'Drag-Along' rights. 'Drag-Along Rights' will

31

permit a majority of equity interest holders to require minority equity interest holders to participate in any sale of the Reorganized Debtor on the same terms and conditions. In addition, the New Firstbase Equity Interests will be subject to a 'call option' right, allowing the Reorganized Debtor or a designated holder (or group of holders) of a majority of equity interests to repurchase shares from minority equity interest holders upon demand or under other customary triggering events, at a value that will be further specified in the Reorganized Debtor's governing documents, which will be included in the Plan Supplement.

(e)  *Voting*: Class 3 is Impaired, and Class 3 Creditors are entitled to vote to accept or reject the Plan.

**Class 4 Harbor Compliance Claim**

(a)  *Classification*: Class 4 is comprised of the Harbor Compliance Claim. The Harbor Compliance Claim is separately classified from other General Unsecured Claims because, *inter alia*, Harbor Compliance is a judgment creditor of the Debtor and, in its capacity as Plan Proponent, has agreed to forego a Cash distribution under the Plan so as to transfer such value to the Debtor's other General Unsecured Creditors.

(b)  *Treatment*: In full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Harbor Compliance Claim, on the Effective Date, Harbor Compliance will receive one hundred percent (100%) of the New Firstbase Equity Interests subject to Pro Rata dilution by any Class 3 Creditor that elects to receive New Firstbase Equity Interests on account of its General Unsecured Claim.

(c)     *Voting*: Class 4 is Impaired, and the Class 4 Creditor is entitled to vote to accept or reject the Plan. Harbor Compliance, as the Plan Proponent, expects Class 4 will vote to accept the Plan.

**Class 5 Convenience Class Claims**

(a)     *Classification*: Class 5 is comprised of all Allowed Convenience Class Claims.

(b)     *Treatment*: Each holder of an Allowed Convenience Class Claim will receive on the Effective Date or as soon thereafter as practicable, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, Cash in an amount equal to the lesser of (i) the Allowed amount of such Claim or (ii) $5,000. Any portion of a General Unsecured Claim that exceeds $5,000 and is voluntarily classified by the holder as a Convenience Class Claim will be deemed extinguished as of the Effective Date, and the Holder will have no further right to recover any portion of such extinguished amount. Holders of Allowed Convenience Class Claims will not be entitled to any further or additional distributions under the Plan other than that provided therein.

(c)     *Voting*: Class 5 is Impaired and Class 5 Creditors are entitled to vote to accept or reject the Plan.

**Class 6 Firstbase Equity Interests**

(a)     *Classification*: Class 6 is comprised of the Firstbase Equity Interests.

(b)     *Treatment*: Upon the Effective Date, the Firstbase Equity Interests will be deemed canceled, null, and void without any further action by the Debtor and the Holders of such Firstbase Equity Interests will receive no distribution on account of the Firstbase Equity Interests. From and after the Effective Date, the

33

Class 6 Equity Interest Holders will have no rights or Claims on account of their equity interests in the Debtor against the Debtor, the Debtor's Estate, the Reorganized Debtor (and its successors and assigns), the Plan Trustee, or the Plan Trust.

(c)   *Voting*: Class 6 is Impaired, and Class 6 Interest Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Class 6 Interest Holders are not entitled to vote to accept or reject the Plan.

## D.   **Provisions for Implementation of Plan**

### 1.   **Settlement**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided under the Plan, including the New Equity Plan Trust Contribution and the Plan Proponent Settlement, on the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

### 2.   **Binding Effect**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan will bind the Debtor, the Reorganized Debtor, the Plan Trustee, and all Holders of Claims and Equity Interests.

### 3.   **Sources of Consideration for Plan Distributions**

The Plan Proponent, the Holders of New Firstbase Equity Interest, and the Debtor will fund distributions under the Plan with (i) the Debtor's Cash on hand as of the Effective Date; (ii) the New Equity Plan Trust Contribution; (iii) the Plan Proponent Settlement; and (iv) the transfer and

assignment of the other Trust Assets to the Plan Trust. The New Equity Plan Trust Contribution will be funded in Pro Rata share by the Plan Proponent and Holders of Allowed General Unsecured Claims in Class 3 electing to take New Firstbase Equity Interests. The New Equity Plan Trust Contribution will be funded on or about the Effective Date. The Plan Proponent, in addition to making the New Equity Plan Trust Contribution, is additionally entering into the Plan Proponent Settlement to, in part, fund the Plan distributions, in excess of the contributions of the Holders of Allowed General Unsecured Claims in Class 3 electing to take New Firstbase Equity Interests.

4.      **Issuance of New Firstbase Equity Interests**

On the Effective Date, the Reorganized Debtor will issue the New Firstbase Equity Interests to the Plan Proponent and to General Unsecured Creditors that elect to receive such interests under the Plan. The issuance of such equity will be exempt from registration under section 1145 of the Bankruptcy Code or other applicable law state or federal law. The New Firstbase Equity Interests will be subject to the terms and conditions set forth in the governing documents of the Reorganized Debtor and any shareholders' agreement included in the Plan Supplement. The New Firstbase Equity Interests issued under the Plan will be "restricted securities" and may be subject to limitations on transfer under applicable securities law. Further, the Reorganized Debtor will not be a reporting company under the Securities Exchange Act of 1934, and there will be no public market for the New Firstbase Equity Interests. Accordingly, creditors electing to receive the New Firstbase Equity Interests are urged to consult their own counsel regarding applicable transfer restrictions.

5.      **Corporate Action by the Debtor**

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Debtor will, as of the Effective Date, be deemed to be authorized and approved

35

by the Debtor's shareholders, officers, and board of directors. Further, upon the Effective Date, the Debtor's officers and directors will immediately be deemed to have tendered their resignations and will no longer have any authority to act by, through or on behalf of the Debtor or the Reorganized Debtor.

**6.    Governance and Management of Reorganized Debtor**

On the Effective Date, the governance documents of the Reorganized Debtor, including its certificate of incorporation, bylaws, or similar governing documents, will be amended or adopted to conform to the provisions of the Plan and the Bankruptcy Code. The initial board of directors and officers of the Reorganized Debtor will be selected by the Plan Proponent and disclosed in the Plan Supplement. The Reorganized Debtor will continue the business operations of the Debtor as a going concern and will possess all corporate powers under applicable law necessary to carry out the Plan.

**7.    Cancellation of Firstbase Equity Interests**

On the Effective Date, all existing equity interests, including common and preferred stock and any SAFEs or convertible instruments issued by the Debtor, will be deemed canceled, null, and void without any distribution or further action by the Debtor or the Holders of such interests.

**8.    Cancellation of Notes, Instruments, and Debentures**

On the Effective Date, except to the extent provided otherwise in the Plan, or the treatment provided under the Plan, any agreement, note, instrument, certificate or other document evidencing or creating any Claim against the Debtor will be automatically cancelled and terminated and of no further force and effect, without any further act or action and deemed surrendered without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of

36

the Debtor under the agreements, notes, instruments, certificates or other documents governing such Claims will be discharged.

### 9. Revesting of Assets in the Reorganized Debtor

On the Effective Date, except as otherwise provided in the Plan, the assets of the Debtor's Estate, including all tangible and intangible property, rights, claims, and causes of action (other than those transferred to the Plan Trust) will revest in the Reorganized Debtor, free and clear of all liens, claims, encumbrances, charges, and interests, subject to the obligations set forth in the Plan. The Reorganized Debtor and any of its successors and assigns will succeed to all of the Debtor's rights, title, and interests in and to such assets in accordance with sections 1141(b) and (c) of the Bankruptcy Code

### 10. Access to Books and Records; Privilege

Upon the occurrence of the Effective Date, the Debtor's books and records will be transferred to Reorganized Debtor. The Plan Trustee will be afforded access to the Debtor's financial books and records, emails, and other financial documents relating to the Debtor's business that are currently in the Debtor's possession, custody or control. The Plan Trustee will also be granted all privileges of the Debtor, including but not limited to, the attorney-client privilege.

### 11. Initial Capitalization of the Reorganized Debtor

Upon the occurrence of the Effective Date, the Reorganized Debtor will be capitalized by the New Equity Capitalization Contribution. The New Equity Capitalization Contribution is the equity contribution from the Holders of the New Firstbase Equity Interests, which is to be made upon the occurrence of the Effective Date to capitalize the Reorganized Debtor in amount sufficient to provide for the working capital needs and debt service, if any, of the Reorganized

Debtor. The New Equity Capitalization Contribution will be paid by the Holders of the New Firstbase Equity Interests in the proportion that such Holder's interest in the New Firstbase Equity Interests bears to the aggregate amount of New Firstbase Equity Interests to be issued by the Reorganized Debtor. The Plan Proponent, in addition to making its proportional share of the New Equity Capitalization Contribution, is additionally entering into the Plan Proponent Settlement to, in part, fund the initial capitalization of the Reorganized Debtor, in excess of the contributions of the Holders of Allowed General Unsecured Claims in Class 3 electing to take New Firstbase Equity Interests. The amount of the New Equity Capitalization Contribution, the Effective Date balance sheet of the Reorganized Debtor and the projections supporting the feasibility of the Plan as required by section 1129(a)(11) of the Bankruptcy Code will be included in the Plan Supplement.

After the Effective Date, the Reorganized Debtor will be wholly or majority owned by the Plan Proponent. The Plan Proponent is a successful, well-capitalized and well-managed business with annual revenues in excess of $39 million, adjusted EBITDA in excess of $15 million and minimal debt service relative to the overall revenues and value of the company. Accordingly, for those Creditors who elect to receive distributions of New Firstbase Equity Interests in lieu of Cash on account of their Allowed claims, the financial condition of the Reorganized Debtor's parent provides reasonable assurance of the Plan's feasibility. Alternatively, because the New Equity Plan Trust Contribution to the Plan Trust is calculated to provide, in conjunction with the other Trust Assets, adequate funding to implement the Plan, fund the Plan Trust and provide for a Cash distribution to Holders of Allowed Claims, the financial condition of the Reorganized Debtor is not relevant to those Holders of Allowed General Unsecured Claims that elect to receive Cash distributions from the Trust. Put differently, the Plan is structured to shift the risk associated with the financial performance of the Reorganized Debtor from the General Unsecured Creditors that

elect a Cash distribution to the Plan Proponent which does not have the option under the Plan to receive a Cash distribution on account of its Allowed claim and those Class 3 members that elect to receive New Firstbase Equity on account of their respective Allowed Claims.

