# <u>EXHIBIT B-2</u>

## [DRAFT] STOCKHOLDERS AGREEMENT

This Stockholders Agreement (this "**Agreement**"), dated as of [●], 2025 (the "**Effective Date**"), is entered into among Firstbase.io, Inc., a Delaware corporation (the "**Company**"), each Person identified on Schedule A hereto (each, an "**Initial Stockholder**" and collectively, the "**Initial Stockholders**"), and each other Person who after the date hereof acquires Shares of the Company and becomes a party to this Agreement by executing a Joinder Agreement (such Persons, collectively with the Initial Stockholders, the "**Stockholders**").

## RECITALS

**WHEREAS**, as of the date hereof, each Initial Stockholder owns the number and percentage of the issued and outstanding Shares set forth opposite the Stockholder's name on Schedule A hereto; and

**WHEREAS**, the Initial Stockholders deem it in their best interests and in the best interests of the Company to set forth in this Agreement their respective rights and obligations in connection with their investment in the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the meanings specified or referenced in this Article I.

"**Affiliate**" means with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "**control**," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "**controlling**" and "**controlled**" shall have correlative meanings.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in the State of Delaware are authorized or required to close.

"**By-Laws**" means the by-laws of the Company, as amended, modified, supplemented, or restated from time to time in accordance with the terms of this Agreement.

21974716v3

"**Certificate of Incorporation**" means the certificate of incorporation of the Company, as filed on January 25, 2021, with the Secretary of State of the State of Delaware, and as amended, modified, supplemented, or restated from time to time in accordance with the terms of this Agreement.

"**Delay Condition**" means any of the following: (a) the Company is prohibited from purchasing Shares by any Financing Document or by Applicable Law; (b) the purchase of any Shares that would, or in the reasonable opinion of the Board that could, result in the occurrence of an event of default under any Financing Document or create a condition which would or could, with notice or lapse of time or both, result in such an event of default; or (c) the purchase of any Shares that would, in the reasonable opinion of the Board, be imprudent in view of the financial condition of the Company or the anticipated impact of the purchase of such Shares on the Company's ability to meet its obligations under any Financing Document or otherwise in connection with its business and operations.

"**Excluded Securities**" means any Shares or other equity securities issued in connection with: (a) a grant to any existing or prospective consultants, employees, officers, or Directors pursuant to any stock option, employee stock purchase, or similar equity-based plans or other compensation agreement; (b) the exercise or conversion of options to purchase Shares, or Shares issued to any existing or prospective consultants, employees, officers, or Directors pursuant to any stock option, employee stock purchase, or similar equity-based plans or any other compensation agreement; (c) any acquisition by the Company of the shares of stock, assets, properties, or business of any Person; (d) any merger, consolidation, or other business combination involving the Company; (e) a share split, share dividend, or any similar recapitalization; or (f) any issuance of Financing Equity, in each case, approved in accordance with the terms of this Agreement.

"**Fair Market Value**" means the price that would be agreed upon between a willing buyer and a willing seller in an arm's-length transaction, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, determined without giving effect to (i) any discount for minority interest, lack of control, or lack of marketability, and (ii) any control premium, except to the extent the Shares being valued, taken together, represent a controlling interest in the Company.

"**Federal Judgment Rate**" means the interest rate provided under 28 U.S.C. § 1961(a), calculated as of September 25, 2024.

"**Financing Document**" means any credit agreement, guarantee, financing or security agreement, or any other agreement or instrument governing any indebtedness of the Company.

"**Financing Equity**" means any Shares, warrants, or other similar rights to purchase Shares issued to lenders or other institutional investors (excluding the Stockholders and their Affiliates) in any arm's length transaction providing debt financing to the Company.

"**Government Approval**" means any authorization, consent, approval, waiver, exception, variance, order, exemption, publication, filing, declaration, concession, grant, franchise, agreement, permission, permit, or license of, from, or with any Governmental Authority, the giving

of notice to, or registration with, any Governmental Authority, or any other action in respect of any Governmental Authority.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Initial Public Offering**" means any offering of Shares pursuant to a registration statement filed in accordance with the Securities Act.

"**Lien**" means any lien, claim, charge, mortgage, pledge, security interest, option, preferential arrangement, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Organizational Documents**" means the Certificate of Incorporation and the By-Laws.

"**Permitted Transferee**" means, (A) in the case of any Stockholder that is an individual, any one of the following: (i) any spouse or lineal descendant of the Stockholder, (ii) the Stockholder's estate, (iii) a corporation, partnership, or limited liability company, the stockholders, partners, or members of which are only such Stockholder and/or such Stockholder's spouse or lineal descendant, and (iv) a trust, all of the beneficiaries of which are the Stockholder, the Stockholder's spouse, siblings and/or the lineal descendants of the Stockholder; provided, that the instrument creating such trust contains a provision (which shall not be Amended (as defined below) until such time as no Shares are held by such trust) that states that any additional or successor trustees of any trust holding Shares must be such Stockholder's spouse and/or lineal descendants; (B) in the case of any Stockholder that is a trust, any of the following: (i) the Company or any of its Subsidiaries and (ii) the beneficiaries of such trust or a trust for the benefit of one or more such beneficiaries of such trust, provided that the beneficiaries are Permitted Transferees of the Stockholder who created the trust; (C) in the case of a Stockholder that is an estate, any of the following: (i) any other Stockholder, (ii) the Company or any of its Subsidiaries, (iii) the decedent's Permitted Transferees and (iv) a trust for one or more of the decedent's Permitted Transferees; or (D) in the case of a Stockholder that is an entity, any of the following: (i) any investment fund or partnership organized and/or managed by, or that is a controlled Affiliate of, such Stockholder or a Person that controls such Stockholder, (ii) any Subsidiary or Affiliate of such Stockholder, (iii) any successor trust or successor trustee of such Stockholder, and (iv) the Company or any of its Subsidiaries. For purposes of this definition, "**Amended**" means a change to the trust instrument regarding the appointment, selection, or designation of successor or additional trustees, and shall not mean an amendment solely to the other provisions of the trust instrument.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

3

"**Qualified Stockholder**" means any Stockholders who owns at least ten percent (10%) of the Shares.

