**ROYER COOPER COHEN BRAUNFELD LLC**
**Marc Hirschfield, Esquire**
**1120 Avenue of the Americas, 4th Floor**
**New York, New York 10036-6700**
**Telephone: (212) 994-0451**
**Email: mhirschfield@rccblaw.com**
**Marc Skapof, Esquire**
**Telephone: (212) 994-0452**
**Email: mskapof@rccblaw.com**
**Matthew Faranda-Diedrich, Esquire***
**Frank Toub, Esquire****
**Three Logan Square**
**1717 Arch Street, Suite 4700**
**Philadelphia, PA 19103**
**Telephone: (215) 839-1000**
**Email: mfd@rccblaw.com**
**\*Admitted *Pro Hac Vice***
**\*\**Pro Hac Vice* Application Pending**
**Counsel to Creditor, Harbor Business Compliance Corporation**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Firstbase.io, Inc. | : | Case No. 24-11647(LGB) |
| | : | |
| Debtor. | : | Hearing Date: October 20, 2025 |
| | : | 10:00 am |

**HARBOR BUSINESS COMPLIANCE CORPORATION'S OBJECTION**
**TO THE SECOND INTERIM FEE APPLICATION OF**
**QUINN EMANUEL URQUHART & SULLIVAN, LLP FOR ALLOWANCE OF**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED AS SPECIAL**
**LITIGATION COUNSEL FOR THE PERIOD MAY 1, 2025**
**THROUGH AUGUST 31, 2025 (ECF NO. 219)**

Harbor Business Compliance Corporation ("Harbor Compliance"), by and through its

undersigned counsel, hereby submits its Objection (the "Objection") to the above-captioned debtor

and debtor-in-possession's ("Debtor") Second Interim Fee Application of Quinn Emanuel

Urquhart & Sullivan LLP ("Quinn Emanuel") for Allowance of Compensation and

Reimbursement of Expenses Incurred as Special Litigation Counsel for the Period May 1, 2025

through August 31, 2025 (ECF No. 219), (the "<u>Fee Application</u>"), in the instant chapter 11 case

(the "<u>Chapter 11 Case</u>"). In support of its Objection and in opposition to the Fee Application,

Harbor Compliance respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

This case has become yet another forum for the Debtor's principals, Mark Milastsivy and

Filipe Senna (the "Principals") to misappropriate and lie.  What started in the Eastern District of

Pennsylvania, led to a $30,000,000+ jury verdict along with findings of willful, malicious and

outrageous conduct, has only become more flagrant before this Court over the past 13 months.  The

Principals have long misused this Chapter 11 Case as a vehicle to prevent Harbor Compliance

from collecting on its significant jury award, to retain ownership and control of the Debtor, and to

complete the misappropriation of Harbor Compliance's trade secrets (i.e., continuation of the

unlawful conduct which resulted in Harbor Compliance's significant jury award against the Debtor

in the first place).  Indeed, despite this Court's repeated instruction to move this Chapter 11 Case

towards a confirmable plan of reorganization, until very recently the Debtor's principals have

dragged their feet, dug in their heels, and, in a blatant breach of their fiduciary duties, directed the

company and its counsel to focus almost exclusively on a course of conduct that favors incumbent

ownership over the best interests of creditors and the Debtor's estate.  Accordingly, Harbor

Compliance submitted a proposed plan of reorganization and disclosure statement to this Court on

August 11, 2025 (ECF No. 178), and on September 15, 2025 this Court approved the disclosure

statement and allowed Harbor Compliance to begin soliciting creditors on approval of the plan

(ECF No. 196) and scheduling a confirmation hearing for October 20, 2025 (the "<u>Confirmation</u>

<u>Hearing</u>").  Worse still, *as only became known yesterday*, the Principals have embarked on a

scheme to crater the Debtor in a desperate attempt to derail confirmation. What is clear now is that

the Principals have set into motion a double-barreled destructive campaign: (1) divert hundreds of

thousands of dollars from Debtor while, at the same time (2) racking up millions of unnecessary, duplicative and excessive administrative expense (legal bills).

The first part of the Principals' nefarious plan – *draining cash reserves, including by issuing payments to third-parties never authorized by the Bankruptcy Court* – has already resulted in the Debtor having a cash balance as of September 30th of only $255,263, despite projecting $892,671 in the operative cash collateral budget a decrease of $637,408.

The lynchpin of the second prong of Principals' derailment plan depends on its lawyers. Both to coverup the true state of affairs and also to pile on staggering amounts of legal bills. What was once seen as a negligent failure by the Principals to attempt to reorganize the business, has now been exposed for what it actually is: the malicious and willful subversion of the Bankruptcy Code. Part and parcel of this scheme, Quinn Emanuel seeks interim approval of an astounding $801,700.74 in additional legal fees and expenses purportedly incurred for the Period May 1, 2025, through August 31, 2025—which again, do not include fees for the most important legal exercise in any Chapter 11 proceeding: preparing and seeking confirmation of a plan of reorganization.[1] This obscene figure is on top of the already $843,233 preliminarily approved by the Court at the prior interim professional compensation and reimbursement of expenses hearing on July 10, 2025 (the "First Interim Fee Hearing"). In total, in only 11 months, Quinn has racked up $1,644,933.74, despite having little to show for it, and despite their supposedly limited role as "special counsel." By way of comparison, over the entire lifetime of this case, primary bankruptcy counsel, Kirby Aisner & Curley, LLP ("KAC"), has been granted or sought approval for only

---

[1] On September 26, 2025 Debtor filed its Second Fee Application for Kirby Aisner & Curley LLP ("KAC") for the period June 1, 2025 through August 31, 2025 (ECF No. 204) and Dilworth Paxson LLP ("Dilworth") for the period May 1, 2025 through August 31, 2025 (ECF No. 205). Harbor Compliance filed its Objection to these applications on October 10, 2025 (ECF No. 229). Based on the arguments made herein, and as expressly preserved in its Objection, Harbor Compliance further objects to any fees being awarded or paid to KAC and Dilworth beyond what has already been paid and the 10% variance authorized by the Cash Collateral Orders.