12.  **Put Option for Electing Class 3 Creditors.**

The Plan Proponent will honor any Put Option duly exercised by a Holder of an Allowed Class 3 General Unsecured Claim and will fund the repurchase of the applicable New Firstbase Equity Interests in accordance with the terms of the Plan and the Reorganized Debtor's governing documents. Any repurchase of New Firstbase Equity Interests pursuant to an exercised Put Option will be paid in Cash and in a manner reasonably satisfactory to both the Plan Proponent and the electing Holder, including, without limitation, the execution of any documentation necessary to evidence and implement such repurchase. The Plan Proponent will use its available Cash to satisfy the payment obligations arising from any Put Option that is exercised by a Holder of an Allowed Class 3 General Unsecured Claim.

For each Holder of an Allowed Class 3 General Unsecured Claim that exercises the Put Option, the aggregate New Equity Plan Trust Contribution will be reduced, on a dollar-for-dollar basis, by an amount equal to three percent (3%) of the face amount of such Holder's Allowed General Unsecured Claim.

13.  **Implementation of Shareholder Rights for Electing Class 3 Creditors**

The New Firstbase Equity Interests to be issued to electing Holders of Allowed General Unsecured Claims under the Plan shall be subject to customary and typical minority and majority equity interest holder protections, including so-called 'Drag-Along' rights. 'Drag-Along Rights' shall permit a majority of equity interest holders to require minority equity interest holders to participate in a sale of the Reorganized Debtor on the same terms and conditions.

In addition, the New Firstbase Equity Interests will be subject to a 'call option' right, allowing the Reorganized Debtor or a designated holder (or group of holders) of a majority of equity interests to repurchase shares from minority equity interest holders upon demand or under other customary triggering events, at a value that will be further specified in the Reorganized Debtor's governing documents, which will be included in the Plan Supplement.

### E.    Establishment and Administration of the Plan Trust; Appointment of the Plan Trustee

#### 1.    Establishment of the Plan Trust

On the Effective Date, a trust (the "Plan Trust") will be established pursuant to the Plan and the Plan Trust Agreement, the form of which will be filed in the Plan Supplement and will be in form and substance acceptable to the Plan Proponent. The Plan Trust will be administered by a trustee (the "Plan Trustee") in accordance with the terms of the Plan, the Confirmation Order, and the Plan Trust Agreement.

#### 2.    The Plan Trust Assets

On the Effective Date, the following assets will vest in the Plan Trust, free and clear of all liens, claims, encumbrances, and interests (legal, equitable, or otherwise), except as otherwise provided in the Plan or the Confirmation Order (collectively, the "Plan Trust Assets"): (i) the New Equity Plan Trust Contribution; (ii) all Cash held by the Debtor on the Effective Date, net of amounts, if any, used to fund the Reorganized Debtor or pay for Plan implementation arising before the Effective Date; (iii) Causes of Action not otherwise released, waived or settled under the Plan; and (iv) any other property or assets designated by the Plan Proponent to be included in the Plan Trust prior to the Effective Date.

#### 3.    Purpose of the Plan Trust

The Plan Trust will be established for the purpose of (i) collecting, preserving, and monetizing the Plan Trust Assets; (ii) making distributions to holders of Allowed Claims in accordance with the terms of the Plan; (iii) objecting to, settling, or otherwise resolving Disputed Claims; (iv) pursuing or settling any Causes of Action on behalf of the Debtor's Estate; (v) paying fees incurred by the United States Trustee under 28 U.S.C. § 1930 and any applicable interest thereon; and (vi) performing all other matters and duties set forth in the Plan, the Confirmation Order, or the Plan Trust Agreement.

4.        **Appointment and Authority of the Plan Trustee**

On the Effective Date, the individual or entity designated in the Plan Supplement will be appointed as the Plan Trustee and will serve in such capacity in accordance with the terms of the Plan and the Plan Trust Agreement. The Plan Trustee will act in a fiduciary capacity on behalf of the beneficiaries of the Plan Trust and will be vested with the rights and powers set forth in the Plan, the Confirmation Order, and the Plan Trust Agreement, including, without limitation, the authority to: (i) receive and liquidate the Plan Trust Assets; (ii) make interim and final distributions to Holders of Allowed Claims as required under the Plan; (iii) reconcile, object to, settle, or otherwise resolve Disputed Claims; (iv) prosecute, settle, or abandon any retained Causes of Action; (v) engage and compensate attorneys, financial advisors, accountants, or other professionals as necessary to carry out the Plan Trustee's duties, without further order of the Bankruptcy Court; (vi) make all required payments of fees under 28 U.S.C. § 1930 to the U.S. Trustee and file applicable reports; (vii) hold legal title to any Plan Trust Assets and take all actions necessary to preserve and protect such assets; (viii) take any and all actions necessary to implement the provisions of the Plan relating to the Plan Trust; and (ix) take such other actions as are reasonable and necessary to effectuate the purposes of the Plan Trust

**5.        The Plan Trust Agreement**

The Plan Trust will be governed by the Plan Trust Agreement, which will be included in the Plan Supplement. The Plan Trust Agreement will be consistent in all material respects with the terms of the Plan and the Confirmation Order, and will set forth, among other things, the powers, duties, and responsibilities of the Plan Trustee, the procedures for distribution to beneficiaries, the terms for the disposition of the Plan Trust Assets, and the termination of the Plan Trust.

**6.        Tax Treatment of the Plan Trust**

The Plan Trust will be treated as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for United States federal income tax purposes. All parties to the Plan Trust Agreement will treat the transfer of the Plan Trust Assets to the Plan Trust as a transfer to the holders of Allowed Claims, followed by a deemed transfer by such holders to the Plan Trust.

**7.        Termination of the Plan Trust**

The Plan Trust will terminate no later than five (5) years after the Effective Date, unless extended by order of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of liquidating the remaining Plan Trust Assets or resolving outstanding matters. Upon termination of the Plan Trust, any remaining Plan Trust Assets will be distributed in accordance with the Plan and the Plan Trust Agreement, and the Plan Trustee will take such actions as are necessary to wind down and dissolve the Plan Trust.

**F.        Executory Contract and Unexpired Leases; Rejection Claims Bar Date**

**1.        Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement or document entered into in

connection with the Plan, all executory contracts and unexpired leases of the Debtor that are not listed on the Schedule of Assumed Executory Contracts and Unexpired Leases to be included in the Plan Supplement will be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Effective Date. The Debtor will be deemed to have rejected all executory contracts and unexpired leases not expressly scheduled in the Plan Supplement.

The listing of a contract or lease on the Schedule of Assumed Executory Contracts and Unexpired Leases does not constitute an admission by the Debtor or Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that the Debtor or Reorganized Debtor has any liability thereunder.

2. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount, if any, in Cash, as set forth in the Plan Supplement, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. Any such assumed executory contract or unexpired lease will vest in the Reorganized Debtor on the Effective Date, free and clear of all Claims, Liens, and other interests of any kind or nature, except as otherwise provided for in the Plan.

Objections to cure amounts must be filed and served by the deadline to be established by the Bankruptcy Court in the Confirmation Order, and the Bankruptcy Court will resolve any disputes as to the amount of the cure payment required for assumption as promptly as practicable.

3. **Rejection Claims and Bar Date**

Any counterparty to a contract or lease that is rejected under the Plan and that asserts a Claim arising from such rejection must file a proof of claim for damages arising from such

43

rejection with the Bankruptcy Court no later than thirty (30) days after the Effective Date. Any such Claims not filed within such time will be forever barred and unenforceable against the Debtor, the Reorganized Debtor, and the Plan Trust. The Plan Trustee will have the exclusive authority to object to, allow, disallow, settle, or otherwise resolve any Claims arising from the rejection of executory contracts and unexpired leases under the Plan.

G.     **Provisions Regarding Distributions**

1.     **Distributions**

All distributions under the Plan will be made by the Plan Trustee.

2.     **Plan Distribution Reserve**

The Debtor and the Plan Proponent will fund, and the Plan Trustee will establish and maintain, a reserve account (the "Plan Distribution Reserve") sufficient to enable it to make all distributions hereunder that are required to be made on the Effective Date.

3.     **Disputed Claims Reserve**

From and after the Effective Date, and until such time as all Disputed Claims have been compromised, settled or determined by Final Order, the Plan Trustee will establish and maintain a reserve account, which account will be funded with Cash and New Firstbase Equity Interests on or before the Effective Date by the Debtor and the Plan Proponent (the "Disputed Claims Reserve") necessary to ensure that each Holder of a Disputed Claim will receive payment of its Allowed amount in accordance with the provisions of the Plan in the event such Claim is Allowed in the maximum amount claimed.

4.     **Manner of Distribution under Plan**

Any distribution in Cash to be issued under the Plan will be made in a manner to be determined by the Plan Trustee, which may include, by check drawn on a domestic bank or by

44

wire transfer. Any fees, costs or other expenses associated with the distribution by wire transfer to any Holder will be deducted from and paid out of such Holder's distribution. Any distribution in New Firstbase Equity Interests to be issued by the Plan Trustee will be made in a manner reasonably acceptable to the Plan Trustee, the Creditor receiving such interests, and the Reorganized Debtor.

### 5.    Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided in the Plan, distributions and deliveries to Holders of record of Allowed Claims will be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim filed by any such Holders. The Plan Trustee will be permitted, in its discretion, to withhold distributions until it will have received a tax identification number and such other tax withholding forms as it may reasonably require to comply with applicable federal, state, or local laws. In the event that any such tax information is not supplied within one month following a written request for such information, then that Holder of an Allowed Claim will have that claim discharged and will be forever barred from asserting such Claim against the Debtor.