"**Representative**" means, with respect to any Person, any and all directors, managers, members, partners, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"**Sale of the Company**" means, one or more of the following effected in a single transaction or series of transactions, (a) the sale to Third-Party Purchasers of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole, (b) the sale to Third-Party Purchasers of fifty-one percent (51%) or more of the issued and outstanding Shares of the Company, (c) the merger or consolidation of the Company or substantially all of the Company's Subsidiaries in a transaction in which Third-Party Purchaser(s) thereafter control, directly or indirectly, the business and affairs of the Company, or (d) any plan of reorganization, recapitalization, merger or consolidation involving the Company, except for a reorganization, recapitalization, merger or consolidation following which the stockholders of the Company immediately prior to such reorganization, recapitalization, merger or consolidation own directly or indirectly at least fifty-one percent (51%) of the combined voting power of the outstanding voting securities of the Company or any successor thereto or the Person resulting from such reorganization, recapitalization, merger or consolidation.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Shares**" means shares of common stock, $0.00001 par value, of the Company and any securities issued in respect thereof, or in substitution therefor, in connection with any share split, dividend, or combination, or any reclassification, recapitalization, merger, consolidation, exchange, or similar reorganization.

"**Subsidiary**" means with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Third-Party Purchaser**" means, with respect to any Stockholder, any Person who is not an Affiliate of such Stockholder.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Shares owned by a Person or any interest (including a beneficial interest) in any Shares owned by a Person. "**Transferred**" and "**Transfer**" (when used as a noun) shall have correlative meanings.

21974716v3                                      4

## ARTICLE II
## MANAGEMENT AND OPERATION OF THE COMPANY

**Section 2.01    Board of Directors.**

(a)    The Stockholders agree that the business and affairs of the Company shall be managed through a board of directors (the "**Board**"), which shall initially consist of two (2) members (each member of the Board, a "**Director**"). The initial Directors shall be Vincent Michael Montali and Megan Danz, and each such Director shall hold office until the earlier to occur of: (i) the next annual stockholders' meeting at which such Director's successor is designated in accordance with the Organizational Documents; or (ii) such Director is removed in accordance with the Organizational Documents.

(b)    The Board shall have the right to establish any committee of Directors as the Board shall deem appropriate from time to time. Subject to this Agreement, the Organizational Documents, and Applicable Laws, committees of the Board shall have the rights, powers, and privileges granted to such committee by the Board from time to time. Any delegation of authority to a committee of Directors to take any action must be approved in the same manner as would be required for the Board to approve such action directly.

## ARTICLE III
## TRANSFER OF INTERESTS

**Section 3.01    General Restrictions on Transfer.**

(a)    Except as permitted pursuant to Section 3.01(b), each Stockholder agrees that such Stockholder will not, directly or indirectly, voluntarily or involuntarily, Transfer any of its Shares without the prior written consent of the Board (in its sole discretion).

(b)    The provisions of Section 3.01(a) shall not apply to any of the following Transfers by any Stockholder of any of its Shares (i) to a Permitted Transferee; (ii) pursuant to Section 3.02; (iii) pursuant to Section 3.03; or (iv) to the Company pursuant to Section 3.04 or Section 3.05.

(c)    In addition to any legends required by Applicable Law, each certificate representing the Shares of the Company now owned or that may hereafter be acquired by the Stockholders shall bear a legend substantially in the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS AGREEMENT AMONG THE COMPANY AND ITS STOCKHOLDERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT.

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR

21974716v3                                    5

UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER."

(d)     Prior notice shall be given to the Company by a Stockholder of any Transfer of Shares, including Transfers to a Permitted Transferee. Prior to consummation of any Transfer by any Stockholder of any of its Shares, including a Transfer to a Permitted Transferee or a Third-Party Purchaser, such Stockholder shall cause any transferee who is not already a party to this Agreement to execute and deliver to the Company a joinder in form and substance acceptable to the Board in which such transferee agrees to be bound by the terms and conditions of this Agreement (a "**Joinder Agreement**").

(e)     Notwithstanding any other provision of this Agreement, each Stockholder agrees that it will not, directly or indirectly, Transfer any of its Shares: (i) except as permitted under the Securities Act and other applicable federal or state securities laws, and then, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act; (ii) if it would cause the Company or any of its Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended; or (iii) if it would cause the assets of the Company or any of its Subsidiaries to be deemed plan assets as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company. In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(f)     Any Transfer or attempted Transfer of any Shares in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Shares for all purposes of this Agreement and the Organizational Documents of the Company.

(g)     This Agreement shall cover all of the Shares now owned or hereafter acquired by the Stockholders while this Agreement remains in effect.