$291,851.23 ($242,844.71 from its first interim fee application plus $49,006.52 in its second interim fee application).

At the First Interim Fee hearing, the Court expressed significant reservations about the total amount of professional fees accrued by Quinn Emanuel at that point in time, finding some of the fees "excessive" and noting that the Court had "a real problem with where these expenses are going in this case. And it's not just that they're substantially excessive [of] the amounts that were escrowed for the amount of fees, because they are." Specifically, as it pertained to work on the Third Circuit Appeal, the Court found time to be duplicative and excessive, reducing those fees by a total of $75,000. And the Court also reduced $33,119.50 of Quinn Emanuel's fees as outside the scope of its retention. At the First Interim Fee Hearing, the Court authorized payment of only $140,408 of Quinn Emanuel's request due, in part, to concerns over their fees dwarfing the cash collateral budgeted figure as well as the Debtor's ability to pay. *See* July 10, 2025 Hearing re Application for Interim Professional Compensation and Reimbursement of Expenses at 25:10–20, a true and correct copy of which is attached hereto as **Exhibit A**.

Although the Court told the Debtor that they "probably ought to adjust their budget" or at least "should consider" doing so if they planned on exceeding the 10% variance permitted under the Cash Collateral Orders in future fee applications, Debtor ignored the directive. And rather than heeding the Court's prior findings and concerns regarding excessive fees, Debtor's principals doubled down and had Quinn Emanuel do and seek to recover for *even more out of scope and clearly excessive work*. All told, Quinn Emanuel incurred and is seeking to recover at least nearly $500,000 in duplicative, excessive and altogether unnecessary fees. The rationale for embarking on what seems to a kamikaze mission of accruing insurmountable legal fees has come into sharp focus when viewed alongside Debtor's actions as described above: the Principals clearly hope that

Quinn Emanuel's excessive fees will be a "poison pill" that, along with the Principals' diversion of cash, will ensure that they alone remain in control of Debtor.

This outrageous conduct cannot be rewarded, and the Court should therefore deny the Fee Application and fashion an Order limiting total Quinn Emanuel's total fees (both prior and present) to the 10% variance permitted under the Cash Collateral Orders, a cumulative total of $767,051[2]. If the total fees are held to this level, there will be sufficient cash on hand to pay all administrative claims and fund Harbor Compliance's reorganization plan, meaning that the Principals' attempts to crater the Debtor will have been rightfully rebuffed. If, however, counsels' exorbitant fees are not reduced to abide by the 10% variance permitted under the Cash Collateral Orders, then any resulting deficit in cash should be funded by personal contributions from the Principals as a sanction for their destructive actions.

## II.    RELEVANT BACKGROUND
### a.    Debtor Files Bankruptcy Petition Due to Insolvency

1.    On September 25, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. ECF No. 1.

2.    In its Petition, Debtor represented that it had between $1,000,001 and $10 million in estimated assets and between $10,000,001 and $50 million in estimated liabilities. *Id.* at ¶¶ 14-15.

3.    Debtor further represented that "[a]fter any administrative expenses are paid, no funds will be available to unsecured creditors." *Id.* at ¶ 13.

4.    On October 1, 2024, Debtor filed its first Motion for an Order Authorizing Debtor's Use of Cash Collateral on an Interim Basis ("First Cash Collateral Motion") wherein it represented that "Debtor's bankruptcy was precipitated by the entry of a final judgment entered against it in

---

[2] Of this sum, $224,241 was already paid to counsel pursuant to a prior interim fee application.

favor of [Harbor Compliance] on April 23, 2024, in an action entitled *Harbor Business Compliance Corp. v. Firstbase.io, Inc.*, Case No. 5:23-cv-0802 in the United States District Court for the Eastern District of Pennsylvania in the amount of $27,915,714.00 (the '<u>Foreign Judgment</u>')…Debtor filed its petition to preserve the value of its assets while post-trial motions are resolved and Debtor pursues an appeal of the Foreign Judgment." ECF No. 6 at ¶ 5.

5.      Debtor further represented that it "believes that with the help of counsel, [] it will be able to restructure its affairs and propose a plan of reorganization that is in the best interests of its creditors and affords them the greatest recovery possible." *Id.* at ¶ 6.

6.      In support of its request, Debtor submitted a proposed operating budget that supposedly "includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of operating the Debtor's for the period set forth in the Budget." *Id.* at ¶ 30. The proposed budget did not accurately account for Debtor's ongoing legal fees to prosecute the Chapter 11 Case. See ECF No. 6-8 (not accounting for *any* accruing legal fees in operating expenses).

7.      On October 8, 2024, the Court issued an Interim Order Authorizing Debtor's Use of Cash Collateral from the Petition Date until November 12, 2024 ("<u>First Cash Collateral Order</u>") based on the Debtor's proposed operating budget, which was annexed as Exhibit A to the First Cash Collateral Order. ECF Nos. 12, 12.1 at ¶ 1.

### b. Debtor Employs an Evolving Flock of Law Firms to Fight its Legal Battles

8.      On October 23, 2024, the Debtor filed an application to employ KAC as its bankruptcy counsel in the Chapter 11 Case (ECF No. 22), which the Court subsequently approved, effective as of the Petition Date. ECF No. 37.