### 6.    Undeliverable Distributions

#### (a)    Holding of Undeliverable Distributions

If any distribution to the Holder of an Allowed Claim under the Plan is returned as undeliverable, no further distributions will be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then-current address. Any Holder ultimately receiving a distribution that was initially returned as undeliverable will not be entitled to any interest or other accruals of any kind on such distribution. Nothing contained in the Plan will require the Plan Trustee to attempt to locate any Holder of an Allowed Claim.

45

(b)      Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date such distribution is returned as undeliverable will have such Claim for such undeliverable distribution discharged and, except for distributions to be made after the Holders provide the Plan Trustee their proper address, will be forever barred from asserting any such Claim against the Debtor, the Reorganized Debtor, the Plan Trustee or their respective professionals, the Plan Distribution Reserve, or the Disputed Claims Reserve. In such case, any consideration held for distribution on account of such Claim will belong to the Plan Trust.

**7.      Time Bar to Payments**

Checks issued on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check will be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. Any request by a Holder of a Claim in respect of such a voided check will be made within 180 days from and after the date of issuance of such voided check. Any fees, costs or other expenses associated with the voided check will be deducted from and paid out of such Holder's distribution. After such date, all Claims in respect of voided checks will be discharged and forever barred, and the Plan Trust will be entitled to retain all monies related thereto.

**8.      Distributions After Effective Date**

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, will be deemed to have been made on the Effective Date.

9.          **Fractional Dollars; De Minimis Distributions**

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment will be made on account of any distribution less than fifty dollars ($50.00) with respect to any Allowed Claim unless a request therefore is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date.

10.         **Fractional Interests; De Minimis Distributions**

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of New Firstbase Equity Interests will not be made. Whenever any payment of a fraction of an Interest under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest number (up or down), with half shares of New Firstbase Equity Interests being rounded down. No payment in New Firstbase Equity Interests will be made on account of any distribution of less than 10 shares with respect to any Allowed Claim unless a request therefore is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date.

11.       **Setoffs/Recoupment**

Notwithstanding anything contained in the Plan to the contrary, the Plan Trustee may, pursuant to sections 502(d) or 553 of the Bankruptcy Code or applicable non-bankruptcy law, setoff or exercise recoupment against any Allowed Claim or Allowed Administrative Expense and the distributions to be made on account thereof (before any distribution is made on account of such Claim or Administrative Expense), the rights and Causes of Action of any nature related to the

47

Claim or Administrative Expense that it may hold against the Holder of such Allowed Claim or Allowed Administrative Expense; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release of any such Claims, rights and Causes of Action that the Debtor may possess against such Holder.

**12.      Preservation of Subordination Rights**

Except as otherwise provided in the Plan, all subordination rights and claims relating to the subordination by the Plan Trustee of any Allowed Claim or Equity Interest will remain valid, enforceable and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

**13.      Waiver by Creditors of All Subordination Rights**

Each Holder will be deemed to have waived all contractual, legal and equitable subordination rights that they may have, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, with respect to any and all distributions to be made under the Plan, and all such contractual, legal or equitable subordination rights that each Holder has individually and collectively with respect to any such distribution made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined unless such rights have been asserted prior to the Effective Date.

**14.      Claims Paid by Third Parties**

(a)      <u>Claims Paid by Third Parties</u>

A Claim will be reduced in full, and such Claim will be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives Payment in Full on account of such Claim from a party that is not the Debtor, the Reorganized Debtor or the Plan

Trustee. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor, the Reorganized Debtor or the Plan Trustee on account of such Claim, such Holder will repay, return or deliver any distribution held by or transferred to the Holder to the Plan Trustee to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)  Claims Payable by Insurance Carriers

No distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's insurers agrees to Pay in Full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurer's agreement, such Claim may be expunged to the extent of any payment on the Claims Register by the Plan Trustee without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)  Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to Holders of Allowed Claims covered by the Debtor's insurance policies will be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor will anything contained in the Plan constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

**H.  Procedures for Resolution of Disputed, Contingent, and Unliquidated Claims**

1.      **Disallowance of Claims or Interests**

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM WILL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS WILL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

2.      **Amendments to Claims**

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the express written authorization of the Bankruptcy Court or the Plan Trustee, and, to the extent such authorization is not received, any such new or amended Claim filed will be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      **Prosecution of Objections to Disputed Claims**

Upon the Effective Date, the Plan Trustee will solely be responsible for pursuing any objection to the allowance of all Disputed Claims and will have the right to exercise all rights of setoff and recoupment and other defenses that the Debtor or its Estate may have with respect to any such Disputed Claim. The Plan Trustee will have the exclusive authority to settle, compromise or withdraw any objections to any Disputed Claims without necessity of further approval of the Bankruptcy Court.

50

Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Disputed Claims will be served and filed not later than one-hundred-eighty (180) days after the Effective Date; provided, however, that this deadline may be extended upon motion by the Plan Trustee, without notice to Holders of Disputed Claims.

**4.        Estimation of Claims**

The Plan Trustee may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Plan Trustee previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, including the Claim resolution procedures established under the Plan and approved by the Bankruptcy Court in the Confirmation Order.

**5.        No Distributions Pending Allowance**

If an objection to a Claim or portion thereof is filed, no payment or distribution provided under the Plan will be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

**6.        Payments and Distributions on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, the Plan Trustee may, in its discretion, pay the undisputed portion of a Disputed Claim.

**I.        <u>Conditions Precedent to Confirmation and Effective Date of the Plan</u>**

**1.        Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation of the Plan that must be (A) satisfied or (B) waived in the sole discretion of the Plan Proponent: (i) a Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code will have been entered by the Bankruptcy Court; (ii) the entry of the Confirmation Order in form and substance reasonably satisfactory to the Plan Proponent; and (iii) the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, will have been filed.

**2.        Conditions Precedent to Effective Date of Plan**

The following are conditions precedent to the Effective Date of the Plan that must be (A) satisfied or (B) waived in the sole discretion of the Plan Proponent: (i) confirmation will have occurred and the Confirmation Order in form and substance satisfactory to the Plan Proponent will have been entered by the Bankruptcy Court; (ii) the Confirmation Order will have become a Final Order; (iii) there will not be in effect on the Effective Date any (a) order entered by a U.S. court, (b) order, opinion, ruling or other decision entered by any other court or governmental entity or (c) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or

making illegal the consummation of any of the transactions contemplated by the Plan; and (iv) all other actions and documents necessary to implement the Plan will have been effected or executed.

### 3. Effect of Non-Occurrence of Effective Date

If the conditions listed in Article IX.A and B of the Plan are not satisfied or waived in accordance with Article IX of the Plan, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or against or any Equity Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, the Plan Proponent or any other party; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor or the Plan Proponent.

### J. Release, Exculpation, Injunctive, and Related Provisions

### 1. Discharge of All Claims and Release of Liens

**Except as otherwise provided by the Plan, pursuant to section 1141 of the Bankruptcy Code, the Confirmation Order will act as a discharge of all Claims that arose prior to the Confirmation Date.**

**On the Effective Date and concurrently with the applicable distributions made under the Plan, and in the case of a Secured Claim, satisfaction of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, security interests, or any other property interests securing any Claim against Property of the Estate will be fully released and discharged, and all right, title, and interest of any Holder of such liens, mortgages, deeds of trust, pledges, security interests, and other property interests will revert to the Reorganized Debtor or Plan Trustee (as applicable) and any of its successors or assigns, in each case, without further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor or the Plan Proponent.**

2.      **Injunction**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor which arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind which would interfere in any way with any Property of the Estate, (b) the enforcement, attachment, collection, or recovery of any Property of the Estate by any manner or means of any judgment, award, decree, or order against the Debtor, its Estate, the Reorganized Debtor, or the Plan Trust on account of any such Claim or Equity Interest, and/or (c) creating, perfecting, or enforcing any encumbrance of any kind against any Property of the Estate on account of any such Claim or Equity Interest. Such injunction will extend to the Reorganized Debtor (and its successors and assigns) and its properties and interests in property. Any Person or Entity injured by any willful violation of such injunction will recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages from the willful violator. However, nothing contained in Article X of the Plan will prohibit the Holder of a timely filed proof of claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan or enjoin or prohibit the interpretation or enforcement by the Claimant of any obligations of the Debtor or the Plan Trustee under the Plan.**

3.      **Releases by the Debtor**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which**

is hereby confirmed, as of the Effective Date, the Debtor and its Estate, the Reorganized Debtor, on behalf of itself and its successors and assigns, the Plan Proponent or the Plan Trustee, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case, the Debtor, the governance, management, transactions, ownership, or operation of the Debtor, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan, the Disclosure Statement, or any restructuring transaction (including the Restructuring), contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article X.C of the Plan will

55

**only be applicable to the maximum extent permitted by law; and (ii) will not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud will not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, none of Mark Milastsivy, Filipe Senna, or any other of the Debtor's Former Directors and Officers will be Released Parties and all Causes of Action owned by the Debtor or the Debtor's Estate that may be asserted against such non-Released Parties are preserved under the Plan and will constitute Trust Assets.**

**4.      Exculpation**

**Except as otherwise specifically provided in the Plan, no Exculpated Party will have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or distribution of securities, the distribution of any property, or the implementation of the restructuring, each pursuant to and in accordance with the Plan), of the Chapter 11 Case, the Debtor, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, or any**

**restructuring transaction (including the Restructuring), contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the pursuit of Confirmation, the pursuit of Consummation of the Plan, or the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of any securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, will be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in Article X.D of the Plan (i) will only be applicable to the maximum extent permitted by law; and (ii) will not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud will not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any**

party or Entity under the Plan, any restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, none of Mark Milastsivy, Felipe Senna, or any other of the Debtor's Former Directors and Officers will be Exculpated Parties and all Causes of Action owned by the Debtor or the Debtor's Estate that may be asserted against such non-Exculpated Parties are preserved under the Plan and will constitute Trust Assets.