**Section 3.02    Tag-Along Right.**

(a)     If at any time on or after the Effective Date any Stockholder (the "**Selling Stockholder**") proposes to Transfer any Shares to a Third-Party Purchaser (other than pursuant to Section 3.01(b)) (a "**Tag-Along Sale**"), each Qualified Stockholder (each, a "**Tag-Along Stockholder**") shall be permitted to participate in such Transfer on the terms and conditions set forth in this Section 3.02.

(b)     Prior to the consummation of any Tag-Along Sale, the Selling Stockholder shall deliver to the Company and each Tag-Along Stockholder a written notice (a "**Sale Notice**") of

such Tag-Along Sale at least fifteen (15) days prior to the consummation of such Tag-Along Sale and shall describe in reasonable detail: (i) the number of Shares proposed to be Transferred by the Selling Stockholder; (ii) the name of the Third-Party Purchaser; (iii) the per Share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (iv) the proposed date of the closing of the Transfer, which shall not be less than thirty (30) days from the date of the Sale Notice.

(c)    Each Tag-Along Stockholder that desires to participate in the Tag-Along Sale (a "**Participating Stockholder**") shall exercise its rights under this Section 3.02 by delivering to the Selling Stockholder a written notice (a "**Tag-Along Notice**"), within ten (10) days after its receipt of the Sale Notice (the "**Tag-Along Period**"), stating (A) its election to participate in the Tag-Along Sale on the terms and conditions set forth in the Sale Notice and in accordance with this Section 3.02 and (B) the number of Shares it is offering to Transfer in such Tag-Along Sale. The offer of each Participating Stockholder set forth in its Tag-Along Notice shall be irrevocable and, to the extent such offer is accepted, shall be binding on such Participating Stockholder. Subject to Section 3.02(d), each Participating Stockholder shall have the right to Transfer in the Tag-Along Sale up to that number of Shares equal to the product of (1) the number of outstanding Shares then held by such Participating Stockholder, multiplied by (2) a fraction (x) the numerator of which is equal to the number of Shares the Selling Stockholder proposes to sell in such Tag-Along Sale and (y) the denominator of which is equal to the number of outstanding Shares then owned by the Selling Stockholder.

(d)    The Selling Stockholder shall use commercially reasonable efforts to include in the Tag-Along Sale all of the Shares that the Participating Stockholders have offered to Transfer pursuant to their Tag-Along Notices, it being understood that the Third-Party Purchaser shall not be required to purchase any Shares in excess of the number of Shares set forth in the Sale Notice. In the event the Third-Party Purchaser elects to purchase less than all of the Shares sought to be Transferred by the Selling Stockholder and the Participating Stockholders in the Tag-Along Sale, the number of Shares to be Transferred to the Third-Party Purchaser by the Selling Stockholder and the Participating Stockholders shall be reduced pro rata in proportion to the number of Shares that each such Stockholder proposed to Transfer in such Tag-Along Sale so that the aggregate number of Shares to be Transferred by the Selling Stockholder and the Participating Stockholders collectively equals the aggregate number of Shares that the Third-Party Purchaser is willing to purchase.

(e)    Each Tag-Along Stockholder that does not deliver a Tag-Along Notice in accordance with Section 3.02(c) shall be deemed to have waived all of such Tag-Along Stockholder's rights to participate in the Tag-Along Sale, and the Selling Stockholder shall (subject to the rights of any Participating Stockholders) thereafter be free to Transfer to the Third-Party Purchaser, without any further obligation to the Tag-Along Stockholders who are not Participating Stockholders under this Section 3.02, the number of Shares set forth in the Sale Notice for the same or lesser consideration per Share, and on terms and conditions which are not materially more favorable to the Selling Stockholder, than the terms and conditions set forth in the Sale Notice. Notwithstanding anything to the contrary herein, no failure by a Tag-Along Stockholder to participate in, or election by a Tag-Along Stockholder to waive its rights related to,

a particular Transfer of Shares shall act as a waiver of such Tag-Along Stockholder's rights in connection with a future Transfer of Shares.

(f)     The Selling Stockholder and each Participating Stockholder shall receive the same form and amount of consideration per Share (or election regarding the form and amount of consideration) in the Tag-Along Sale; provided, that each such Stockholder's proportionate share of related expenses will be deducted from such consideration in accordance with Section 3.02(f).

(g)     Each Participating Stockholder shall make or provide the same representations, warranties, covenants, and indemnities as the Selling Stockholder makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, and indemnities pertaining specifically to the Selling Stockholder, each Participating Stockholder shall make comparable representations, warranties, covenants, and indemnities pertaining specifically to itself); provided, that all representations, warranties, covenants, and indemnities shall be made by the Selling Stockholder and each Participating Stockholder severally and not jointly, and any indemnification obligations shall be limited to the aggregate amount of proceeds received by such Participating Stockholder in the Tag-Along Sale.

(h)     The fees and expenses of the Selling Stockholder incurred in connection with the Tag-Along Sale for the benefit of all Participating Stockholders (it being understood that costs incurred by or on behalf of the Selling Stockholder for its sole benefit will not be considered to be for the benefit of all Participating Stockholders), to the extent not paid or reimbursed by the Company or the Third-Party Purchaser, shall be shared by the Selling Stockholder and each Participating Stockholder on a pro rata basis, based on the amount of consideration received by each such Stockholder in the Tag-Along Sale.