9.      On October 31, 2024, Debtor filed an Application to Employ and Retain Quinn Emanuel and Dilworth each as special litigation counsel in connection with Debtor's post-trial motions (and its later appeal) filed in connection with a civil action between Harbor Compliance and Debtor.  ECF No. 30 at ¶ 21.

10.     Debtor stated in its application that it was represented by Dilworth though trial in the civil action between Debtor and Harbor Compliance and that Debtor subsequently added Quinn Emanuel to its legal team for post-trial proceedings.  *Id.* at ¶¶ 9-10.

11.     Debtor outlined the services to be provided by Dilworth and Quinn Emanuel as follows:

> Quinn Emanuel and Dilworth will maintain the same roles and division of services, under their retention herein, as they have pre-petition, with Dilworth handling all trial matters, including but not limited to providing extensive factual knowledge of the trial record and issues that have been raised through the course of the litigation, and Quinn Emanuel taking the lead on the briefing and argument on appeal. At times, and only if necessary, each firm may assist the other in the preparation and presentation of certain issues, but such efforts are not redundant or duplicative of
> each other.

*Id.* at ¶ 30.

12.     The Court granted Debtor's application on December 2, 2024, effective *nunc pro tunc* to the Petition Date, and specifically directed each firm to "use its best efforts to avoid any duplication of services with any of the Debtor's other retained professionals in this chapter 11 case."  ECF Nos. 45, 46 at ¶¶ 2-3.

13.     On February 28, 2025, Debtor filed a Supplemental Application to Expand the Scope of the Retention and Employment of Quinn Emanuel "to include representation of it and its officers" in an adversary proceeding initiated by Harbor Compliance seeking a declaratory

judgment as to the relative ownership rights in certain of the Debtor's assets and monetary damages against the Debtor's insiders for their tortious conduct. ECF No. 86 at ¶ 23.

14.    The Court granted Debtor's Supplemental Application on March 26, 2025. ECF No. 109 at ¶ 2.

15.    On June 6, 2025, Debtor filed a Second Supplemental Application to Expand the Scope of the Retention and Employment of Quinn Emanuel (ECF No. 146) (the "Second Supplemental Application").

16.    Debtor's Second Supplemental Application sought to retain Quinn Emanuel to represent Debtor in an appeal filed by Harbor Compliance of this Court's Order granting summary judgment in favor of debtor in an adversary proceeding (Adv. Pro. No. 24-04043-lgb) initiated by Debtor against Harbor Compliance (the "Preference Action"). ECF No. 146 at ¶ 1.

17.    On June 16, 2025, Quinn Emanuel filed its first interim application for allowance of compensation and reimbursement of expenses from October 1, 2024 through April 30, 2025 [ECF No. 156]. Quinn Emanuel sought compensation for professional services in the amount of $946,260.00 and reimbursement of $2,496.44 in expenses, totaling $948,756.44. [*Id.*]

18.    On July 2, 2025, the United States Trustee filed a general response expressing concern that the Debtor would have little cash left over if Quinn Emanuel and the Debtor's other counsel fees were paid in full and requested that the Court only allow payments up to the amount of escrowed for such purposes and held as retainers. ECF No. 163.

19.    The United States Trustee also specifically objected that Quinn Emanuel should (1) disclose the fee allocation among defendants in the Harbor Compliance Adversary Action, and (2) not be allowed fees for pursuing sanctions in the Harbor Compliance Adversary Action. Harbor Compliance filed an Omnibus Objection that objected to the mounting administrative costs in the

case, which in part, included Quinn Emanuel's fees, and specifically complained that Quinn Emanuel's fees were included services that were unauthorized and duplicative of services provided by KAC, Debtor's lead bankruptcy counsel. ECF No. 164.

20.     The Debtor replied arguing Quinn Emanuel's fees were reasonable in seeking sanctions in the Harbor Compliance Adversary Action and were not unauthorized or duplicative. ECF No. 166.

21.     The Bankruptcy Court held a hearing on Quinn Emanuel's fee application and entered an Order allowing Quinn Emanuel's fees in the amount of $840,736.94 and expenses in the amount of $2,496.44, and an interim payment of Quinn Emanuel's fees and expenses in the amounts of $137,911.66 and $2,496.44 respectively. ECF No. 168.

22.     In doing so, the Court cautioned that the case was "no going anywhere good at the moment" and that it would only authorize payment of the amount escrowed through April plus ten percent. Exhibit A at 32:1–18.

23.     On July 11, 2025, the Court granted the Second Supplemental Application. ECF No. 167.

24.     Subsequently, KAC and Debtor's other special counsel in this matter, Dilworth filed their respective, second interim fee applications on September 29, 2025 for the periods of June 1, 2025 through August 31, 2025 and May 1, 2025 through August 31, 2025, respectively. ECF Nos. 204 and 205, respectively.

25.     On October 1, 2025, Debtor filed a Motion Seeking Approval and Authority to Enter into Stipulations and Orders by and between the Debtor and Dilworth, JurisLogic LLC ("JurisLogic") and Stenn Assets USA Inc. ("Stenn") conditionally resolving their respective pre-petition Claims against the Debtor (the "Stipulation Motion"). ECF No. 210.

26.     On October 16, 2025, Harbor Compliance filed its Objection to the Stipulations. Motion. ECF No. 250.

27.     Because Quinn Emanuel neglected to file a second interim fee application, on October 7, 2025, Harbor Compliance sought to Estimate Quinn Emanuel's Fees and requested a hearing on same on shortened notice via email to the Court, pursuant to the Court's policies and procedures.