In addition to the foregoing, to the extent permitted by applicable law, no Exculpated Party will have nor incur, and each Exculpated Party is hereby released and exculpated from, any Claim, interest, obligation, suit, judgment, damage, demand, debt, right, Causes of Action, loss, remedy, or liability for any claim, arising between the Petition Date and the Effective Date, in connection with or arising out of related to (i) any and all activities by the Debtor or the Plan Proponent in the operation of their respective businesses or in connection with the Restructuring. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in Article X.D of the Plan will only be applicable to the maximum extent permitted by law; and (2) will not be construed as exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud will not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence.

K.   **Retention and Preservation of Causes of Action**

1.   **Retention of Causes of Action**

Except as otherwise provided in the Plan, all Causes of Action will, on the Effective Date, automatically and irrevocably vest in the Plan Trust free and clear of liens, claims, encumbrances and interests. The Plan Trustee will have the exclusive right, authority, and discretion to institute, commence, pursue, prosecute, abandon, transfer, settle, or compromise any and all such Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal) without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided in the Plan.

### 2. Preservation of Causes of Action

Except as otherwise provided in the Plan, the Plan Trustee reserves all rights to pursue any and all Causes of Action, including without limitation, any Causes of Action against Former Directors and Officers, and the Plan Trustee hereby reserves the right to pursue, administer, settle, transfer, litigate, enforce and liquidate all Causes of Action consistent with the terms and conditions of the Plan. Except as otherwise provided in the Plan, the Plan expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine or other rule of law, including, without limitation, any statute of limitations or the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, will apply to such Causes of Action upon, after or as a result of the Confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Plan Trustee or the Reorganized Debtor expressly reserves the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Reorganized Debtor or the Plan Trustee is a defendant or an interested party, against any Entity including, without limitation, the plaintiffs and co-defendants in such lawsuits.

### L. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and to the extent permitted by applicable law, the Bankruptcy Court will retain such jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Case or the Plan after Confirmation and after the Effective Date, and any other matter or proceeding that is within the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 1334 or 28 U.S.C. § 157 including, without limitation, jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any Administrative Expense Request and the resolution of any and all objections to the allowance or priority of Claims;

2. Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3. Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

4. Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including all Causes of Action and objections or estimations to Claims or Equity Interests, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Plan Trustee or any other Entity after the Effective Date; provided, however, that the Plan Trustee reserves the right to prosecute the Causes of Action in all appropriate jurisdictions;

5. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and of all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan;

6. Enter such orders necessary to sell, dispose of, liquidate, and/or convey any property of the Estate;

7. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan, except as otherwise provided for in the Plan;

9. Resolve any cases, controversies, suits or disputes with respect to the releases, injunctions and other provisions contained in Article X of the Plan and enter any orders that may be necessary or appropriate to implement such releases, injunctions and other provisions;

10. Enter and implement any orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11. Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement; and

12. Enter an order and/or Final Decree concluding the Chapter 11 Case.

Notwithstanding any other provision to the contrary in this Article XII to the Plan, nothing therein will prevent the Plan Trustee from commencing and prosecuting any Causes of Action before any other court or judicial body which would otherwise have appropriate jurisdiction over the matter and parties thereto, and nothing therein will restrict any such courts or judicial bodies from hearing and resolving such matters.

## M.    **Miscellaneous Provisions**

### 1.       **No Stay of Confirmation Order**

The Confirmation Order will contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d) and 7062.

### 2.       **Compromise of Controversies**

Pursuant to Bankruptcy Rule 9019 in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith

compromise of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtor or the Plan Proponent or any of them, arising out of, relating to, or in connection with, the business or affairs of, or transactions with, the Debtor. The entry of the Confirmation Order will constitute approval by the Bankruptcy Court of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan or the Disclosure Statement, and the findings of the Bankruptcy Court will constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, the Plan Proponent, Creditors and other parties in interest, and are fair and equitable and within the range of reasonableness. The provisions of the Plan, including without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**3.      Payment of Statutory Fees**

All fees payable pursuant to section 1930(a) of title 28 of the United States Code will be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable. From and after the Effective Date, the Plan Trustee will be liable for and will pay the fees under 28 U.S.C. § 1930 until entry of an order converting, dismissing or closing the Chapter 11 Case, whichever occurs first. In addition, the Plan Trustee will file post-confirmation quarterly reports in conformity with U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Case, whichever comes first.

**4.      Modification of Plan**

Subject to the limitations contained in the Plan:

62

(a)    The Plan may be amended or modified by the Plan Proponent (a) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent the Plan Proponent institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code.

(b)    The Plan Proponent reserves the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code to the extent permissible under section 1127 of the Bankruptcy Code without the need to resolicit acceptances.

(c)    After the Effective Date, the Reorganized Debtor may amend or modify, upon order of the Bankruptcy Court, the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**5.**    **Revocation of Plan**

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If the Plan Proponent revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (i) the Plan will be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, will be deemed null and void, and without prejudice to any party, and (iii) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor, the Plan Proponent or any other Entity, (b) prejudice in any manner the rights of the Debtor, the Plan Proponent or any other Entity, or (c) constitute an admission of any sort by the Debtor, the Plan Proponent any other Entity.

6.      **Confirmation of the Plan under Section 1129(b)**

The Plan Proponent requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan Proponent reserves the right to amend the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification. See Section VII.C.4 herein for further discussion of why the Plan Proponent believes the Plan meets the non-consensual plan confirmation requirements of Section 1129(b) with respect to both Class 3 and Class 6, which are Impaired under the Plan.

7.      **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**8.      Reservation of Rights**

Except as expressly set forth therein, the Plan will have no force or effect unless the Bankruptcy Court will enter the Confirmation Order and the Effective Date will occur. None of the filing of the Plan, any statement or provision contained therein, or the taking of any action by the Debtor or the Plan Proponent with respect to the Plan, the Disclosure Statement or the Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtor or the Plan Proponent with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**9.      Section 1146 Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtor; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan will not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent will forego the collection of any such tax or government assessment and accept for filing and recording any

65

of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtor in the Chapter 11 Case, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code or otherwise, will be deemed to be or have been done in furtherance of the Plan.

10.       **Further Assurances**

The Creditors receiving distributions hereunder and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

11.       **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered will be sent by first-class U.S. mail, postage prepaid, as follows:

To the Debtor:
Kirby Aisner & Curley LLP
700 Post Rd, Suite 237
Scarsdale, NY 10583
Attn: Dawn Kirby, Esq. and Dana Brescia, Esq.

To the Plan Proponent and/or the Reorganized Debtor:
Royer Cooper Cohen Braunfeld LLC
1717 Arch Street, Suite 4700
Philadelphia, PA 19103
Attn: Matthew Faranda-Diedrich, Esq.

- and -

Royer Cooper Cohen Braunfeld LLC
1120 Avenue of the Americas
4th Floor
New York, NY 10036
Attn: Marc Skapof, Esq.

66

To the U.S. Trustee:
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Suite 534
New York, NY 10004-1408
Attn: Andrew Velez-Rivera, Esq.

To the Plan Trustee:
To be designated in the Plan Supplement

## 12.      Transactions on Business Days

If the date on which a transaction may occur under the Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

## 13.      Filing of Additional Documents

On or before the Effective Date, the Plan Proponent or the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan.

## 14.      Post-Confirmation Date Service List

From and after the Confirmation Date, all notices of appearance and demands for service of process filed with the Bankruptcy Court prior to such date will no longer be effective. No further notices, other than notice of entry of the Confirmation Order will be required to be sent to such Entities. Any party in interest that requests notice of matters after the Confirmation Date will contact the Plan Trustee, in accordance with Article XIII.K of the Plan.

## 15.      Post-Effective Date Fees and Expenses

From and after the Effective Date, the Plan Trustee will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses in accordance with and from the funds provided for such use in the Plan.

67

16.      **Severability**

The provisions of the Plan will not be severable unless such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

17.      **Conflicts**

To the extent any provision of the Plan or the Disclosure Statement or any document executed in connection therewith or any documents executed in connection with the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of the Confirmation Order, the terms and provisions of the Confirmation Order will govern and control.

To the extent any provision of the Disclosure Statement or any document executed in connection therewith or any documents executed in connection with the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of the Plan, the terms and provisions of the Plan and the Confirmation Order will govern and control.

18.      **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and still extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the closing of the Chapter 11 Case. All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

19.      **Entire Agreement**

The Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**20.      Closing of Chapter 11 Case**

The Plan Trustee will promptly, upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Case. Furthermore, the Voting Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

**21.      Change of Control Provisions**

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the consummation of the Plan will be waived or otherwise cancelled under the Plan.

**VII.   CONFIRMATION PROCEDURE**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**A.      <u>Solicitation of Votes</u>**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 3, 4, and 5 of the Plan are Impaired and are entitled to vote to accept or reject the Plan. The Claims in Class 6 are Impaired and conclusively presumed to have rejected the Plan. Claims in Classes 1 and 2 are Unimpaired. The Holders of Allowed Claims in such Classes are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes therefore is not required under section 1126(f) of the Bankruptcy Code. Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan as a consensual plan, the

Holders of Impaired Claims against, and Impaired Interests in, the Debtor that are entitled to vote must accept the Plan.

An Impaired Class of Claims will have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. Any Creditor in an impaired Class who filed a Proof of Claim on or before the applicable Bar Date (or, if not filed by such date, any Proof of Claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim is not the subject of an objection or request for estimation, is entitled to vote.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for October 16, 2025, at 10:00 a.m. (Prevailing Eastern Time) via Zoom for Government or in-person, as directed by the Court, before the Honorable Lisa G. Beckerman, at the Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, NY 10004-1408. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the

70

objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the Objection Notice Parties on or before _____, 2025 at __:00 p.m. (Prevailing Eastern Time).

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

### C.   Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of Creditors and stockholders that are Impaired under the Plan.

#### 1.   Acceptance

Classes 3, 4, 5, and 6 of the Plan are Impaired under the Plan. Classes 1 and 2 of the Plan are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.