(i)     Each Participating Stockholder shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Stockholder, subject to the limitations set forth in Section 3.02(g).

(j)     The Selling Stockholder shall have ninety (90) days following the expiration of the Tag-Along Period to Transfer the Shares described in the Sale Notice, on terms not materially more favorable to the Selling Stockholder than those set forth in the Sale Notice and subject to the rights of the Tag-Along Stockholders set forth in this Section 3.02 (which ninety (90)- day period may be extended by up to one hundred and twenty days (120) days to the extent reasonably necessary to obtain any required Government Approvals). If at the end of such period the Selling Stockholder has not completed the Tag-Along Sale, the Selling Stockholder may not then effect a Transfer of Shares subject to this Section 3.02 without again fully complying with the provisions of this Section 3.02.

**Section 3.03   Drag-Along Right.**

(a)     If at any time on or after the Effective Date, any Stockholder or group of Stockholders (together with their respective Affiliates) collectively hold more than fifty percent (50%) of the outstanding Shares (the "**Dragging Stockholders**"), receive a bona fide offer from a

Third-Party Purchaser to consummate, in one transaction, or a series of related transactions, a Sale of the Company (a "**Drag-Along Sale**"), then, upon the written request of the Dragging Stockholders, and subject to such Drag-Along Sale's compliance with the provisions of this Section 3.03, each other Stockholder (each, a "**Drag-Along Stockholder**") shall and, as applicable, the Company shall (i) take all necessary or desirable actions in connection with the consummation of the Drag-Along Sale as reasonably requested by the Dragging Stockholders, including (1) the Company providing assistance with legal, accounting, tax, financial, benefits and other due diligence, and (2) otherwise cooperating with the Dragging Stockholders, the prospective buyer(s), any investment bankers, consultants or other professional advisors who have been retained in connection with such Drag-Along Sale and their respective Representatives, (ii) Transfer a pro rata portion of his, her or its Shares on the same terms and conditions as apply to the Transfer by the Dragging Stockholders in the Drag-Along Sale (except as set forth in Section 3.03(d) or with respect to any customary rollover separately negotiated by any one or more Stockholders with an acquiror that may be applicable to such Stockholders), (iii) consent to, raise no objections against, and vote their Shares in favor of any such Drag-Along Sale, (iv) execute and deliver all reasonable documents and instruments which are necessary to effectuate such Drag-Along Sale (including participating in any escrow arrangements) and (v) waive all dissenters' rights, appraisal rights and any similar rights in connection with such Drag-Along Sale.

(b)    The Dragging Stockholders shall exercise its rights pursuant to this Section 3.03 by delivering a written notice (the "**Drag-Along Notice**") to the Company and each Drag-Along Stockholder no later than twenty (20) days prior to the closing date of such Drag-Along Sale. The Drag-Along Notice shall make reference to the Dragging Stockholders' rights and obligations hereunder and shall describe in reasonable detail: (i) the number of Shares to be sold by the Dragging Stockholders, if the Drag-Along Sale is structured as a Transfer of Shares; (ii) the identity of the Third-Party Purchaser; (iii) the proposed date, time, and location of the closing of the Drag-Along Sale; (iv) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (v) a copy of any form of agreement proposed to be executed in connection therewith.

(c)    If the Drag-Along Sale is structured as a Transfer of Shares, then, subject to Section 3.03(d), each Dragging Stockholder and each Drag-Along Stockholder shall Transfer the number of Shares equal to the product of (i) the aggregate number of Shares the Third-Party Purchaser proposes to buy as stated in the Drag-Along Notice and (ii) a fraction (A) the numerator of which is equal to the number of Shares then held by such Dragging Stockholder or Drag-Along Stockholder, as the case may be, and (B) the denominator of which is equal to the number of Shares then held by all of the Stockholders (including, for the avoidance of doubt, the Dragging Stockholders).

(d)    The consideration to be received by a Drag-Along Stockholder shall be the same form and amount of consideration per Share as is to be received by the Dragging Stockholders (or, if the Dragging Stockholders are given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such Transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Stockholders Transfers their Shares. Each Drag-Along Stockholder shall make or provide the same representations, warranties, covenants, indemnities, and agreements as the

Dragging Stockholders make or provide in connection with the Drag-Along Sale (except that in the case of representations, warranties, covenants, indemnities, and agreements pertaining specifically to the Dragging Stockholders, the Drag-Along Stockholder shall make the comparable representations, warranties, covenants, indemnities, and agreements pertaining specifically to itself); provided, that any indemnification obligation shall be pro rata based on the consideration received by each Dragging Stockholder and each Drag-Along Stockholder, in each case in an amount not to exceed (except in the event of fraud) each Dragging Stockholder and each Drag-Along Stockholder's respective pro rata portions of the purchase price.

(e)    The reasonable and documented fees and expenses of the Dragging Stockholders incurred in connection with a Drag-Along Sale and for the benefit of all Stockholders (it being understood that costs incurred by or on behalf of any Dragging Stockholder for its sole benefit will not be considered to be for the benefit of all Stockholders), to the extent not paid or reimbursed by the Company or the Third-Party Purchaser, shall be shared by all the Stockholders on a pro rata basis, based on the aggregate consideration received by each Stockholder; provided, that no Stockholder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-Along Sale.

(f)    Each Stockholder shall take all actions as may be reasonably necessary to consummate the Drag-Along Sale, including entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Stockholders.