28.     Debtor then filed the instant Fee Application on October 8, 2025.

29.     Debtor did not file a Notice of Hearing along with the Fee Application.

30.     On October 9, 2025, the Court denied hearing Harbor Compliance's request to estimate Quinn Emanuel's fees but noticed the Fee Application to be heard on October 20, 2025.

31.     Those applications are scheduled to be heard on October 20, 2025, the same day as the hearing on the Harbor Compliance proposed plan.

### c. Debtor's Mounting Pre- and Post-Petition Legal Bills Far Exceed the Budget it Provided the Court

32.     Debtor's Schedule of Creditors, filed on February 11, 2025, identifies a pre-petition claim held by Dilworth of $1,036,942.73 for "Legal Bills" incurred as of July 31, 2024 and a pre-petition claim by Quinn Emanuel of $218,136.90 for "Legal Bills" incurred as of August 31, 2024. ECF No. 68 at 3.5, 3.26.

33.     Debtor's Schedule of Creditors identifies additional pre-petition claims for "Legal Bills," "Legal Fees," and "Legal Services" with a cumulative value of $279,540.72.  See ECF No. 68.

34.     On November 8, 2024, the Court issued a Second Interim Order Authorizing Debtor's Use of Cash Collateral from November 12, 2024 through February 28, 2025 ("Second Cash Collateral Order") in an amount which "shall not exceed by more than 10% the amount set

forth in the budget annexed hereto." ECF No. 36 at ¶ 1. The annexed budget accounted for monthly escrow payments of $17,000 for "accruing legal fees" due to Dilworth, Quinn Emanuel, and KAC. See ECF No. 36-1.

35.    On February 24, 2025, Debtor filed a Notice of its Proposed Third Interim Cash Collateral Order (ECF No. 79), with its proposed Third Interim Cash Collateral Budget (ECF No. 79-2), pursuant to which Debtor sought approval to make monthly escrow payments of $55,000 for "accruing legal fees" due to Dilworth, Quinn Emanuel, and KAC as well as two one-time payments of $150,000 each to Quinn Emanuel as a "Fixed fee appeal budget to be approved by the court." ECF No. 79-2.

36.    On February 26, 2025, the Court adopted Debtor's Third Cash Collateral Budget and issued a Third Interim Order Authorizing Debtor's Use of Cash Collateral from March 1, 2025 through June 30, 2025 ("Third Cash Collateral Order") in an amount which "shall not exceed by more than 10% the amount set forth in the budget annexed hereto." ECF No. 83 at ¶ 1.

37.    Ultimately, this Court denied Debtor's request for approval of a fixed-fee structure in connection with its retention of Quinn Emanuel on its appeal to the Third Circuit Court of Appeals.  ECF No. 109.

38.    On June 16, 2025, counsel for Debtor filed their first interim fee applications (the "First Fee Applications").  See ECF Nos. 151-153.

39.    KAC's First Interim Fee Application ("First KAC Fee Application") seeks compensation for fees of $231,840 and expenses of $11,844.71 incurred between the Petition Date and May 30, 2025. ECF No. 151.

40.     Quinn Emanuel's First Interim Fee Application ("First QE Fee Application") seeks compensation for fees of $946,260 and expenses of $2,496.44 incurred between October 1, 2024 and April 30, 2025. ECF No. 152.

41.     Dilworth's First Interim Fee Application ("First Dilworth Fee Application") seeks compensation for fees of $24,775.50 incurred between October 1, 2024 and April 30, 2025. ECF No. 153.

42.     Together, the First Fee Applications seek payment of $1,217,216.65 for legal fees and expenses incurred over a six (or, as to the First KAC Fee Application, a seven) month period when Debtor failed to finalize a reorganization plan despite multiple extensions to its exclusivity periods and, in fact, dedicated only 5.1 hours of a total 1,296.5 hours billed to reorganization efforts.

43.     On June 23, 2025, the Court issued a Fourth Interim Order Authorizing Debtor's Use of Cash Collateral from July 1, 2025 through November 3, 2025 ("Fourth Cash Collateral Order") in an amount which "shall not exceed by more than 10% the amount set forth in the budget annexed hereto." ECF No. 157 at ¶ 1. The annexed budget accounted for monthly escrow payments of $78,000 for "accruing legal fees" due to Quinn Emanuel and KAC. See ECF No. 157-1.

44.     On September 29, 2025, KAC and Dilworth filed their second interim fee applications, and on October 8, 2025, Quinn Emanuel filed its second interim fee application (the "Second Fee Applications"). See ECF Nos. 204–05, 219.

45.     KAC's Second Interim Fee Application ("Second KAC Fee Application") seeks compensation for fees of $48,132.50 and expenses of $874.02 incurred between the June 1, 2025 and August 31, 2025. ECF No. 204.

46.     Dilworth's Second Interim Fee Application ("Second Dilworth Fee Application") seeks compensation for fees of $16,804.00 incurred between May 1, 2025 and August 31, 2025. ECF No. 205.

47.     Quinn Emanuel's Second Interim Fee Application ("Second QE Fee Application") seeks compensation for fees of $794,649.50 and expenses of $7,051.24 incurred between May 1, 2025 through August 31, 2025. ECF No. 219.

48.     Together, the Second Fee Applications seek payment of $867,511.26 for legal fees and expenses incurred over a four (or, as to the Second KAC Fee Application, a three) month period when Debtor failed to even propose a reorganization plan despite the termination of its exclusivity periods and, in fact, KAC dedicated only 10.3 hours of a total 111.4 hours billed to reorganization efforts. *See* ECF No. 204-2.