#### 2.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to determine that confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan. The Plan provides for the reorganization and continuation of the Debtor's business by the Reorganized Debtor and the establishment of the Plan Trust to manage and liquidate certain assets for the benefit of Creditors. The Plan's feasibility is established by the agreement of the Creditors receiving New Firstbase Equity Interests (including the Plan

Proponent) to make their proportional contribution to the New Equity Plan Trust Contribution, the Plan Proponent's release of all litigation under the Plan Proponent Settlement and the Plan's procedures for funding the Plan Trust. Additionally, the issuance of New Firstbase Equity Interests in the Reorganized Debtor will provide the Plan Proponent and any other Creditors electing to receive distributions in New Firstbase Equity Interests an ownership interest in a debt-free entity under the direction and management of the Plan Proponent, a successful and experienced operator of businesses of this type. In addition, the Creditors receiving New Firstbase Equity Interests intend to adequately capitalize the Reorganize Debtor as of the Effective Date through the New Equity Capitalization Contribution. The Plan Proponent intends to provide detailed financial projections for the Reorganized Debtor in the Plan Supplement, further demonstrating the Plan's feasibility. Finally, the overall structure of the Plan provides for the resolution of claims, satisfaction of obligations, liquidation of Trust Assets and the maximization of the Debtor's value for the benefit of Holders of Allowed Claims against the Debtor.

3.    **Best Interests Test**

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims and Equity Interests of each Impaired Class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting

from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 would include the fees and commissions payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Debtor during the Chapter 11 Case such as compensation for attorneys, would be Paid in Full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Petition Date Claims.

Additionally, the New Equity Plan Trust Contribution and Plan Proponent Settlement each provide value to Holders of Allowed Claims that would not be available for distribution in a chapter 7 liquidation. Absent the New Equity Plan Trust Contribution, which will be used to Pay in Full the Administrative Expense, Priority Tax and Priority Non-Tax Claims, a chapter 7 trustee would not have sufficient funds from the Debtor's Cash and other assets to Pay in Full those higher priority claims, leaving no available funds for distribution to Holders of Allowed Unsecured Claims. Further, the Plan Proponent's decision to accept satisfaction of the Harbor Compliance Claim in New Firstbase Equity Interests and not Cash represents a reallocation of value from the Plan Proponent to the other creditors that would not be available in a chapter 7 liquidation. In other words, the inclusion of the Harbor Compliance Claim in the same class as other General Unsecured Creditors would result in a materially lower Cash distribution to those Creditors than under the

Plan where the Plan Proponent's decision to equitize its claim serves to increase the amount of distributable Cash to Holders of General Unsecured Claims.

Similarly, the Plan Proponent Settlement embodied in the Plan confers value on the Debtor's estate not otherwise available in a chapter 7 liquidation. Under the Plan Proponent Settlement, the Plan Proponent has agreed to forgo any additional benefits and value it would receive if, for example, (i) its claim was increased by the District Court on remand from the Third Circuit Appeal; (ii) its claim was recharacterized as a secured claim from the successful prosecution of the Preference Decision Appeal; or (iii) the Plan Proponent prevailed in its adversary proceeding alleging that material portions of the Debtor's property belong to the Plan Proponent and not to the Debtor and its Estate. After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Chapter 11 Case, including the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, the equitization of the Harbor Compliance Claim, the New Equity Plan Trust Contribution and Plan Proponent Settlement, the Plan Proponent has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7. The Plan Proponent also believes that the value of any distributions to each Class of Allowed Claims could be less than under the Plan because such distributions in a chapter 7, if any, case may not occur for a substantial period of time.

The Plan Proponent intends to include in the Plan Supplement a liquidation analysis of the Debtor, prepared by Harbor Compliance and its advisors, that will summarize the liquidation

74

values of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estate.

### 4.    Non-Consensual Confirmation Under Section 1129(b)

Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan over the rejection of an impaired class of claims or interests—commonly referred to as a "cramdown"—so long as the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Plan Proponent believes that the Plan satisfies these requirements and can be confirmed over the rejection of Class 3 (General Unsecured Claims) and the deemed rejection of Class 6 (Firstbase Equity Interests), if necessary.

(a)    <u>Ability to Confirm the Plan Over Rejection of Class 3 (General Unsecured Claims)</u>

a.    *The Plan is Fair and Equitable with Respect to Class 3*

Section 1129(b)(2)(B) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of unsecured claims if the holders of such claims receive or retain property of a value not less than the allowed amount of their claims, or, if they receive less than full payment, no class of claims or interests junior to such class receives or retains any property under the plan on account of such junior claims or interests.

Under the Plan, Class 3 creditors—comprising general unsecured commercial creditors, including vendors, service providers, and parties potentially asserting rejection damages—may choose one of the following forms of treatment:

<u>Plan Trust Interests</u>: Class 3 creditors who do not affirmatively elect to receive New Firstbase Equity in the Reorganized Debtor will receive, on account of their Allowed Claims, a pro rata share of the Plan Trust Interests, entitling them to distributions from the Plan Trust Assets,

75

which include the New Equity Plan Trust Contribution, any Cash on hand, and the proceeds of retained Causes of Action.

New Firstbase Equity Election Option: Class 3 creditors may alternatively elect to receive a pro rata share of the New Firstbase Equity in the Reorganized Debtor, in full and final satisfaction of their Allowed Claims. The allocation of New Firstbase Equity to electing Class 3 creditors will be made on the same terms applicable to other equity recipients under the Plan.

In either case, Class 3 creditors are receiving a meaningful recovery. Moreover, no junior class—specifically, the holders of existing equity interests in the Debtor (Class 6)—will receive or retain any property under the Plan. Those interests will be cancelled in full on the Effective Date. Accordingly, the Plan satisfies the "fair and equitable" standard under section 1129(b) of the Bankruptcy Code.

### b.    The Plan Does Not Discriminate Unfairly with Respect to Class 3

The "unfair discrimination" test under section 1129(b) prohibits a plan from providing materially disparate recoveries to similarly situated creditors or interest holders without a legitimate, justifiable basis. Under the Plan, Class 3 (General Unsecured Claims) and Class 4 (Harbor Compliance Claim) are both Impaired unsecured creditor classes and are treated differently. The Plan Proponent submits that this differential treatment is legally permissible and does not constitute unfair discrimination for the following reasons:

Different Claim Characteristics: While both Class 3 and Class 4 hold unsecured claims, their respective claims differ in nature and underlying legal status. Class 4 consists of a single, liquidated, non-contingent judgment claim held by the Plan Proponent, which was partially reduced to judgment prepetition. By contrast, Class 3 includes a variety of general commercial claims, including trade debt, service invoices, and other vendor obligations, some of which may

be contingent, disputed, or subject to setoff rights. These differences in legal character and litigation posture provide a reasonable basis for separate classification and treatment.

Equity Election Available to Class 3: The Plan Proponent, as the holder of the Class 4 judgment claim, is receiving New Equity in the Reorganized Debtor in full satisfaction of its claim. However, Class 3 creditors are not precluded from similar treatment. Any Class 3 creditor may elect to receive New Firstbase Equity Interests under the same pro rata allocation mechanics as Class 4. This optional treatment eliminates any concern that Class 3 creditors are being denied a recovery available only to Class 4. The Plan empowers each Class 3 creditor to make an informed decision based on their preferences regarding litigation risk, potential upside, and long-term equity value.

Non-Electing Class 3 Creditors Retain Valuable Rights: Class 3 creditors that do not elect equity treatment are not disadvantaged arbitrarily. Instead, they receive beneficial interests in the Plan Trust, which is funded by a meaningful cash contribution and will pursue retained estate claims for the benefit of Trust beneficiaries. This path offers an alternative, litigation-based recovery that may be more suitable for creditors seeking more passive or cash-oriented returns.

Reasonable and Non-Arbitrary Basis for Separate Classification: The separate classification of the Class 4 judgment claim is supported by long-standing precedent under the Bankruptcy Code permitting separate classification of claims with distinct legal origins, including judgment creditors, tort claimants, and insider claims. The Plan Proponent's claim arose from litigation unrelated to the general commercial dealings that gave rise to most Class 3 claims, and was tried and significantly adjudicated prior to the Petition Date.

Accordingly, the Plan's treatment of Class 3 is not discriminatory, let alone unfairly so. Class 3 creditors receive a meaningful recovery under the Plan, with flexibility to elect equity if

77

desired, and no junior class receives or retains any property unless and until Class 3 is satisfied as set forth in the Plan. Therefore, the Plan Proponent believes that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed even if Class 3 votes to reject it.

(b)    Confirmation of the Plan Over Equity and SAFE Holder Objections

The Plan Proponent believes that the Plan is confirmable notwithstanding the deemed rejection by the holders of the Debtor's equity interests and SAFE instruments. Class 6 (consisting of all existing equity interests, including SAFE rights convertible into equity) will receive no distribution under the Plan and those interests will be canceled on the Effective Date. Because this Class is impaired and deemed to reject the Plan, the Plan Proponent will seek confirmation pursuant to the "cramdown" provisions of Bankruptcy Code § 1129(b). Section 1129(b) permits the Court to confirm a plan despite a dissenting impaired class so long as the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such class. The Plan Proponent asserts that the Plan satisfies these requirements as to the First Base Equity and SAFE interest Holders.

Fair and Equitable Treatment / Absolute Priority: Under the Bankruptcy Code, "fair and equitable" includes adherence to the absolute priority rule. In the context of a dissenting class of equity interests, § 1129(b)(2)(C) provides that a plan is fair and equitable if either (i) each holder of an equity interest in that class receives property of a value equal to the full value of its interest, or (ii) no holder of any junior interest receives or retains any property on account of such junior interest. Here, alternative (i) is not applicable because the Debtor's equity (including rights under SAFEs) has no realizable value – the Debtor's assets are insufficient to satisfy all creditor claims in full. Instead, the Plan relies on the second prong: no class junior to the equity/SAFE holders

will receive any property under the Plan. In fact, there is no class of interests junior to Class 6, and all existing equity and SAFE interests are being extinguished without recovery. Accordingly, the absolute priority rule is respected: the holders of equity and SAFE interests will receive nothing, while no lesser-ranked interest obtains any distribution. Furthermore, no senior class is receiving more than full payment of its claims – the Plan Proponent (Harbor Compliance) is converting its claim to equity and contributing new value to fund creditor recoveries, rather than receiving any Cash in excess of its allowed claim while General Unsecured Creditors (Class 3) are receiving Cash or New Firstbase Equity Interests that are not in excess of their respective Allowed Claims. This ensures that the Plan's treatment of senior classes is not over-generous at the expense of equity, satisfying an additional aspect of the fair and equitable standard (*i.e.*, that no senior class receives more than 100% of its claim).