(g)    The Dragging Stockholders shall have ninety (90) days following the date of the Drag-Along Notice in which to consummate the Drag-Along Sale, on the terms set forth in the Drag-Along Notice (which such period may be extended for a reasonable time not to exceed an additional thirty (30) days to the extent reasonably necessary to obtain any Government Approvals). If at the end of such period, the Dragging Stockholders have not completed the Drag-Along Sale, the Dragging Stockholders may not then effect a transaction subject to this Section 3.03 without again fully complying with the provisions of this Section 3.03.

**Section 3.04    Call Right.**

(a)    Subject to the terms and conditions of this Section 3.04, at any time on or after the Effective Date, the Company shall have the right (the "**Call Right**"), but not the obligation, to cause any Stockholder (a "**Called Stockholder**") to sell all of its Shares at the Fair Market Value of the Shares (the "**Call Purchase Price**").

(b)    If the Company desires to purchase and redeem the Shares pursuant to this Section 3.04, the Company shall deliver to the Called Stockholder a written, unconditional, and irrevocable notice exercising the Call Right (the "**Call Exercise Notice**").

(c)    The Called Stockholder shall at the closing of any purchase and redemption consummated pursuant to this Section 3.04, represent and warrant to the Company that (A) the Called Stockholder has full right, title, and interest in and to the Shares, (B) the Called Stockholder has all the necessary power and authority and has taken all necessary action to sell such Shares as

21974716v3                                        10

contemplated by this Section 3.04, and (C) the Shares are free and clear of any and all Liens other than those arising as a result of or under the terms of this Agreement.

(d)    Subject to Section 3.04(e), the closing of any purchase and redemption of Shares pursuant to this Section 3.04 shall take place no later than ninety (90) days following receipt by the Called Stockholder of the Call Exercise Notice (the dated on which the closing occurs, the "**Call Closing Date**").

(e)    The Company shall pay the Call Purchase Price for the Shares by certified or official bank check or by wire transfer of immediately available funds on the Call Closing Date.

(f)    At the closing of any sale and purchase pursuant to this Section 3.04, the Called Stockholder shall deliver to the Company a certificate or certificates representing the Shares to be sold (if any), accompanied by stock powers and all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the Call Purchase Price. The Called Stockholder shall take all other actions as may be reasonably necessary to consummate the sale contemplated by this Section 3.04, including entering into agreements and delivering such other certificates and instruments and consents as may be deemed necessary or appropriate.

(g)    The Fair Market Value of the Shares shall be determined by an independent nationally recognized investment banking, accounting, or valuation firm selected by the Board (the "**Valuation Firm**"). The Company shall provide the Valuation Firm with all reasonably necessary Company financial and other records as the Valuation Firm may request. The Valuation Firm shall deliver its written determination of the fair market value per Share within sixty (60) days of its engagement to the Called Stockholder and the Company and, absent fraud or manifest error, such determination of the Fair Market Value shall be final, conclusive, and binding on the parties. The fees and expenses of the Valuation Firm shall be borne by the Company.

(h)    The Company may assign the Call Right to any Affiliate of the Company or to any other Person designated by the Company. Any such assignee shall be entitled to exercise the Call Right and to consummate the purchase of the Shares in accordance with Section 3.04 as if it were the Company.

**Section 3.05    Put Right.**

(a)    On or prior to the first anniversary of the Effective Date, each Stockholder (a "**Put Stockholder**") may elect to sell to the Company all of the Shares held by such Put Stockholder at the price set forth for such Put Stockholder on Schedule B hereto (the "**Put Purchase Price**").

(b)    If any Put Stockholder desires to sell its Shares to the Company pursuant to this Section 3.05, such Put Stockholder shall deliver to the Company a written notice to such effect on or prior to the first anniversary of the Effective Date (the "**Put Notice**").

(c)    Subject to Section 3.05(d) and Section 3.05(e), the Company shall use commercially reasonable efforts to consummate the closing of any sale of Shares pursuant to this Section 3.05 (each, a "**Put Right Closing**") within ninety (90) days following receipt by the Company of the applicable Put Notice (the "**Latest Closing Date**").

(d)    If any Delay Condition exists that would delay the Put Right Closing or payment of the Put Purchase Price in accordance with Section 3.05(c) beyond the Latest Closing Date, the Company shall notify the applicable Put Stockholder in writing as soon as practicable of such Delay Condition (the "**Delay Condition Notice**"), and such Put Stockholder shall have the right, within ten (10) Business Days of receipt thereof, to rescind its Put Notice by delivering written notice to the Company.

(e)    If the Company delivers a Delay Condition Notice to the applicable Put Stockholder, and such Put Stockholder does not timely rescind the Put Notice as provided in Section 3.05(d), the Put Notice shall remain outstanding and the Company may defer the Put Right Closing, including its payment of the Put Purchase Price, until the earliest practicable date on which no Delay Condition exists, in which case the Put Purchase Price shall accrue interest at the Federal Judgment Rate from the Latest Closing Date to the date the Put Purchase Price is actually paid.

(f)    Subject to Section 3.05(e), at each Put Right Closing (i) the Company shall pay the Put Purchase Price for the Shares to the applicable Put Stockholder by wire transfer of immediately available funds; and (ii) such Put Stockholder shall (A) deliver to the Company a certificate or certificates (if any) representing Shares, accompanied by stock powers and all necessary stock transfer taxes paid and stamps affixed, as applicable; and (B)represent and warrant to the Company that (x) such Put Stockholder has full right, title, and interest in and to the Shares, (y) such Put Stockholder has all necessary power and authority and has taken all necessary action to sell the Shares as contemplated by this Section 3.05, and (z) Put Stockholder is free and clear of any and all Liens other than those arising as a result of or under the terms of this Agreement.