49.     Shockingly, just yesterday, it was reveals through the Debtor's filing of its August MOR and September account balances, that the Debtor's cash position has decreased to approximately only $255,263 – which is $637,408 decrease over the case budget reported to the Court.

50.     The main culprit for this precipitous drop in cash is that, despite revenues underperforming, the Debtor has added new and unapproved expenses.  For example, a branding and design company by the name of Porta Rocha (whose founders are curiously located in Brazil, where one of the Principals, Filipe Senna, resides) received a total of $225,000 from Debtor *over the course of 7 days between August 28th – September 5th*:



See Debtor's Monthly Operating Report for month ending August 31, 2025 (ECF No. 245) at page 36 of 61.

See Debtor's most recent bank statements attached hereto as Exhibit "D" at page 36.

51.     Nowhere on the Debtor's cash collateral budgets do they disclose hiring a branding and design company, and the Debtor did not ask for Bankruptcy Court Approval before entering into these obligations.  A screenshot of Porta Rocha's webpage appears below:



52. Also, in both August and September Debtor made payment of *approximately $250,000 per month* to an entity named Remote Technology Services that appears to be, per Wikipedia, "a human resources technology platform which provides payroll and compliance services for companies with distributed workforces and contractors." https://en.wikipedia.org/wiki/Remote_(platform):



| 08/25 | 08/25 Online Domestic Wire Transfer Via: Community Fsb/026073150 A/C: Remote Technology Services Inc New York City NY 10010 US Ref Trf0000158294 Imad: 0825Mmqimp2M006252 Trn: 3291535237Es | 249,456.74 |
| 08/25 | 08/25 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Firstbase Io Inc New York NY 10013 US Ref /Time/12:03 Imad: 0825Mmq/mp2N006088 Trn: 3293035237Es | 37,000.00 |

Page 23 of 26

24-11647-lgb    Doc 245    Filed 10/15/25    Entered 10/15/25 09:48:14    Main Document
Pg 36 of 61

**CHASE** ○

August 01, 2025 through August 29, 2025
Account Number: ████████2157

**ELECTRONIC WITHDRAWALS** *(continued)*

*See* Debtor's Monthly Operating Report for month ending August 31, 2025 (ECF No. 245).



*See* Exhibit "D" at page 37.

53.    Although it is possible these charges related to paying some portion of its overseas workforce, that is far from certain, and in any event, Debtor did not ask for Bankruptcy Court Approval before entering into these obligations.

## III.    ARGUMENT
### a.    Legal Standard

Section 330 of the Bankruptcy Code authorizes bankruptcy courts to award professionals employed pursuant to section 327 "***reasonable*** compensation for actual, ***necessary*** services rendered" as well as "reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1)(A) and (B) (emphasis added).  "The statute contains two separate criteria, and before determining the reasonableness of the service, the Court must make a threshold inquiry into its necessity." *In re Keene Corp.,* 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997).  When looking to *necessity*, the Code explicitly prohibits compensation for:

> (i) unnecessary duplication of services; or
>
> (ii) services that were not--

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).  To determine *reasonableness*, the Code instructs:

The court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

The applicant bears the burden of proof in all fee matters. *In re Keene Corp*., 205 B.R. at 695. The burden of proof to show entitlement to fees should "not be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors." *In re Spanjer Bros., Inc*., 191 B.R. 738, 747 (Bankr. N.D. Ill. 1996) (citation omitted). Pursuant to section 331 of the Bankruptcy Code, trustees and other professionals in chapter 11 cases are permitted to file applications for interim fee awards. *U.S. Trustee v. Fishback (In re Glados, Inc.)*, 83 F.3d 1360, 1367 (11th Cir. 1996).  Interim fee awards are discretionary, and are subject to reexamination and adjustment during the course of the case. *In re Spanjer*

*Brothers, Inc.*, 191 B.R. at 747, *citing In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557 (Bankr. D. Utah 1985).

Here, Debtor's Second QE Fee Application is unreasonable and should be denied for numerous reasons. Section II below sets forth Harbor Compliance's objections to the Second QE Fee Application generally, and Section III provides Harbor Compliance's specific objections to the amounts and purported tasks reflected therein.

### b. The Second QE Fee Application Should Not Be Allowed in the Amounts Requested.

As an initial matter, the Second QE Fee Application seeks compensation that is blatantly unreasonable and thus barred by 11 U.S.C. § 330(a)(1)(A). *See, e.g.*, *In re Keene Corp.*, 205 B.R. at 695 ("Even in the absence of an objection, the bankruptcy court has an independent duty to review fee applications to protect the estate lest overreaching professionals drain it of wealth which by right should inure to the benefit of unsecured creditors."). Indeed, the Second QE Fee Application seeks compensation for legal fees and expenses totaling $801,700.74. Yet the Second QE Fee Application far exceeds the Debtor's proposed budget and reflect legal work that does not even include the drafting of a potential plan of organization. Instead, this work was largely duplicative, unnecessary, and performed for the primary benefit of Debtor's equity-holders, to the detriment of Debtor's unsecured creditors. Pivotally, if paid in the amounts requested, the Second QE Fee Applications will drain the estate of its remaining capital and send Debtor into administrative insolvency. The Second QE Fee Application should be denied accordingly.

### i. The Amounts Requested in the Second QE Fee Application is Unreasonable in Light of the Court's Prior Admonition to Adjust Cash Collateral Budgets to Reflect Actual Spend, and in Light of the Principals' Improper Conduct.