No Unfair Discrimination / Classification: The Plan also does not "discriminate unfairly" against equity or SAFE holders. Unfair discrimination typically means similarly situated classes are treated materially differently without a reasonable basis. Here, all equity interests – including common stock, preferred stock, and any SAFE or convertible equity instruments – are classified together and share the same fate: cancellation with no recovery. There is no other equity-interest class receiving more favorable treatment. Equity and SAFE holders are of equal legal priority and are treated equally under the Plan. They are also properly classified separate from creditor claims, given the fundamentally different legal nature of equity/SAFE interests versus creditor claims. This separate classification is permitted by 11 U.S.C. § 1122 and reflects that equity interests have a junior priority relative to all classes of claims. Because the Debtor's creditors are not being paid in full, it is appropriate (and mandated by the absolute priority rule) that equity and SAFE holders receive no property on account of their interests. The Plan's treatment of these interests is

consistent with what those holders would receive in a liquidation scenario (*i.e.*, nothing) and does not unfairly discriminate among similarly situated interest holders.

In sum, the Plan Proponent will request confirmation under § 1129(b) with respect to the dissenting equity and SAFE interest class. The Plan Proponent submits that the Plan's treatment of equity and SAFE holders – cancellation of those interests and no distribution – meets the statutory cramdown requirements. The Plan is "fair and equitable" to Class 6 because no junior interest is receiving any property, and it does not unfairly discriminate because all interests of the same priority are treated alike. Therefore, even over the objection of equity and SAFE investors, the Plan can be confirmed so long as all other applicable confirmation requirements are satisfied.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.      Liquidation under Chapter 7

If the Plan is not confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee would be appointed to liquidate the Debtor's assets. The proceeds of such liquidation would be distributed in accordance with the priorities established by the Bankruptcy Code. The Plan Proponent believes that liquidation under chapter 7 would result in reduced recoveries (or none at all) to Creditors due to additional administrative costs and the likely loss of value in a forced liquidation scenario. Accordingly, the Plan Proponent believes that confirmation and consummation of the Plan will provide a greater recovery for Creditors than would a chapter 7 liquidation.

### B.      Alternative Plan of Reorganization

If the Plan is not confirmed, another party in interest may propose an alternative plan of reorganization. However, any such alternative plan would be subject to the requirements of the Bankruptcy Code, including the feasibility, best interests, and confirmation standards under

80

section 1129. The Plan Proponent believes that the current Plan represents the best opportunity for the Debtor's Creditors to realize maximum recovery with the least delay and administrative expense. There is no assurance that any alternative plan would provide equal or better recovery or that it could be confirmed in a reasonable period of time.

## IX.   CERTAIN RISK FACTORS TO BE CONSIDERED

### A.   <u>Certain Bankruptcy Law Considerations</u>

#### 1.   Risk of Non-Confirmation of the Plan

Although the Plan Proponent believes that the Plan satisfies all requirements for confirmation under the Bankruptcy Code, there is no assurance that the Bankruptcy Court will confirm the Plan. If the Plan is not confirmed, the Debtor may be forced to pursue other alternatives, including liquidation under chapter 7 or another reorganization plan. Any such alternative could result in delays, increased costs, and diminished recoveries for Creditors.

#### 2.   Risk of Non-Occurrence of the Effective Date

Even if the Plan is confirmed by the Bankruptcy Court, there is no guarantee that all of the conditions to the occurrence of the Effective Date will be satisfied or waived. If the Effective Date does not occur, the Plan may not be consummated and the Debtor could remain in bankruptcy for an extended period or face conversion to chapter 7. Such outcomes could adversely affect Creditor recoveries and the value of the Debtor's assets.

#### 3.   Risk of Adverse Ruling Affecting Plan Proponent Settlement

The Plan Proponent Settlement is premised on resolving all pending litigation between the Plan Proponent and the Debtor as of the Effective Date. Notably, Harbor Compliance has agreed to dismiss (or cause the Reorganized Debtor to dismiss): (i) the Reorganized Debtor's appeal styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, Case No. 25-1278 pending in the

United States Court of Appeals for the Third Circuit; (ii) the Plan Proponent's appeal styled *In re Firstbase.io, Inc.* (*Harbor Business Compliance Corporation v. Firstbase.io, Inc.*), Case No. 1:25-cv-04717-LAK pending in the United States District Court for the Southern District of New York and (iii) the Plan Proponent's adversary complaint styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc. et al.*, Case No. 25-01032-lgb pending in the United States Bankruptcy Court, Southern District of New York. These concessions add significant value to the Estate by eliminating litigation that could otherwise consume resources and potentially threaten the Debtor's assets. However, there is a risk that one or more adverse court rulings could occur before the settlement is effective or in the absence of a confirmed Plan. For example, if the Third Circuit were to issue a decision on the Debtor's appeal and overturn or materially modify Harbor Compliance's $31.2 million judgment before Plan consummation, such a development could drastically alter the landscape. An adverse ruling (such as vacatur of the judgment or other favorable outcome for the Debtor) would undermine a key premise of the Plan Proponent Settlement – namely, Harbor Compliance's allowed claim and its agreement to convert that claim into equity of the Reorganized Debtor. In that event, Harbor Compliance might reconsider its commitments or withdraw from the settlement, and the Plan's viability could be jeopardized. Even a ruling short of complete vacatur – for instance, a new trial order or other delay – could materially affect the parties' bargaining positions. Thus, ongoing litigation poses a risk: if any pending appeal or court decision yields a result inconsistent with the Plan's assumptions, the Plan Proponent Settlement could be nullified or require renegotiation, leading to delays, increased costs, or even the failure of the Plan. Creditors should understand that confirmation and effectiveness of the Plan are conditioned on the litigation status quo; significant adverse legal developments could derail the proposed resolution.

4.         **Risk that Creditors Receiving New Firstbase Equity Interests Do Not or Cannot Make the Plan Contribution Payment**

Those Creditors receiving New Firstbase Equity Interests have committed to making their pro rata share of a substantial Cash contribution to fund the Plan in an amount of up to [$300,000][5], *i.e.*, the New Equity Plan Trust Contribution. This contribution – combined with the Debtor's cash on hand and other Trust Assets – will be used to pay administrative expenses, priority claims, and to provide a meaningful distribution to general unsecured creditors. The New Equity Plan Trust Contribution is critical to the Plan's feasibility and to the promised creditor recoveries. If, for any reason, the Creditors receiving New Firstbase Equity Interests fail to timely fund the required contribution in the amount contemplated, the Plan would face a serious shortfall. Inability to fund could result from, for example, financial reversals affecting Creditors receiving New Firstbase Equity Interests or other unforeseen circumstances. Failure to receive the New Equity Plan Trust Contribution would likely mean the Plan Trustee could not pay administrative and priority claims in full or provide the projected recoveries to unsecured creditors. In such scenario, the Plan might not become effective or could default immediately post-confirmation, as it would no longer satisfy the Bankruptcy Code's feasibility requirement (11 U.S.C. § 1129(a)(11)). The Plan Proponent has indicated that it will have the resources to make its contribution to the New Equity Plan Trust Contribution and this Disclosure Statement adequately advises Class 3 Creditors electing to receive New Firstbase Equity Interests of their need to have adequate Cash reserves to make their contribution, and the Confirmation Order will likely require that such contributions be deposited in an escrow or similar account in advance of the Effective Date and as a condition precedent to the Plan going effective. Nevertheless, creditors should recognize this risk. If the Creditors receiving New Firstbase Equity Interests cannot or do not fund the New Equity Plan Trust

---

[5] Amount of the total contribution to be finalized in advance of solicitation on the Plan.

Contribution in the agreed amount, the outcome may be conversion of the case to Chapter 7 or another restructuring attempt, and creditor recoveries could be materially lower than under the proposed Plan.

### 5. Risk of Inadequate or Incomplete Financial Information

The Plan Proponent has formulated the Plan based on financial and operational information made available to it by the Debtor, including but not limited to the Debtor's monthly operating reports, schedules of assets and liabilities, statements of financial affairs, projected cash flows, cash collateral budgets, and other financial statements and reports (collectively, the "Financial Information"). The Plan Proponent has relied on this Financial Information in evaluating the feasibility of the Plan, assessing recoveries for creditors, and estimating the value of the Debtor's assets and liabilities.

There is a risk that one or more components of the Financial Information may be inaccurate, incomplete, or materially different from the Debtor's actual financial condition. For example:

- The Debtor's reported revenues or expenses in monthly operating reports may be misstated or based on assumptions that later prove incorrect.

- Certain assets listed in the Debtor's schedules may be overstated in value or may not be readily liquidated.

- The Debtor's projected cash flows and budgeted expenditures may be optimistic, based on unachieved milestones, or otherwise inconsistent with actual performance.

- Liabilities may be understated or contingent claims not fully disclosed.

If it is ultimately determined that the Financial Information materially misrepresents the Debtor's true financial position, the economic assumptions underlying the Plan may be invalidated. This could negatively affect projected recoveries for creditors, the feasibility of the Plan, or the ability to fund the Plan Trust and other post-Effective Date obligations. It could also

impact the relative recoveries between creditor classes or undermine the "best interests of creditors" analysis under section 1129(a)(7) of the Bankruptcy Code.