(g)    The Put Stockholder shall take all actions as may be reasonably necessary or appropriate to consummate any sale contemplated by this Section 3.05, including entering into customary agreements and delivering any certificates, instruments, or consents reasonably requested by the Company.

(h)    The Company may assign its obligations under this Section 3.05 (including the obligation to purchase Shares pursuant to a Put Notice) to any Affiliate of the Company or to any other Person designated by the Company; provided that no such assignment shall relieve the Company of its ultimate obligation to ensure that the Put Purchase Price is paid in accordance with the terms of this Section 3.05.

## ARTICLE IV
## PREEMPTIVE RIGHTS

**Section 4.01    Preemptive Rights.**

(a)    The Company hereby grants to each Qualified Stockholder the right to purchase its pro rata portion of any new Shares (other than any Excluded Securities) (the "**New Securities**") that the Company may from time to time propose to issue or sell to any Person.

(b)    The Company shall give written notice (an "**Issuance Notice**") of any proposed issuance or sale of New Securities to the Qualified Stockholders within ten (10) Business Days following Board approval of such issuance or sale. The Issuance Notice shall set forth the material

terms and conditions of the proposed issuance, including (i) the number and description of New Securities proposed to be issued; (ii) the proposed issuance date; and (iii) the proposed purchase price per share.

(c)     Each Qualified Stockholder shall for a period of ten (10) days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase, at the purchase price set forth in the Issuance Notice, the amount of New Securities equal to the product of: (i) the total number of New Securities to be issued by the Company on the issuance date; and (ii) a fraction determined by dividing (A) the number of Shares owned by such Qualified Stockholder immediately prior to such issuance by (B) the total number of Shares outstanding on such date immediately prior to such issuance, by delivering a written notice to the Company (an "**Acceptance Notice**"). Such Qualified Stockholder's election to purchase New Securities shall be binding and irrevocable. The failure of a Qualified Stockholder to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this Section 4.01 with respect to the purchase of such New Securities, but shall not affect its rights with respect to any future issuances or sales of New Securities.

(d)     The Company shall be free to complete the proposed issuance or sale of New Securities described in the Issuance Notice with respect to any New Securities not elected to be purchased pursuant to Section 4.01(c) in accordance with the terms and conditions set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced), provided, such issuance or sale is closed within sixty (60) Business Days after the expiration of the Exercise Period; subject, however, to the extension of such sixty (60) Business Day-period for a reasonable time not to exceed sixty (60) Business Days after the expiration of the Exercise Period to the extent reasonably necessary to obtain any necessary Government Approvals. Prior to such proposed issuance or sale of New Securities, the Company shall cause each proposed holder of such New Securities to execute and deliver to the Company a Joinder Agreement. In the event the Company has not sold such New Securities within such time period, the Company shall not thereafter issue or sell any New Securities without first again offering such securities to the Qualified Stockholders in accordance with the procedures set forth in this Section 4.01.

(e)     The closing of any purchase by any Qualified Stockholder who has delivered an Acceptance Notice (each, an "**Exercising Stockholder**") shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Securities in accordance with this Section 4.01, the Company shall deliver share certificates (if any) evidencing the New Securities, which New Securities shall be issued free and clear of any Liens (other than those arising hereunder, those attributable to the actions of the purchasers thereof, and restrictions on transfer arising under applicable state or federal securities Laws), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Securities shall be, upon issuance thereof to the Exercising Stockholders and after payment therefor, duly authorized, validly issued, fully paid, and non-assessable. Each Exercising Stockholder shall deliver to the Company the purchase price for the New Securities purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of New Securities shall take all such other actions as may be reasonably necessary to consummate the purchase and sale, including entering into such additional agreements as may be necessary or appropriate.

21974716v3                                          13

## ARTICLE V
## CORPORATE OPPORTUNITIES; CONFIDENTIALITY

**Section 5.01    Corporate Opportunities.** Except as otherwise provided in the second sentence of this Section 5.01, (a) no Stockholder nor any of its Permitted Transferees or any of their respective Representatives shall have any duty to communicate or present an investment or business opportunity or prospective economic advantage to the Company in which the Company may, but for the provisions of this Section 5.01, have an interest or expectancy (a "**Corporate Opportunity**"); and (b) to the fullest extent permitted by Applicable Law, no Stockholder or any of its Permitted Transferees or any of their respective Representatives (even if such Person is also an officer or Director of the Company) shall be deemed to have breached any fiduciary or other duty or obligation to the Company by reason of the fact that any such Person pursues or acquires a Corporate Opportunity for itself or its Permitted Transferees or directs, sells, assigns, or transfers such Corporate Opportunity to another Person or does not communicate information regarding such Corporate Opportunity to the Company. The Company renounces any interest in a Corporate Opportunity and any expectancy that a Corporate Opportunity will be offered to the Company; provided, that the Company does not renounce any interest or expectancy it may have in any Corporate Opportunity that is offered to an officer or Director of the Company whether or not such individual is also a Director or officer of a Stockholder, if such opportunity is expressly offered to such Person in his or her capacity as an officer or Director of the Company.