That the Second QE Fee Application seeks unreasonable compensation is evidenced by the massive discrepancies between the budgeted fees reflected in the Cash Collateral Orders, on the

one hand, and the amounts now demanded by counsel for Debtor, on the other hand. The total amount requested of $801,700.74 exceeds the legal fees authorized by the applicable cash collateral orders by several orders of magnitude. Despite the Court's invitation at the First Interim Fee Hearing for Debtor to "adjust their budget" going forward to account for actual legal spend, the Debtor did no such thing. What is worse, the Debtor hid from the Court and all creditors that *they knew their legal spend already vastly exceeded the figures presented to the Court*. These figures were relied upon by the Court in approving both the First Interim Fee Request (in part) and also the Cash Collateral Order. Despite verifying that monthly legal budgets were estimated at $55,000 for purposes gaining these approvals, *Debtor (and specifically its CEO Mark Milastsivy) knew by no later than June 17, 2025 that Quinn Emanuel had accrued $498,477.75 in fees and expenses for the month of May alone*:

**quinn emanuel** trial lawyers

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

June 17, 2025

Mark Milastsivy
CEO
Firstbase.io, Inc.
447 Broadway
2nd Fl Ste 187
New York NY 10013

Matter #: 12978-00001
Invoice Number: 101-0000191539
Responsible Attorney: Derek L. Shaffer

<u>Trade Secret Dispute</u>

For Professional Services through May 31, 2025 in connection with a trade secret dispute.

| | |
|---|---:|
| Fees | $495,915.50 |
| Expenses | $2,562.25 |
| Net Amount | $498,477.75 |
| Total Due This Invoice | $498,477.75 |
| Balance Due from Previous Statement(s) | $1,166,893.34 |
| Total Balance Due | $1,665,371.09 |

These vast overspends were never reported to the Court and were instead deliberately kept hidden. If the Second QE Fee Application is granted as requested, these discrepancies will prove catastrophic to the estate. Said plainly, if the Court were to approve payment in the amounts requested, the estate will be immediately administrative insolvent. Harbor Compliance would submit that the Principals' outrageous conduct in attempting to crater the Debtor to preserve their own interests should not be rewarded, and the Court should therefore deny the Fee Application and fashion an Order limiting total fees for all counsel (<u>both prior and present</u>) to the 10% variance permitted under the Cash Collateral Orders. Doing so would ensure the viability of the current Harbor Compliance plan, as demonstrated in the calculation below:

**Fees capped at CC Budget amounts plus 10% for Quinn and Dilworth; Fees for Kirby based on filed Fee App 1 & 2 through August 2025 and projected budget plus 10% for September and October 2025**

| | | |
|---|---|---|
| Quinn | $ | 359,700 |
| Kirby | | 353,451 |
| Dilworth | | 53,900 |
| Paid | | (224,241) |
| Escrow (As of 11/1) | | (405,900) |
| **Balance** | **$** | **136,910** |

$47,141 to Kirby was paid from retainer

If, however, counsels' exorbitant fees are not reduced to abide by the 10% variance permitted under the Cash Collateral Orders, then any resulting deficit in cash should be funded by personal contributions from the Principals as a sanction for their improper and destructive actions. *See In re 680 Fifth Ave. Associates*, 218 B.R. 305, 323 (Bankr.S.D.N.Y.1998) ("A bankruptcy court "has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons.").

> ii. **The Amounts Requested in the Second QE Fee Application is Unreasonable and the Services Covered are Unnecessary as They Solely Benefit Debtor's Equity Holders, to the Detriment of Its Unsecured Creditors.**

The amounts requested in the Second QE Fee Application is further barred by section 330(a) of the Code because they reflect fees incurred for services that benefit Debtor's equity holders and insiders, Mark Milastsivy and Filipe Senna, at the expense of the estate's unsecured creditors. Payment of such fees is antithetical to the goals of section 330(a) and bankruptcy proceedings in general. Under section 330(a), "it is not enough for an attorney to work ethically and zealously for a client whose interests may be antithetical to the estate's." *In re Keene Corp.*, 205 B.R. 690, 696 n.7 (Bankr. S.D.N.Y. 1997). Rather, a debtor's attorney "has a fiduciary duty to maximize the estate" particularly where the estate is insolvent and the attorney's "allowed fees must be borne entirely by the creditors." *Id.* at 696 (citations omitted). "In this regard, the

services must benefit the estate, not the debtor whom [the professional] represented." *Id.* (disallowing compensation for legal fees incurred in connection with unnecessary contempt motion on behalf of insolvent debtor and noting that burden on firm to bear cost of contempt motion "is not grounds to reward the services and punish the creditors who had no say in the matter"). Notably, the contempt motion in *In re Keene Corp.* was supported by both legal and factual merit, but was still deemed "unnecessary" because "the maximum possible recovery was so small that no reasonable attorney would have commenced this proceeding." *Id.* at 702; *accord In re Allied Computer Repair, Inc.*, 202 B.R. at 887 (Attorney for the estate is obligated to "abandon litigation once it becomes reasonably obvious that [its] cost ... is out of sync with the value of the asset sought to be recovered").

As a whole, the Second QE Fee Application confirms Debtor's general strategy of using this Chapter 11 Case to maintain control of the company on behalf of Milastsivy and Senna for as long as possible by holding creditors at bay while chasing at windmills in its Third Circuit appeal. Contrary to Debtor's representations to this Court, it does not and has never had any intention of using "the help of counsel" to "propose a plan of reorganization that is in the best interests of its creditors and affords them the greatest recovery possible." ECF No. 6 at ¶ 6. Though counsel for Debtor seeks total compensation for its professionals in this application of $867,511.26 for legal fees and expenses, only 10.3 hours was expended by Debtor's bankruptcy counsel, KAC, on such efforts. See ECF No. 204-2. The total fees attributable to reorganization efforts by KAC amount to only $4,977.50. *Id.* As for the intended beneficiary of these legal services, the proof is in the pudding (the time entries). Had Debtor had any intention of maximizing the value of the estate and recovery to its unsecured creditors, its counsel would have needed to spend significantly more than 10.3 hours exploring paths to reorganization and negotiating a settlement with the estate's

largest creditor, Harbor Compliance.  This strategy is counter-productive to the administration of this case and further injurious to the estate's unsecured creditors, whose potential recovery is further diminished by Debtor's mounting and excessive legal bills.