Depending on the magnitude and nature of any such discrepancies, parties in interest may seek to oppose confirmation, request conversion or dismissal of the Chapter 11 Case, or challenge the adequacy of the Disclosure Statement. If confirmation is delayed, denied, or reversed, creditors may face extended litigation, increased administrative costs, or lower recoveries than would otherwise be available under the Plan.

Accordingly, creditors should consider the possibility that the Financial Information made available to the Plan Proponent may differ materially from the Debtor's actual financial condition, and that such differences could adversely affect the Plan's implementation and the distributions contemplated thereunder.

6.    **Risk to Class 3 Creditors that Elect to Receive New Firstbase Equity Interests**

(a)    Difficulty in Valuing the Equity of the Reorganized Debtor; Illiquidity and Lack of Market; Minority Ownership; Speculative Nature of Equity Election

Class 3 Creditors who elect to receive equity interests in the Reorganized Debtor in lieu of a cash distribution or beneficial interests in the Plan Trust should be aware of several significant risks associated with such election.

The value of the equity interests to be issued under the Plan is inherently speculative and highly uncertain. There is no established trading market for such equity interests, and none is expected to develop following the Effective Date. The Reorganized Debtor will be a privately held company, and the equity will not be listed on any national securities exchange or traded in any public market. As a result, creditors who receive such equity will hold illiquid securities that may be difficult or impossible to sell or transfer other than through the Put Option. There may also be

substantial restrictions on transferability under applicable securities laws, including holding periods and legends, and the Reorganized Debtor does not anticipate registering such securities with the SEC or qualifying them under state securities laws.

Moreover, the equity interests being offered under the Plan will represent a minority ownership stake in the Reorganized Debtor. Holders of such interests will have limited rights and influence over the governance, operations, or strategic decisions of the Reorganized Debtor. Majority control will be held by the Plan Proponent, further limiting the influence of minority holders and potentially creating conflicts of interest.

The future value of the Reorganized Debtor is subject to numerous risks and uncertainties, including but not limited to its ability to generate revenue, execute its business plan, attract financing, and operate in a competitive and evolving industry. There can be no assurance that the Reorganized Debtor will be profitable or that the equity interests will have any meaningful value at any time. Creditors who elect to receive equity instead of cash or trust interests are making a speculative investment in a substantially new enterprise with no guarantee of return.

Accordingly, the election to receive equity should only be made by those creditors who are financially sophisticated, capable of bearing the risk of total loss, and who do not require liquidity in the near term. The Plan Proponent makes no representation as to the current or future value of the equity to be issued, and creditors are urged to consult with their own financial and legal advisors before making any such election.

    (b)    <u>New Equity Capitalization Contribution; New Equity Plan Trust Contribution; Failure to Make Contributions</u>

Class 3 Creditors who elect to receive equity interests in the Reorganized Debtor in lieu of a cash distribution or beneficial interests in the Plan Trust will also be responsible for making Cash

contributions to capitalize the Reorganized Debtor and fund the Plan Trust which includes a number of risks.

In order to satisfy the working capital needs and debt service, if any, of the Reorganized Debtor, those creditors electing to receive New Firstbase Equity Interests will be required to make a capital contribution to capitalize the Reorganized Debtor on the Effective Date. The amount of capital necessary to capitalize the Reorganized Debtor will be included in the Plan Supplement. Those creditors electing to receive New Firstbase Equity Interests must have sufficient Cash reserves in order to fund their proportion of the capitalization contribution on the Effective Date. Each creditor electing to receive New Firstbase Equity Interests will be responsible for their pro rata share of the total capitalization contribution, where their portion of the capitalization contribution will be equal to the proportion of the total that creditor's New Firstbase Equity Interests bearing to the aggregate amount of the New Firstbase Equity Interest.

Similarly, in order for the Plan Trust to fund distributions to the Holders of Allowed Class 3 Claims electing to take the cash distribution, those Class 3 Creditors receiving equity interests in the Reorganized Debtor must make a contribution to the Plan Trust. The contribution the Plan Trust may be up to [$300,000] and will be disclosed in the Plan Supplement. Each creditor electing to receive New Firstbase Equity Interests will be responsible for their pro rata share of the total Plan Trust contribution, where their portion of the Plan Trust Contribution will be equal to the proportion of the total that creditor's New Firstbase Equity Interests bearing to the aggregate amount of the New Firstbase Equity Interest. Those creditors electing to receive New Firstbase Equity Interests must have sufficient Cash reserves in order to fund their proportion of the Plan Trust contribution on the Effective Date.

Any Class 3 Creditors who elects to receive New Firstbase Equity Interests but fails to make the New Equity Capitalization Contribution, the New Equity Plan Trust Contribution, or any other Cash contribution required under the Plan on the Effective Date will be subject to the penalties and conditions to be outlined in the Reorganized Debtor's governing documents, which will be included in the Plan Supplement, which may include forfeiture of its New Firstbase Equity Interests.

7.      **Risk Factors Relating to Put Option**

The availability of the Put Option introduces a number of risks that creditors and other stakeholders should carefully consider. There can be no assurance that the Plan Proponent will have sufficient liquidity to honor all exercised Put Options during the one-year exercise period. The Put Option may also affect the overall economics of the Plan, particularly if a substantial number of creditors elect to exercise the option, thereby reducing the New Equity Plan Trust Contribution on a dollar-for-dollar basis. This could adversely affect the amounts available to other stakeholders or impair post-Effective Date operations of the Plan Trust. Moreover, while the Plan provides that the repurchase terms must be reasonably satisfactory to both the Reorganized Debtor and the creditor, disputes over satisfaction could lead to delay or litigation.

8.      **Risk Factors Relating to Shareholder Rights**

The issuance of New Firstbase Equity Interests under the Plan is subject to various risks and uncertainties, including the following:

(a) Drag-Along Rights May Compel Involuntary Sale

Minority equity interest holders may be required to sell their shares in the event a majority elects to sell the Reorganized Debtor or its assets. While such rights aim to ensure fairness, they may also result in a sale that some interest holders do not support.

(b) <u>Dispute Over Terms of Sale</u>

The exercise of Drag-Along rights may give rise to disagreements regarding valuation, terms of sale, or application of such rights, which could lead to legal disputes or delays.

(c) <u>Dilution and Liquidity</u>

The equity securities issued under the Plan may be subject to dilution in future financing rounds and may not have an active trading market, limiting liquidity for equity interest holders.

Recipients of equity under the Plan should carefully consider these risks in evaluating the securities to be received and should consult with their legal and financial advisors when considering whether to elect to receive distributions of Cash and Trust assets versus New Firstbase Equity Interests.

9. **Risk of Involuntary Repurchase Under Call Option**

The equity to be issued under the Plan will be subject to a Call Option that permits the Reorganized Debtor or a designated holder (or group of holders) of a majority of equity interests to repurchase shares from minority equity interest holders upon demand or under other customary triggering events, at a value that will be further specified in the Reorganized Debtor's governing documents, which will be included in the Plan Supplement. This repurchase right may be exercised at fair market value or pursuant to a valuation formula, which may not reflect the full market potential or strategic value of the equity interests at the time of repurchase. As a result, affected interest holders may be required to sell their interests involuntarily and may not realize the long-term value of their equity holdings. Furthermore, disputes may arise regarding the occurrence of a triggering event or the determination of fair market value, which could result in litigation or delays.

10. **Risk of Competing Plan Proposed by the Debtor**

Harbor Compliance's Plan is a "creditor plan" proposed after the Debtor's exclusivity period lapsed. There is a risk that the Debtor (or another party in interest) could file a competing Chapter 11 plan. If the Debtor were to propose its own plan of reorganization – particularly if predicated on a different resolution of Harbor Compliance's claim (for example, following a successful reduction on appeal) or involving new financing or investors friendly to existing equity – the confirmation process could become protracted and uncertain. The Bankruptcy Code allows multiple plans to be considered in a case once exclusivity has expired, but ultimately only one plan can be confirmed. If a competing plan is filed, the Bankruptcy Court may permit both the Plan Proponent's Plan and the Debtor's plan to proceed through solicitation and then decide at confirmation which plan (if any) to confirm, taking into account the preferences of creditors and equity holders. The introduction of a competing plan would likely lead to litigation, increased administrative expenses, and delay in exiting Chapter 11. Creditors might be solicited to vote on more than one plan, and differing distribution proposals could split creditor support. For example, a Debtor-proposed plan might offer existing equity holders some participation or warrants (something the Plan Proponent's Plan does not provide), in an effort to garner equity holder support. While such a plan would need to satisfy the same confirmation standards (including feasibility and fair and equitable treatment of dissenting classes), its mere existence could complicate or delay confirmation of Harbor Compliance's Plan. There is also the risk that no plan achieves the requisite acceptances or confirmation under these circumstances. In summary, the filing of a competing plan would create uncertainty as to which plan (if any) will ultimately be consummated and could result in creditors receiving different treatment than contemplated under the Harbor Compliance Plan. This risk is inherent in a non-exclusivity scenario and should be considered by creditors voting on the Plan.

11.        **Risk of a Sale of Assets Under Section 363(b)**

Another potential development is that the Debtor might seek to sell substantially all of its assets in a court-approved sale process pursuant to Bankruptcy Code § 363(b) rather than proceed with a reorganization plan. A sale of the Debtor's business outside the Plan could be initiated by the Debtor (or potentially by a trustee or other fiduciary, if appointed) to maximize value for the estate. Notably, a Section 363 sale can occur at any time during the Chapter 11 case, even prior to or in lieu of a plan, and it allows a debtor to transfer assets to a purchaser free and clear of liens or interests, subject to Court approval. If the Debtor were to pursue a 363 sale of its platform, customer contracts, or other core assets, it could fundamentally alter the course of this case. The risk to the Plan Proponent's Plan is that a successful sale might render the proposed Plan moot – for instance, if a third-party buyer acquires the business for cash, the Debtor might use the sale proceeds to pay creditors (potentially under a subsequent liquidating plan or Chapter 7), and the equity in the Reorganized Debtor that would have been issued to Harbor Compliance under the Plan might no longer be relevant. A sale could potentially yield a higher immediate recovery for creditors if a competitive auction reveals bidders willing to pay more than the value Harbor Compliance is ascribing to the company through its Plan. On the other hand, a sale process entails its own risks: if no sufficiently high bids materialize, the eventual recoveries could be lower, and much depends on the speed and efficiency of the sale. In addition, Harbor Compliance has initiated an adversary proceeding seeking a declaration that a material portion of the Debtor's assets are legally owned by the Plan Proponent and not property of the Debtor's Estate. The pendency of this action would likely serve as a disincentive for potential buyers to make an offer for the Debtor's assets in advance of a ruling from the Bankruptcy Court as to ownership or otherwise result in diminished purchase price offers.