**Section 5.02    Confidentiality.**

(a)    Each Stockholder acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Stockholder acknowledges that (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; and (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace. Without limiting the applicability of any other agreement to which any Stockholder is subject, each Stockholder shall, and shall cause its Representatives to, keep confidential and not, directly or indirectly, disclose or use (other than in connection with the conduct of the Company's business or for the purposes of such Stockholder monitoring and analyzing its investment in the Company), including use for personal, commercial, or proprietary advantage or profit, any Confidential Information of which such Stockholder is or becomes aware. Each Stockholder in possession of Confidential Information shall, and shall cause its Representatives to, take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)    Nothing contained in Section 5.02(a) shall prevent any Stockholder from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Stockholder;

(iii) to the extent required by legal process or pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Stockholders; (vi) to such Stockholder's Representatives who, in the reasonable judgment of such Stockholder, need to know such Confidential Information and agree to be bound by the provisions of this Section 5.02 as if a Stockholder; or (vii) to any potential transferee in connection with a proposed Transfer of Shares in accordance with this Agreement, as long as such potential transferee agrees in writing to be bound by the provisions of this Section 5.02 as if a Stockholder before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Stockholder shall: (A) to the extent permitted by Applicable Law, promptly notify the Company in writing of such request so that the Company may seek, at its sole cost and expense, a protective order or other remedy, and (B) provide reasonable assistance, at the Company's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure. If, after providing such notice and assistance as required herein, the Stockholder remains subject to disclose any Confidential Information, the Stockholder (or its Representatives) shall disclose no more than that portion of the Confidential Information which is required to disclose and, on the Company's request and at the Company's sole cost and expense, shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment.

(c)    The restrictions of Section 5.02(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Stockholder or any of its Representatives in violation of this Agreement; (ii) is or has been independently developed or conceived by such Stockholder without use of Confidential Information; or (iii) becomes available to such Stockholder or any of its Representatives on a non-confidential basis from a source other than the Company, the other Stockholders, or any of their respective Representatives, provided, that such source is not known by the receiving Stockholder to be bound by a confidentiality agreement regarding the Company.

(d)    The obligations of each Stockholder under this Section 5.02 shall survive for so long as such Stockholder remains a Stockholder, and for two (2) years following the earlier of: (i) termination, dissolution, liquidation, and winding up of the Company; or (ii) such Stockholder's Transfer of its Shares.

## ARTICLE VI
## INFORMATION RIGHTS

**Section 6.01  Financial Statements.** The Company shall furnish to each Qualified Stockholder: (a) within one hundred and twenty (120) days after the end of each fiscal year, the unaudited balance sheet of the Company as at the end of each such fiscal year and the unaudited statements of income, cash flows, and changes in stockholders' equity for such year; and (b) within forty-five (45) days after the end of each fiscal quarter, the unaudited balance sheet of the Company at the end of such quarter and the unaudited statements of income, cash flows, and changes in stockholders' equity for such quarter.

**Section 6.02  Inspection Rights.** The Company shall, and shall cause its officers, Directors, and employees to: (i) afford each Qualified Stockholder and the Representatives of each such Qualified Stockholder, during normal business hours and upon reasonable written notice,

21974716v3                                15

reasonable access at all reasonable times to its officers, employees, auditors, properties, offices, plants, and other facilities and to all books and records; and (ii) afford such Qualified Stockholder the opportunity to consult with its officers from time to time regarding the Company's affairs, finances, and accounts as each such Stockholder may reasonably request upon reasonable notice.

**ARTICLE VII**
**REGISTRATION RIGHTS**

**Section 7.01    Demand Registration.** At any time after the earlier of (i) three (3) years following the Effective Date or (ii) one hundred eighty (180) days after the Company's Initial Public Offering, the Holders of at least thirty-five percent (35%) of the Registrable Securities (the "**Requesting Holders**") may request in writing that the Company file a registration statement under the Securities Act covering the offer and sale of all or part of the Registrable Securities held by such Holders. Upon receipt of such request, the Company shall, as soon as reasonably practicable, file and use commercially reasonable efforts to cause to be declared effective a registration statement covering the Registrable Securities requested to be registered. The Company shall not be required to effect more than two (2) demand registrations pursuant to this Section.

**Section 7.02    Piggyback Registration.** If the Company proposes to file a registration statement under the Securities Act for its own account or for the account of any other securityholder, the Company shall give prompt written notice to all Holders of Registrable Securities. Each such Holder shall have the right, subject to customary underwriter cutbacks, to include in such registration statement all or part of its Registrable Securities by delivering a written request to the Company within fifteen (15) business days after receipt of notice from the Company.

**Section 7.03    Expenses.** The Company shall bear all registration expenses incurred in connection with registrations pursuant to this Section, except that each Holder shall bear its own underwriting discounts, selling commissions, and transfer taxes, if any.

**ARTICLE VIII**
**REPRESENTATIONS AND WARRANTIES**

**Section 8.01    Representations and Warranties.** Each Stockholder, severally and not jointly, represents and warrants to the Company and each other Stockholder that:

(a)    For each such Stockholder that is not an individual, such Stockholder is duly organized or formed, as applicable, validly existing, and in good standing under the laws of the State of organization or formation, as applicable.

(b)    Such individual Stockholder has full capacity and, for each such Stockholder that is not an individual, full corporate or limited liability company, as applicable, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. For each such Stockholder that is not an individual, the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all requisite corporate or limited liability company, as applicable, action of such Stockholder. Such Stockholder has duly executed and delivered this Agreement.