Once again, the services covered by the Second QE Fee Applications are simply incompatible with any genuine effort by Debtor to maximize the value of its estate.  Rather, at every turn, Debtor's insiders have abused these proceedings to advance their own interests at the expense of the estate and its unsecured creditors. For this reason alone, the Second QE Fee Applications should be denied in the amounts presently requested, without prejudice to counsel for Debtor to seek compensation for necessary and reasonable fees incurred during the pendency of this action.

### c.  Specific Objections to the Second QE Fee Application.
#### i.  The Second QE Fee Application Seeks Compensation for Unauthorized and Duplicative Services.

Harbor Compliance specifically objects to the Quinn Emanuel to the extent that it seeks compensation for services related to general case administration, which is squarely within the purview of KAC, as Debtor's bankruptcy counsel, and is beyond the scope of this Court's retention orders for Quinn Emanuel and Dilworth as special litigation counsel.

For example, Quinn Emanuel continued to bill for duplicative things outside the scope of their limited retention for doing many of the same things the Court, at the Interim Fee Hearing, admonished "weren't in the scope of [Quinn Emanuel's] retention" such as "plan process, financing discussions, Rule 2004 discovery … defending clients at depositions for a 2004."  All told, Quinn Emanuel racked up a total of $68,648 in out-of-scope and duplicative bills including work for attorneys on the team to "review brief briefing" and "review 9011 letter" and "review docket and prior briefing".  *See* Ex. B at "Outside Scope" tab.  For the Court's convenience, Harbor

Compliance has prepared a spreadsheet detailing all of Quinn Emanuel's objectionable fees (the "QE Fee Spreadsheet"), attached hereto as Exhibit "B".

Quinn Emanuel's related fees for these time entries are not only unauthorized, they are unnecessarily duplicative of the fees requested by KAC, as bankruptcy counsel. See 11 U.S.C. § 330(a)(4)(A) ("the court shall not allow compensation for (i) unnecessary duplication of services"). *See also In re New Boston Coke Corp*.,299 B.R. 432, 443 (Bankr. E.D.Mich. 2003) (disallowing fees of special counsel for services that were duplicative of general counsel*); In re Malden Mills Industries, Inc*., 281 B.R. 493, 498 (Bankr. D. Mass. 2002) (holding that chapter 11 professionals, especially when involved in multiprofessional cases, must ensure they do not duplicate work or perform work falling within purview of another professional, and must explain necessity for overlap if such overlap occurs); *In re Sapolin Paints, Inc.,* 38 B.R. 807, 814-15 (Bankr. E.D.N.Y. 1984) (disallowing portion of fees of co-counsel to creditors' committee because services were duplicative*); In re Underground Utils. Constr. Co*., 13 B.R. 735, 737 (Bankr. S.D.Fla. 1981) (special counsel should not be compensated for services rendered which duplicated services performed by bankruptcy counsel for debtor).

Quinn Emanuel's consistent invasion into KAC's role as bankruptcy counsel is reflective of the true purpose of this Chapter 11 Case. From the start, Debtor has utilized these proceedings to advance the legal interests of its owners and insiders, Milastsivy and Senna, rather than to maximize the value of its estate. Indeed, Quinn Emanuel is not only unauthorized to serve as Debtor's bankruptcy counsel, it is affirmatively barred from doing so due to its adverse interest as a pre-petition creditor of the estate.

All such requested fees and expenses should be disallowed.

### ii.  The Second QE Fee Application Seeks Excessive Compensation for Services Provided.

The fees requested by Quinn Emanuel are not only unauthorized, they are also clearly excessive.  For example, despite having essentially fully briefed the Third Circuit Appeal, somehow Quinn Emanuel managed to rack up an additional $88,662.50 to finish a reply brief (for which they already sought $370,665 at the Interim Fee Hearing, an amount the Court already found to be "excessive"), prepare for oral argument, and file a pointless opposition to Harbor Compliance's motion to seal.  As but one example of the excessive fees incurred, Quinn conducted not one, but two, separate "moot court" sessions, each several hours in length and each involving a whopping 6 lawyers, which totaled 30 hours and $49,048 in fees.  Ex. B at "Third Circuit" tab. Quinn's billing on the Third Circuit Appeal included $60,856 (44.2 hours) for filing a petition for rehearing that was not only destined to fail and excessive, but also *outside the scope of their limited retention*.  *See* Email from Marc Skapof dated August 28, 2025, attached hereto as Exhibit "C". *See also* Ex. B at "Panel Rehearing" tab. Finally, Quinn Emanuel's billing on the Third Circuit Appeal also includes entries for several non-legal tasks.  For example, Quinn Emanuel billed 6.5 hours at $1,395 per hour, $9,067.50 total, for an attorney to "prepare oral argument prep binders." *See* Second QE Fee Application at page 29 of 56, 5/19/2025 time entry by LM6.