**12.      Additional Risk Factors**

Creditors should be aware that there are certain risks inherent in the Plan and the implementation thereof, including, but not limited to, the following:

(a)      Litigation Risk

The outcome of potential litigation by or against the Plan Trust, including the pursuit of Causes of Action, is uncertain and may impact the amount of recoveries available to Holders of Allowed Claims.

(b)      Claim Resolution Risk

The ultimate allowance of Disputed Claims and rejection damages Claims may differ from current estimates, affecting distributions to Creditors.

(c)      Plan Implementation Risk

Delays or difficulties in implementing the provisions of the Plan, including obtaining required approvals or executing transactions contemplated by the Plan, may affect its success.

(d)      Business Risk

The success of the Reorganized Debtor is subject to inherent risks in the operation of its business in a competitive and potentially volatile market environment.

(e)      Market and Liquidity Risk

The New Firstbase Equity Interests may be illiquid, unregistered, and not publicly traded, which could limit the ability of Holders to sell or transfer such interests.

**B.      Certain Tax Matters**

**1.      Tax Consequences and Risks**

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Claims.

This summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances of each Holder. This discussion does not cover all possible tax consequences or the tax laws of any state, local, or non-U.S. jurisdiction. **HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM UNDER THE PLAN.**

2.      **Tax Consequences to Holders of Claims**

A Holder of an Allowed Claim that receives a distribution of Cash in satisfaction of its Claim will generally recognize taxable income, gain, or loss in an amount equal to the difference between the amount of Cash received and the Holder's adjusted tax basis in the Claim. If the Claim is a capital asset in the hands of the Holder, the gain or loss generally will be treated as a capital gain or loss. If the Claim is a business debt, any gain may be treated as ordinary income to the extent of any accrued but unpaid interest.

A Holder of an Allowed Claim that receives equity in the Reorganized Debtor may recognize income to the extent the fair market value of the equity received exceeds the Holder's tax basis in the Claim. If the equity is received in satisfaction of accrued interest, that portion may be treated as ordinary income. The holding period for the equity generally begins on the day after receipt. The character of any gain or loss will depend on the nature of the Claim and other relevant factors.

3.      **Tax Consequences to the Debtor**

In general, the discharge of indebtedness for less than full payment gives rise to cancellation of indebtedness ("COD") income, which is includible in gross income under the Internal Revenue Code. However, the Debtor expects that any COD income arising from the

implementation of the Plan will be excluded from income under Section 108 of the Internal Revenue Code, because the Debtor will be in a Title 11 case. Excluded COD income may result in the reduction of tax attributes, such as net operating losses, credits, and tax basis in assets.

As a result of the ownership change occurring pursuant to the Plan, the Debtor may experience an "ownership change" for purposes of Section 382 of the Internal Revenue Code. Section 382 may limit the amount of post-reorganization income that can be offset by pre-reorganization net operating losses or other tax attributes. The extent of any limitation will depend on the value of the Reorganized Debtor and applicable interest rates as of the Effective Date.

### C.    Additional Factors to be Considered

#### 1.    The Plan Proponent Does not Have Direct Knowledge of the Debtor, its Finances or Operations

The Plan Proponent is a Creditor of the Debtor and does not have direct or unfettered access to the Debtor's books and records, employees, management team or outside advisors. All sources of information about the Debtor, its finances and operations contained herein have been gathered from: publicly available information filed on the Chapter 11 Case docket, discovery produced by the Debtor to the Plan Proponent under FRBP 2004 and information received in the litigation styled *Harbor Business Compliance Corporation v. Firstbase.io, Inc.*, Case No. 5:23-cv-00802-JFL in the Eastern District of Pennsylvania and the Debtor's subsequent appeal in the Third Circuit Court of Appeals. Accordingly, the Plan Proponent cannot and does not represent that the Debtor information used herein is materially accurate in all respects or a complete representation of the Debtor's finances or operations.

#### 2.    The Plan Proponent Has No Duty to Update

The information contained in this Disclosure Statement and the Plan is provided as of the date hereof, unless otherwise specifically stated herein. The Plan Proponent has no duty to update

the information contained herein, and it expressly disclaims any obligation to do so. Creditors and other parties in interest should not rely on any representations, warranties, or statements beyond the date of this Disclosure Statement and the Plan, unless expressly stated otherwise in an amended or supplemented version approved by the Bankruptcy Court. Notwithstanding the foregoing, the Plan Proponent intends to file the Plan Supplement with additional information related to, *inter alia*, the Plan Trust, the projections for the Reorganized Debtor and the liquidation analysis.

3.　　　**No Representations Outside This Disclosure Statement or the Plan Are Authorized**

No representations concerning the Debtor or the Plan are authorized by the Plan Proponent other than as set forth in this Disclosure Statement. Creditors and other parties in interest should not rely on any representations or inducements made to secure their acceptance of the Plan that are not contained in this Disclosure Statement, the Plan, the Plan Supplement or other documents approved by the Bankruptcy Court.

4.　　　**No Legal or Tax Advice is Provided to You By This Disclosure Statement or the Plan**

This Disclosure Statement and Plan is not intended to, and does not, provide legal or tax advice to any party. All Creditors and Equity Interest Holders are urged to consult with their own legal and tax advisors regarding the Plan, including the consequences of the Plan's confirmation and consummation. The Plan Proponent makes no representations regarding the tax consequences of the Plan to any Holder of a Claim or Interest.

5.　　　**No Admission Made**

The statements contained in this Disclosure Statement and the Plan will not be deemed to be an admission of any fact or liability by any party, or deemed evidence thereof, and will not be admissible in any proceeding involving the Debtor, the Plan Proponent or any other party in

interest, except in proceedings to approve or enforce the terms of the Plan or this Disclosure Statement. The Plan Proponent and the Plan Trustee, as applicable, reserves all rights with respect to the prosecution or defense of any claims or causes of action.

## X.    SECURITIES LAW MATTERS

### A.    Securities Law Considerations – Section 1145 Exemption

Section 1145(a)(1) of the Bankruptcy Code provides that the offer or sale of securities under a plan of reorganization is exempt from registration under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if certain requirements are satisfied. This exemption applies to the offer or sale of securities if (i) the securities are issued by a debtor, an affiliate participating in a joint plan, or a successor to such entities; (ii) the recipients hold claims against, interests in, or claims for administrative expenses against the debtor; and (iii) the securities are issued in exchange for such claims or interests, or principally in such exchange and partly for Cash or property.

### 1.    Applicability of Section 1145 to the Plan

The Plan Proponent believes that the exemption provided under Section 1145 of the Bankruptcy Code will apply to the issuance of the New Equity in the Reorganized Debtor to Holders of Allowed Claims under the Plan. Specifically, the Plan Proponent believes that: (i) the new equity will be issued by the Reorganized Debtor, which qualifies as a successor to the Debtor; (ii) the recipients of the new equity will be Holders of Allowed Claims against the Debtor; (iii) the securities will be issued in exchange for such Allowed Claims; and (iv) the issuance of the new equity is not being conducted for capital raising or general solicitation purposes.

### 2.    Nature of Securities Issued under Section 1145

Securities issued pursuant to Section 1145 of the Bankruptcy Code are considered exempt from registration under the Securities Act and state blue sky laws. Such securities may generally be resold without registration, except by persons who are deemed to be 'underwriters' as defined in Section 1145(b)(1) of the Bankruptcy Code. An 'underwriter' is defined broadly and includes persons who: (i) purchase securities with a view to distribution; (ii) offer or sell securities on behalf of the issuer; and/or (iii) are affiliates of the issuer at the time of the offer or sale. Accordingly, persons who are or may be considered 'underwriters' under Section 1145 should consult their own counsel regarding the resale of any securities received under the Plan.

### 3. Transfer Restrictions and Legend

Although securities issued under Section 1145 are not subject to the registration requirements of the Securities Act, they may still be subject to certain resale restrictions under federal and state securities laws. Such securities may also bear a restrictive legend advising holders to consult with counsel before attempting any resale. Recipients of such securities should be aware that the Reorganized Debtor does not intend to register the securities under the Securities Act or list them on any securities exchange.

## XI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, Harbor Compliance believes that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, Harbor Compliance urges all eligible Holders of Impaired Claims and Interests to vote to **accept** the Plan, and to complete and return their Ballots so they are actually **received** by Royer Cooper Cohen Braunfeld LLC, c/o Alexandra Pittinsky, Harbor Compliance's Voting Agent, on or before __:00 p.m. (Prevailing Eastern Time) on _____, 2025.

**Dated: August __, 2025**

**<u>PLAN PROPONENT</u>**

_____

By:     _____
Title:   _____

Respectfully submitted,

**ROYER COOPER COHEN
BRAUNFELD LLC**

Dated: September __, 2025

By: */s/ Marc Skapof*

Marc E. Hirschfield, Esquire
Marc Skapof, Esquire
1120 Avenue of the Americas, 4th Floor
New York, New York 10036-6700
Telephone: (212) 994-0452
Email: mskapof@rccblaw.com

Matthew Faranda-Diedrich, Esquire*
Three Logan Square
1717 Arch Street, 47th Floor
Philadelphia, PA 19103
Telephone: (215) 839-1000
Email: mfd@rccblaw.com
*Admitted *Pro Hac Vice*

*Counsel to Creditor, Harbor Business
Compliance Corporation*

99