21974716v3                                              16

(c)      This Agreement constitutes the legal, valid, and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). The execution, delivery, and performance of this Agreement require no action by, or in respect of, or filing with, any Governmental Authority by or with respect to such Stockholder.

(d)      The execution, delivery, and performance by such Stockholder of this Agreement does not: (i) conflict with or result in any violation or breach of any provision of any of the organizational documents of such Stockholder; (ii) conflict with or result in any violation or breach of any provision of any Applicable Laws; or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which the Stockholder is a party.

(e)      Subject to the other provisions of this Agreement, the representations and warranties contained herein shall survive the date of this Agreement and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof).

## ARTICLE IX
## TERM AND TERMINATION

**Section 9.01   Termination.** This Agreement shall terminate upon the earliest of (a) the consummation of an Initial Public Offering; (b) the date on which none of the Stockholders holds any Shares; and (c) the termination, dissolution, liquidation, or winding up of the Company.

**Section 9.02   Effect of Termination.** The following provisions shall survive the termination of this Agreement: Section 5.02 (as and to the extent provided in Section 5.02(d)), this Section 9.02, Section 10.01, Section 10.03, Section 10.11, Section 10.12(a) and Section 10.13.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 10.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Stockholder hereby agrees, at the request of the Company or any other Stockholder, to execute and deliver such additional documents, certificates, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 10.03 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (i)

21974716v3                                                    17

when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (iv) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.03): (i) if to the Company, at its principal office address; or (ii) if to a Stockholder, at the address set forth on Schedule A attached hereto.

**Section 10.04 Acknowledgments.** Each Stockholder has read this Agreement and acknowledges that (a) such Stockholder has been advised that a conflict may exist between such Stockholder's interests, the interests of the other Stockholders, and/or the interests of the Company; (b) this Agreement may have significant legal, financial planning, and/or tax consequences to the Stockholder; and (c) such Stockholder has sought, or has had the full opportunity to seek, the advice of independent legal, financial planning, and/or tax counsel of its choosing regarding such consequences.

**Section 10.05 Interpretation.** For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and gender neutral forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.06 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21974716v3

**Section 10.07 Entire Agreement.** This Agreement and the Organizational Documents constitute the sole and entire agreement of the parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency or conflict between this Agreement and any Organizational Document, this Agreement shall prevail.

**Section 10.08 Successors and Assigns; Assignment.** Subject to the rights and restrictions on Transfers set forth in this Agreement, this Agreement is binding upon and inures to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns. This Agreement may not be assigned by any Stockholder except as permitted in this Agreement (or as otherwise consented to in writing by all the other Stockholders prior to the assignment) and any such assignment in violation of this Agreement shall be null and void.

**Section 10.09 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.10 Amendment and Modification.** This Agreement may only be amended, modified, or supplemented by an instrument in writing executed by the Company and the Stockholders holding a majority of the issued and outstanding Shares and any such written amendment, modification, or supplement will be binding upon the Company and each Stockholder; provided, however, that Section 3.04 and Section 3.05 may only be amended, modified, or supplemented in a manner that affects all Stockholders generally by an instrument in writing executed by the Company and the Stockholders holding all of the issued and outstanding Shares, and (ii) the Company and any individual Stockholder may enter into a written agreement amending, modifying, or supplementing the application of Section 3.04 or Section 3.05 as between the Company and such Stockholder, and any such agreement shall be binding only on the Company and such Stockholder (and not on any other Stockholder). Notwithstanding the foregoing, the Board shall cause Schedule A to be updated from time to time as necessary to accurately reflect the information required to be included therein (including to reflect any issuances of Shares to any Stockholders or Transfer of Shares, in each case, pursuant to the terms of this Agreement). Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement.

**Section 10.11 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

21974716v3

19

**Section 10.12  Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)      This Agreement, including all Exhibits and Schedules hereto, and all matters arising out of or relating to this Agreement, shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)      The parties agree that any suit, action, or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought exclusively in the U.S. District Court for the District of Delaware or, if that court lacks subject-matter jurisdiction, in the Court of Chancery of the State of Delaware or the Superior Court of the State of Delaware (and the appropriate appellate courts therefrom). Each party irrevocably (i) submits to the exclusive jurisdiction of such courts, (ii) waives any objection to venue or claim that such forum is inconvenient, and (iii) agrees that any cause of action hereunder shall be deemed to arise from business transacted in Delaware. Service of process by certified or registered mail to a party's address specified in Section 10.03 shall be effective for any such action.

(c)      **EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**Section 10.13  Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 10.14  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**The Company:**

FIRSTBASE.IO, INC.

By: _____
    Name:
    Title:

**Initial Stockholders:**

HARBOR BUSINESS COMPLIANCE CORPORATION

By: _____
    Name:
    Title:

[NAME OF STOCKHOLDER]

By: _____
    Name:
    Title:

[NAME OF STOCKHOLDER]

By: _____
    Name:
    Title:

[NAME OF STOCKHOLDER]

By: _____
    Name:
    Title:

21974716v3

**Schedule A**
**Stockholders**

| Stockholder | Address | Shares | Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Schedule B**
**Put Purchase Price**

| Stockholder | Put Purchase Price* |
|---|---|
|  |  |
|  |  |

\* To be an amount equal to 3% of the face amount of the Stockholder's Allowed General Unsecured Claims.