The Third Circuit Appeal was not the only area where Quinn Emanuel's fees were excessive.  They spent a total of $89,053 preparing a mediation statement and reply, despite both documents amounting to a grand total of 20 pages of text.  *See* Ex. B at "Mediation Statement" tab.  Quinn Emanuel also continued to pile on when it came to briefing in the adversary action. Somehow Quinn Emanuel racked up an additional 62.7 hours – or $88,662.50 – *for just the reply brief*.  *Id.* at "MTD" tab. Finally, Quinn charged $7,420 in travel time at $1,855 hour, clearly unreasonable and excessive. *See* Ex. B at "Travel" tab.

All told, Quinn incurred $477,012.50 in excessive and unnecessary fees as follows:

- $60,856 on the Petition for Rehearing
- $162,373 on excessive and duplicative Third Circuit tasks, including two separate moot court sessions
- $68,648 in work outside the scope of their employment
- $88,662.50 in work on the Reply Brief to the Motion to Dismiss
- $89,053 in work on the mediation statement
- $7,420 in travel

## IV.    CONCLUSION

For the past eight months, Debtor's insiders have sought to use this Chapter 11 Case as a means to hold creditors at bay while they squander the company's remaining capital on legal battles with no endgame.  The instant Second QE Fee Application seeks compensation of $801,700.74 in fees and expenses supposedly incurred in the interests of the estate.  Yet for all counsel's collective time on this matter, they billed only a handful of hours for efforts towards reorganization and have yet to propose an actual plan.  Harbor Compliance has not and will not sit idly by while Debtor abuses the protections of Chapter 11 proceedings to benefit its owners and insiders at the expense of the estate and its unsecured creditors.  Harbor Compliance files this Objection to the Second QE Fee Application in hopes that Debtor can avoid administrative insolvency and proceed with reorganization, to the benefit of all creditors.  But if the improper and unreasonable compensation sought in the Fee Application is authorized, Harbor Compliance will have no choice but to consider Chapter 7 conversion to cut off Debtor's unrestrained legal spending.  In the interests of all creditors and the estate, Harbor Compliance respectfully requests that the Court deny the Second QE Fee Application and fashion an Order limiting total fees for all counsel (both prior and present) to the 10% variance permitted under the Cash Collateral Orders.  Doing so would ensure the viability of the estate.  If, however, counsels' exorbitant fees are not reduced to abide by the 10% variance permitted under the Cash Collateral Orders, then any

resulting deficit in cash should be funded by personal contributions from the Principals as a sanction for their improper and destructive actions.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Date: October 16, 2025

By: */s/ Marc Skapof*
Marc Hirschfield, Esquire
1120 Avenue of the Americas, 4th Floor
New York, New York 10036-6700
T: (212) 994-0452; F: (484) 362-2630
E:  mhirschfield@rccblaw.com
Marc Skapof, Esquire
T: (212) 994-0452; F: (484) 362-2630
Email: mskapof@rccblaw.com

Matthew Faranda-Diedrich, Esquire*
Frank Toub, Esquire**
Three Logan Square
1717 Arch Street, 47th Floor
Philadelphia, PA 19103
T: (215) 839-1000; F: (484) 362-2630
Email: mfd@rccblaw.com
*Admitted *Pro Hac Vice*
** *Pro Hac Vice* Application Pending

*Attorneys for Creditor, Harbor Business Compliance Corporation*

**ROYER COOPER COHEN BRAUNFELD LLC**
**Marc Hirschfield, Esquire**
**1120 Avenue of the Americas, 4th Floor**
**New York, New York 10036-6700**
**Telephone: (212) 994-0451**
**Email: mhirschfield@rccblaw.com**
**Marc Skapof, Esquire**
**Telephone: (212) 994-0452**
**Email: mskapof@rccblaw.com**
**Matthew Faranda-Diedrich, Esquire***
**Frank Toub, Esquire****
**Three Logan Square**
**1717 Arch Street, Suite 4700**
**Philadelphia, PA 19103**
**Telephone: (215) 839-1000**
**Email: mfd@rccblaw.com**
***Admitted *Pro Hac Vice***
*****Pro Hac Vice* Application Pending**
***Counsel to Creditor, Harbor Business Compliance Corporation***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Firstbase.io, Inc. | : | Case No. 24-11647(LGB) |
| | : | |
| Debtor. | : | |
| | : | |

### CERTIFICATE OF SERVICE

I, Marc Skapof, do here by affirm under penalty of perjury, that I am not a party to the action and am over 18 years of age and a partner at the law firm of Royer Cooper Cohen Braunfeld LLC, 1120 Avenue of the Americas, 4th Floor, New York, New York 10036.

On this date, I caused to be served a true and correct copy of Creditor, Harbor Business Compliance Corporation's Objection to the Second Interim Fee Application of Quinn Emanuel Urquhart & Sullivan, LLP, directly to Chambers via Federal Express Priority Overnight and as follows:

*Via ECF and/or Email*

Kirby Aisner & Curley LLP
Attn: Dawn Kirby, Esq.
700 Post Road, Suite 237
Scarsdale, New York 10583

Quinn Emanuel Urquhart & Sullivan, LLP
Derek L. Shaffer
1300 I St. NW, Ste. 900
Washington, DC 20005
derekshaffer@quinnemanuel.com
Eric Winston
865 South Figueroa St., 10th Fl.
Los Angeles, CA 90014
ericwinston@quinnemanuel.com
Joseph H. Margolies
191 N. Wacker Dr., Ste. 2700
Chicago, IL 60606
josephmargolies@quinnemanuel.com

U.S. Trustee
United States Trustee
Office of the United States Trustee - NY
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004-1408

Date: October 16, 2025                                    */s/ Marc Skapof*
                                                          Marc Skapof, Esquire