**KANE RUSSELL COLEMAN LOGAN PC**

Morris D. Weiss
New York Bar No. 2594695
401 Congress Ave., Suite 2100
Austin, Texas 78703
Telephone: (512) 487-6580
Email: mweiss@krcl.com

Rama Douglas
New York Bar No. 5491220
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4271
Email: rdouglas@krcl.com

*Counsel to Scaleworks Fund III, LP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                                        Chapter 11

FIRSTBASE.IO, INC.                                Case No. 24-11647 (LGB)

                        Debtor.

--------------------------------------------------------X

### SCALEWORKS' STATEMENT OF INTEREST AND STATUS REPORT

Scaleworks Fund III, L.P. ("Scaleworks"), a prospective purchaser of substantially all assets of Firstbase.io, Inc. (the "Debtor"), hereby submits this Statement of Interest and Status Report in the Debtor's Chapter 11 case. Scaleworks respectfully states as follows:

1.    Proposed Purchase Offer: Scaleworks reaffirms its readiness and ability to acquire the Debtor's business and assets for a consideration of $12 million in cash, plus an equity stake representing 10% ownership in a new acquisition vehicle to be organized by Scaleworks. This proposal is fully committed and funded. Scaleworks has secured the necessary capital to close the transaction. The offer provides immediate and meaningful cash recovery to the estate, along with upside potential for stakeholders through the equity component. The proposed 10% equity allocation to creditors will be issued in the form of non-voting, non-convertible shares, ensuring

creditors share in future value creation while preserving a stable governance structure for the reorganized business.

2.      <u>DIP Financing Commitment</u>: In support of this transaction, Scaleworks has offered to provide a $500,000 debtor-in-possession ("DIP") financing facility on a superpriority, secured basis. This DIP facility (outlined in the term sheet attached as **<u>Exhibit B</u>**) will furnish the Debtor with vital liquidity to fund operations and administrative expenses through the sale process. All necessary terms of the DIP facility have been negotiated and agreed in principle, subject to Court approval. Importantly, the DIP financing is available to the Debtor immediately and will be credited dollar-for-dollar against the purchase price at closing or, at Scaleworks' election, credit-bid under 11 U.S.C. § 363(k) in the sale.

3.      <u>Definitive Documentation</u>: Attached as **<u>Exhibit A</u>** is a fully developed Asset Purchase Agreement ("APA") reflecting the material terms of Scaleworks' offer, and the terms of the DIP. These documents have been negotiated with the Debtor and are fully executable, subject only to customary closing conditions and the completion of confirmatory due diligence. In particular, the APA and DIP term sheet include provisions to ensure a free-and-clear sale under section 363 (with no successor liability) and other standard protections for the transaction, as detailed below. Scaleworks stands prepared to finalize and execute the APA promptly once all conditions have been met.

4.      <u>Ability to Close Promptly</u>: Scaleworks has substantially completed its diligence and expects to complete confirmatory diligence focused primarily on verifying that the Debtor owns or can lawfully transfer the core intellectual property and assets required to continue operations. Scaleworks hopes to timely receive the information necessary to conduct and conclude its due diligence process. Scaleworks understands the importance of an expedited timeline and is

committed to moving swiftly. Barring unforeseen issues in diligence, Scaleworks is confident that it can finalize the acquisition on an expedited basis (approximately one month) and during this time frame expects that its diligence will be completed and Court authorization obtained.

5.    <u>Support of Debtor and Key Creditor</u>: Both the Debtor's management and its key creditor Novel Growth Partners California Investments, LLC ("Novel") have expressed support for this Scaleworks proposal. Their support underscores that the Scaleworks transaction is viewed as a value-maximizing alternative to the current plan sponsored by Harbor Business Compliance Corporation ("Harbor"). The Debtor has indicated that the Scaleworks bid may yield a better outcome for the estate and its creditors, including Novel and other general unsecured creditors, compared to the existing Harbor-sponsored plan. Scaleworks has contacted Harbor to explore whether a consensual resolution can be reached that would allow for an amended plan with improved treatment for general unsecured creditors. Harbor has suggested any such discussions may be better deferred until after plan confirmation. However, Scaleworks believes that resolving these issues in the plan context would provide greater certainty and enhance equity value for all stakeholders and provide greater disclosure to the Court and the parties in interest.

6.    <u>Consummation of Sale or Confirming a Plan</u>: Scaleworks is prepared to proceed with an asset purchase as outlined above and is also prepared to proceed to implement its proposed transaction through a chapter 11 plan.

7.    <u>Operational Continuity and Workforce Stability</u>: Scaleworks has assembled an experienced leadership team, including a designated CEO and CFO, to ensure immediate operational continuity. The company intends to retain key employees and maintain all existing customer relationships and service levels through the transition. This plan provides a stable path forward that avoids disruption and preserves jobs, which would not be achievable under liquidation

or a contentious sale. In Scaleworks' view, this operational transition is critical to preserving enterprise value, ensuring a seamless customer experience, and mitigating execution risk to the estate.

8.    <u>Request for Court's Consideration</u>: Scaleworks respectfully requests that the Court take notice of this competing proposal and allow an appropriate process for its consideration. Scaleworks is mindful of the Court's prior guidance and need for an expeditious resolution. Scaleworks seeks to ensure that its fully-funded alternative transaction can be evaluated on the merits, in parallel with or as a replacement for the pending Harbor plan. Scaleworks defers to the Court as to scheduling and procedure, but is prepared to work on an expedited schedule with all parties to facilitate a fair comparison of the two alternatives in the best interest of creditors.

9.    <u>Sale Order Protections</u>: Should the Court entertain and ultimately approve a sale to Scaleworks (or its designee), Scaleworks requests that any sale order include the customary findings and protections under 11 U.S.C. § 363. In particular, the sale order should provide that the sale of assets to Scaleworks is free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) (with any such interests attaching to the sale proceeds in the same priority), and that Scaleworks (or its designee) is a good-faith purchaser entitled to the protections of section 363(m). The sale order should further confirm that Scaleworks is not a successor to the Debtor and shall have no successor or transferee liability for any pre-existing claims against the Debtor. Moreover, in light of the litigation and judgment held by Harbor, the sale order must expressly address Harbor's asserted claims. Scaleworks requests language clarifying that any claim or interest asserted by Harbor, including any claims related to the Debtor's "Firstbase Start" or "Firstbase Agent" services or any alleged misuse of Harbor's intellectual property, will attach only to the sale proceeds and not to the purchased assets, thereby barring Harbor (or any party

claiming through Harbor) from pursuing the Buyer or the acquired assets post-closing. In addition, Scaleworks respectfully requests that the sale order explicitly include findings that all purchased assets shall be transferred free and clear of any and all liens, claims, or interests of any kind, including any asserted or potential intellectual property or trade secret claims, and that any such interests shall attach solely to the sale proceeds. These provisions will ensure that the transaction is truly free and clear and that Scaleworks can take the Debtor's business forward without the specter of Harbor's claims.

Scaleworks respectfully requests that this Court consider this proposed alternative transaction for the benefit of the stakeholders in this case.

Dated: November 2, 2025
      Austin, Texas

                          Respectfully submitted,

                          KANE RUSSELL COLEMAN & LOGAN PC

By: */s/ Morris D. Weiss*            
      Morris D. Weiss
      New York Bar No. 2594695
      401 Congress Ave., Suite 2100
      Austin, Texas 78701
      Telephone:  (512) 487-6650
      Email: mweiss@krcl.com

      -and-

      Rama Douglas
      New York Bar No. 5491220
      901 Main Street, Suite 5200
      Dallas, Texas 75202
      Telephone: (214) 777-4271
      Email: rdouglas@krcl.com

      *Attorneys for Scaleworks Fund III, LP*

### CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2025, a true and correct copy of the foregoing pleading was served electronically via the Court's ECF/CM notification system to all parties receiving such notices.

*/s/ Morris D. Weiss*

Morris D. Weiss

**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of November 3, 2025, is entered into between **Firstbase.io, Inc.,** a Delaware corporation and debtor-in-possession ("**Seller**"), and **Scaleworks Associates III, LLC**, or its designee (including a newly formed entity organized by Scaleworks Associates III, LLC), a Delaware limited liability company ("**Buyer**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

**RECITALS**

**WHEREAS**, Seller is engaged in the business of providing formation, compliance, registered agent, and incorporation services to startups and small businesses across all 50 states in the United States through an automated digital platform, including its proprietary Firstbase Start and Firstbase Agent services (the "**Business**"); and

**WHEREAS**, on September 25, 2024 (the "**Petition Date**"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), commencing Case No. 24-11647 (the "**Bankruptcy Case**"), and Seller continues to operate the Business and manage its assets as a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Buyer has agreed to provide debtor-in-possession financing to Seller in the Bankruptcy Case (the "**DIP Facility**") to fund Seller's operations and administration of the Bankruptcy Case pending the sale of the Purchased Assets, and Buyer intends to credit bid the outstanding obligations under the DIP Facility as part of the Purchase Price (as defined below) for the Purchased Assets;

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all of the assets and certain specified liabilities of Seller relating to the Business, through a sale and assumption to be conducted under Sections 105, 363 and 365 of the Bankruptcy Code, all subject to the terms and conditions set forth herein and the approval of the Bankruptcy Court; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature, wherever

located, of Seller related to or used in the Business (other than the Excluded Assets) (collectively, the "**Purchased Assets**"), including, without limitation, the following:

(a)    all cash, cash equivalents, and marketable securities of Seller;

(b)    all accounts receivable (trade and non-trade), notes receivable, and other receivables of Seller (the "**Accounts Receivable**");

(c)    all inventory, finished goods, raw materials, work-in-process, packaging, supplies, parts and other inventories owned by Seller (the "**Inventory**");

(d)    all Contracts of Seller listed on Schedule 1.01(d) of the Disclosure Schedules (the "**Assigned Contracts**"). For purposes of this Agreement, "**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments and legally binding arrangements, whether written or oral. Seller shall assume and assign the Assigned Contracts to Buyer at Closing pursuant to Section 365 of the Bankruptcy Code and the Sale Order (as defined herein), and Buyer shall be responsible for payment of all amounts required to cure any defaults under such Assigned Contracts as required by Section 365(b)(1) of the Bankruptcy Code (collectively, the "**Cure Costs**");

(e)    all intellectual property and other intangible proprietary rights owned by Seller or used in the Business, including, without limitation, the patents, patent applications, trademarks, trade names, service marks, logos, Internet domain names, websites, social media accounts, software, technology, trade secrets, customer and client data, and other intellectual property rights of Seller, including those items listed on Schedule 1.01(i) of the Disclosure Schedules (collectively, the "**Intellectual Property**");

(f)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, computers, telephones, hardware, peripherals and other tangible personal property (the "**Tangible Personal Property**");

(g)    all prepaid expenses, credits, advance payments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, security and other deposits, charges, sums, and fees (including any such item relating to the payment of Taxes) of Seller;

(h)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets or Assumed Liabilities;

(i)    all insurance benefits, rights and proceeds arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities, including insurance arising from any claims, occurrences or loss events prior to Closing;

(j)    originals, or where not available, copies, of all books and records of Seller, including books of account, ledgers and general financial and accounting records, machinery and equipment maintenance files, customer lists and customer purchasing histories, price lists, vendor and supplier lists, distribution lists, production data, quality control records and procedures, customer complaints and inquiry files, research and

development files, records, and data (including all correspondence with any federal, state, local or foreign government or any agency or instrumentality thereof, or any court or tribunal of competent jurisdiction), sales and marketing materials, studies, reports and other documents and records, in each case to the extent related to the Business or the Purchased Assets (collectively, the "**Books and Records**");

(k)     all domain names, DNS records and registrar accounts (and administrative credentials thereto), websites, social media handles and accounts, app store/developer portal accounts, and all associated log-ins, passwords and authentication credentials (and any documentation required by registrars, hosting providers or platforms to transfer control) (the "**Digital Assets**"); and

(l)     all goodwill, enterprise value and going concern value of the Business and the Purchased Assets.

**Section 1.02    Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include the assets, properties, and rights of Seller expressly set forth on Schedule 1.02 of the Disclosure Schedules (collectively, the "**Excluded Assets**"). **For the avoidance of doubt, the Excluded Assets shall include any and all claims or causes of action of Seller arising under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553 thereof) and any proceeds or recoveries thereof.** All assets of Seller that are not Purchased Assets shall be deemed Excluded Assets.

**Section 1.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following liabilities and obligations of Seller (and no others), which shall be referred to collectively as the "**Assumed Liabilities**":

(a)     all trade accounts payable and other accrued monetary obligations of Seller to third parties incurred in connection with the Business and outstanding as of the Closing Date (other than any accounts payable or obligations constituting professional fees or administrative expenses of the Bankruptcy Case, and excluding any employment-related obligations, severance, retention, change-in-control or similar compensation or benefits), but only to the extent such payables are not overdue or in default as of the Closing Date;

(b)     all liabilities and obligations of Seller under the Assigned Contracts, but only to the extent that such liabilities arise and are to be performed on or after the Closing Date and do not arise from or relate to any breach, default or failure to perform by Seller under such Assigned Contracts on or prior to the Closing Date; and

(c)     all Cure Costs required to cure any monetary defaults under the Assigned Contracts in order to effectuate the assumption and assignment of the Assigned Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code.

For purposes of this Agreement, "**Liabilities**" means any and all liabilities, obligations or commitments of any nature whatsoever, whether accrued or unaccrued, known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured,

determined or determinable, due or to become due, whenever or however arising (including whether arising out of any contract or tort based on negligence, strict liability or otherwise).

**Section 1.04  Excluded Liabilities.** Except for the Assumed Liabilities expressly set forth in Section 1.03, Buyer shall not assume, and shall not be deemed to have assumed or be liable for, any Liabilities of Seller or any of Seller's Affiliates (as defined herein) of any kind or nature, whether presently in existence or arising hereafter (collectively, the "**Excluded Liabilities**"). All such Excluded Liabilities shall remain the sole responsibility of Seller and its estate. Without limiting the generality of the foregoing, Excluded Liabilities include: (i) any Taxes (as defined herein) arising from or related to the operation of the Business or ownership of the Purchased Assets prior to the Closing; (ii) any indebtedness for borrowed money or guaranty obligations of Seller; (iii) any Liabilities with respect to any Excluded Assets; (iv) any Liabilities to equity holders, officers or directors of Seller (including any loans or compensation-related claims); (v) any Liabilities arising out of claims, litigation or causes of action against Seller (whether such actions are commenced before or after Closing) relating to facts, events or circumstances occurring on or prior to the Closing Date (except to the extent such claim is an Assumed Liability under Section 1.03); and (vi) any Liabilities arising under or relating to any employment, consulting, retention, severance, change-in-control, benefit or similar arrangements or policies of Seller (including any collective bargaining obligations), whether arising before, on or after the Closing Date.

**Section 1.05  Purchase Price.** The aggregate purchase price for the Purchased Assets shall be **$12,000,000** (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. The Purchase Price shall be paid and satisfied as follows:

(a)  **Credit Bid.** An amount equal to the outstanding "DIP Obligations" (as defined in the DIP Orders) as of the Closing (the "**Credit Bid Amount**") shall be credited dollar-for-dollar against the Purchase Price pursuant to section 363(k) of the Bankruptcy Code.

(b)  **Cash at Closing.** The balance of the Purchase Price after giving effect to the Credit Bid Amount shall be paid in cash by wire transfer of immediately available funds to the account(s) designated by Seller on Schedule 1.04 (such balance, the "Cash Purchase Price").

(c)  **Equity Consideration.** In addition to the Cash Consideration and the assumption of the Assumed Liabilities, at the Closing, Buyer (or its designee) shall cause a newly formed acquisition entity that will hold the Purchased Assets ("**NewCo**") to issue to the Debtor's unsecured creditors, on a pro rata basis according to their allowed claims, equity securities representing in aggregate ten percent (10%) of the fully diluted equity of NewCo (the "**Equity Consideration**"). The Equity Consideration shall be designated as a separate class of non-voting, non-convertible shares having no management, information, or preemptive rights, and shall rank pari passu with common equity solely with respect to economic distributions in connection with any sale, merger, or liquidation of NewCo. The Equity Consideration shall not entitle holders to participate in the governance of NewCo, nor shall it restrict Buyer's ability to operate, finance, or sell the Business in the future.

(d)    **No Working Capital Adjustment.** The parties acknowledge and agree that the sale is being effected pursuant to section 363 of the Bankruptcy Code and no working capital adjustment or other post-Closing purchase price true-up shall apply.

(e)    **Cure Costs; Cap.** Buyer shall be responsible for Cure Costs required under section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts up to an aggregate amount of $500,000 (the "**Cure Cap**"). Any Cure Costs in excess of the Cure Cap shall, at Buyer's election, (i) reduce the Purchase Price dollar-for-dollar, or (ii) result in exclusion of the applicable contract(s) from the Assigned Contracts.

**Section 1.06   Allocation of Purchase Price.** The Purchase Price (and the Assumed Liabilities to the extent properly taken into account) shall be allocated among the Purchased Assets for all purposes, including federal and state Tax purposes, in accordance with the allocation schedule to be agreed by Buyer and Seller and set forth on Schedule 1.05 (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in a manner consistent with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller each covenant and agree to file all Tax Returns (including IRS Form 8594) and any other informational statements required by any Tax authority, in a manner consistent with the Allocation Schedule.

**Section 1.07   Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer is required to deduct and withhold under any provision of applicable Tax Law. Any such withheld amounts shall be treated as delivered to Seller for all purposes of this Agreement.

**Section 1.08   Third-Party Consents and Further Assurances.** To the extent that Seller's rights under any Purchased Asset (including any Assigned Contract) may not be sold, assigned or transferred without the consent of another Person which has not been obtained prior to the Closing, or if such assignment would be ineffective or would materially impair Buyer's rights under the asset in question so that Buyer would not acquire the full benefit of such asset, then, unless waived by Buyer, (a) this Agreement and the related instruments of transfer shall not constitute an assignment or transfer of such Purchased Asset until such consent is obtained or the impairment remedied, and (b) Seller, at its expense, shall use its best efforts to obtain any such required consent as soon as practicable after the Closing (and Seller shall cooperate with Buyer, at Buyer's expense, in any reasonable arrangement to provide that Buyer shall receive the benefits under such asset). Nothing in this Section 1.08 shall affect Buyer's rights under this Agreement (including Buyer's rights under Article VII hereof) or relieve Seller of its obligations to transfer the Purchased Assets to Buyer as provided herein.

**ARTICLE II**
**CLOSING**

**Section 2.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Kane Russell Coleman Logan PC in Austin, Texas, or remotely by exchange of electronic documents and signatures, on a date that is no later than **5 Business Days** after the satisfaction or waiver of all of the conditions set forth in Article VI (other than conditions which

by their nature are to be satisfied at the Closing), or on such other date or at such other time as Seller and Buyer may mutually agree in writing. The date on which the Closing actually occurs is referred to herein as the "**Closing Date**."

**Section 2.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a duly executed bill of sale **(in the form attached hereto as Exhibit [A])** (the "**Bill of Sale**") transferring to Buyer all of the Tangible Personal Property included in the Purchased Assets;

(ii)    a duly executed assignment and assumption agreement **(in the form attached hereto as Exhibit [B])** (the "**Assignment and Assumption Agreement**"), effecting the assignment to Buyer of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities;

(iii)    a Transition Services Agreement in the form of **Exhibit [C]** attached hereto/in form and substance satisfactory to Buyer (the "**Transition Services Agreement**") and duly executed by Seller;

(iv)    a Consulting Agreement with identified key personnel in the form of **Exhibit [D]** attached hereto/in form and substance satisfactory to Buyer (the "**Consulting Agreement**") and duly executed by Seller;

(v)    executed registrar transfer forms, platform assignment instruments and any other instruments required to transfer and vest in Buyer full administrative control of the Digital Assets (including domain names, DNS, social media and app store accounts), together with all current log-ins and credentials;

(vi)    a certified copy of the Sale Order (as defined in Section 6.02) entered by the Bankruptcy Court, which Sale Order shall be a Final Order (as defined herein) and in full force and effect as of the Closing;

(vii)    a certificate of an authorized officer of Seller, dated as of the Closing Date, certifying that the conditions set forth in Sections 6.02(a) and 6.02(b) (Seller's representations and covenants) have been satisfied;

(viii)    a certificate of the Secretary or other authorized officer of Seller attaching (A) the resolutions of the board of directors (or other governing body) of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the incumbency and specimen signatures of the officers of Seller executing this Agreement and any other documents to be delivered by Seller at the Closing; and

(ix)    such other customary instruments of transfer, assignment or assumption, filings, or documents (reasonably satisfactory in form and substance

to Buyer) as may be required to give effect to this Agreement and the transactions contemplated hereby (including documents and instruments sufficient to release any Liens on the Purchased Assets, other than Permitted Liens or any Liens that will be released by the Sale Order).

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Cash Purchase Price (as adjusted pursuant to the terms hereof, and net of any amounts credit-bid or withheld in accordance with this Agreement), by wire transfer of immediately available funds to the account(s) designated by Seller in the wire instructions set forth on Schedule 1.04;

(ii)    a duly executed counterpart to the Assignment and Assumption Agreement;

(iii)    if applicable, a duly executed counterpart to the Transition Services Agreement;

(iv)    a certificate of an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Sections 6.03(a) and 6.03(b) (Buyer's representations and covenants) have been satisfied; and

(v)    a certificate of the Secretary or other authorized officer of Buyer attaching (A) the resolutions of the board of directors or other governing authority of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the incumbency and specimen signatures of the officers or representatives of Buyer executing this Agreement and any other documents to be delivered by Buyer at the Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof and as of the Closing Date (or, in the case of any representation or warranty expressly made as of a specified date, as of such specified date), except as set forth in the Disclosure Schedules delivered by Seller to Buyer (it being understood that disclosure of any item in any section or subsection of the Disclosure Schedules shall be deemed disclosed with respect to any other section or subsection of this Agreement to which the relevance of such item is reasonably apparent on its face):

**Section 3.01    Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to any necessary authorization from the Bankruptcy Court, Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby, subject to any required Bankruptcy Court approval. The execution and

delivery by Seller of this Agreement and the Transaction Documents, and the performance by Seller of its obligations hereunder and thereunder, have been duly authorized by all requisite corporate (and, if required, stockholder or other) action on the part of Seller. This Agreement has been duly executed and delivered by Seller and (assuming due authorization, execution and delivery by Buyer and subject to Bankruptcy Court approval) constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**Section 3.02   No Conflicts or Consents.** The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) assuming the Sale Order and other necessary orders are obtained from the Bankruptcy Court, violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) except as set forth on Schedule 3.02, require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets. Except for entry of the Sale Order and such other orders of the Bankruptcy Court as may be required, no consent, approval, permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any other Transaction Document or the consummation of the transactions contemplated hereby or thereby, except as set forth on Schedule 3.02.

**Section 3.03   Financial Statements.** Seller has delivered to Buyer copies of (i) the unaudited balance sheet of Seller as of October 2025 and the related unaudited statements of income and cash flows for the quarter then ended, and (ii) the unaudited balance sheet of Seller (the "**Latest Balance Sheet**") as of October 2025 (the "**Balance Sheet Date**") and the related statements of income and cash flows for the month then ended (collectively, the "Financial Statements"). The Financial Statements have been prepared from the books and records of Seller in accordance with historical accounting practices and fairly present in all material respects the financial condition and results of operations of Seller as of the respective dates thereof and for the periods covered thereby, subject to normal year-end adjustments (which will not be material) and the absence of notes.

**Section 3.04   Absence of Undisclosed Liabilities.** Seller has no Liabilities, other than (a) Liabilities set forth on the face of the Latest Balance Sheet (excluding any notes thereto), (b) Liabilities which have arisen since the Balance Sheet Date in the ordinary course of business consistent with past practice, (c) Liabilities incurred in connection with the Bankruptcy Case

(including postpetition trade payables and administrative expenses incurred in the ordinary course, and any professional fees and expenses of Seller's estate), and (d) other Liabilities which would not, individually or in the aggregate, be material to the Business or the Purchased Assets.

**Section 3.05    Absence of Certain Changes, Events, and Conditions.** Since the Balance Sheet Date, and other than the commencement of the Bankruptcy Case and actions taken in connection therewith, (a) Seller has operated the Business in the ordinary course consistent with past practice, (b) there has not been any event, occurrence or development that has had, or would reasonably be expected to have, a Material Adverse Effect (as defined in Section 6.02(e)), and (c) Seller has not taken any action that, if taken after the date of this Agreement without Buyer's consent, would violate Section 5.01 hereof.

**Section 3.06    Assigned Contracts.** Schedule 1.01(d) of the Disclosure Schedules sets forth a correct and complete list of all Assigned Contracts. Seller has made available to Buyer true and complete copies of each Assigned Contract, including all amendments thereto. Except as a result of the filing of the Bankruptcy Case, (a) each Assigned Contract is valid and binding on Seller and, to Seller's Knowledge, each other party thereto, and is in full force and effect, subject to the applicable provisions of the Bankruptcy Code, and (b) Seller has performed all material obligations required to be performed by it to date under each Assigned Contract and is not in material breach or default thereunder, and, to Seller's Knowledge, no other party to any Assigned Contract is in material breach or default thereunder. **Seller has not rejected any executory contract or unexpired lease that would have been a Purchased Asset, and Seller has not received any written notice of any plan or intention of any other party to any Assigned Contract to cancel, terminate or materially modify such Assigned Contract.**

**Section 3.07    Title to Purchased Assets.** Immediately prior to the Closing, Seller will have, and pursuant to the Sale Order and Section 363(f) of the Bankruptcy Code Seller will convey to Buyer at the Closing, good and valid title to, or in the case of leased or licensed assets, a valid leasehold or license interest in, all of the Purchased Assets, free and clear of all Liens, claims, interests and encumbrances (other than Permitted Liens and Assumed Liabilities). "**Permitted Liens**" means (i) Liens for current period Taxes not yet due and payable or being contested in good faith by appropriate proceedings (and for which adequate accruals or reserves have been established on Seller's books in accordance with past practice), (ii) mechanic's, materialmen's and similar Liens arising in the ordinary course of business that are not yet due and payable or that are being contested in good faith, and (iii) easements, rights of way, zoning ordinances and similar encumbrances on real property that do not materially interfere with the current use of such property.

**Section 3.08    Condition and Sufficiency of Assets.** Except as set forth on Schedule 3.08, the Tangible Personal Property included in the Purchased Assets is in good operating condition and repair (reasonable wear and tear excepted) and is adequate for the uses to which it is currently being put. The Purchased Assets (considered together with the services and benefits to be provided under the Transition Services Agreement, if any) include all assets and rights that are necessary for the continued conduct of the Business by Buyer after the Closing substantially in the same manner as conducted by Seller immediately prior to the Closing.

**Section 3.09    [Intentionally Omitted.]**

**Section 3.10    [Intentionally Omitted.]**

**Section 3.11    [Intentionally Omitted.]**

**Section 3.12    Legal Proceedings; Governmental Orders.** Except for the Bankruptcy Case and any adversary proceedings or contested matters therein, or as set forth on Schedule 3.12, there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller or any Affiliate of Seller that relate to the Business, the Purchased Assets or the Assumed Liabilities, or that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. **Schedule 3.12** sets forth all Actions by or against Seller that are pending in any court or before any arbitrator or Governmental Authority (other than the Bankruptcy Case). **Seller is not subject to any outstanding Governmental Order (nor is any Purchased Asset subject to any Governmental Order) except as set forth on Schedule 3.12.**

**Section 3.13    Compliance with Laws.** Except as set forth on Schedule 3.13 and except for the filing and pendency of the Bankruptcy Case, Seller is and has been in compliance in all material respects with all Laws applicable to the conduct of the Business and ownership of the Purchased Assets. Seller has not received any written notice from any Governmental Authority regarding any actual or alleged violation of any applicable Law with respect to the Business or the Purchased Assets that remains outstanding or unresolved.

**Section 3.14    Taxes.** Seller has filed (or caused to be filed) on a timely basis all material Tax Returns required to be filed by Seller with respect to the Purchased Assets or the Business, and all such Tax Returns are true, complete and correct in all material respects. Seller has paid, or caused to be paid, all Taxes shown as due on such Tax Returns or otherwise due and payable with respect to the Business or the Purchased Assets, other than any Taxes that are being contested in good faith or which are not yet due and payable. There are no Liens for Taxes upon any of the Purchased Assets other than Permitted Liens. As used in this Agreement, "**Tax**" or "**Taxes**" means (i) any and all federal, state, local or foreign taxes, charges, fees, levies, or other similar assessments or liabilities, including income, gross receipts, ad valorem, premium, excise, real property, personal property, windfall profit, sales, use, transfer, customs duties, franchise, registration, employment, withholding, payroll, unemployment, social security, capital stock, severance, stamp, occupation, alternative or add-on minimum, estimated, and other taxes of any kind whatsoever, and including any interest, penalty or addition thereto, whether disputed or not; and (ii) any liability for the payment of any amount of the type described in the foregoing clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any taxable period or as a result of any obligation under any Tax sharing, indemnity or similar agreement.

**Section 3.15    [Intentionally Omitted.]**

**Section 3.16    Brokers.** Except as set forth on Schedule 3.16, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Seller in connection with the transactions contemplated by this Agreement. Any fees due to the Persons listed on Schedule 3.16 shall be the sole responsibility of Seller (as an expense of the estate in the Bankruptcy Case), and no claim for any such fee shall be asserted against Buyer or the Purchased Assets.

**Section 3.17   No Other Representations; "As Is" Sale.** Except for the representations and warranties expressly set forth in this Article III (as qualified by the Disclosure Schedules) or in any certificate delivered by Seller pursuant to this Agreement, neither Seller nor any other Person is making any representation or warranty of any kind, express or implied, at law or in equity, in respect of Seller, the Business or any of the Purchased Assets, including with respect to merchantability or fitness for any particular purpose, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law. Buyer hereby acknowledges and agrees that, except for the express representations set forth in this Agreement and any express representations set forth in the Sale Order, the Purchased Assets are being transferred to Buyer on a strictly "AS IS, WHERE IS" basis and "WITH ALL FAULTS." Buyer has had the opportunity to conduct, and has conducted to its satisfaction, its own independent investigation and review of the Business, the Purchased Assets and Assumed Liabilities, and in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the express representations and warranties of Seller set forth in this Agreement (as qualified by the Disclosure Schedules) and upon its own examination and investigation.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Buyer has full organizational power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document, and the performance by Buyer of its obligations hereunder and thereunder, have been duly authorized by all requisite action on the part of Buyer and its general partner. This Agreement has been duly executed and delivered by Buyer and (assuming due authorization, execution and delivery by Seller and entry of the Sale Order) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

**Section 4.02   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the organizational documents of Buyer; (b) violate or conflict with any Law or Governmental Order applicable to Buyer; or (c) require any consent or notice under, conflict with, or result in a violation or breach of, or constitute a default under, any material contract or other instrument binding upon Buyer. Except for the Sale Order and such other orders of the Bankruptcy Court as may be necessary, no consent, approval, authorization or Order of, or filing with, any Governmental Authority is required by Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

**Section 4.03    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.04    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or materially delay the transactions contemplated by this Agreement.

**Section 4.05    Sufficiency of Funds; DIP Financing.** Buyer (either itself or through its designee or Affiliates) has, and on the Closing Date will have, sufficient cash on hand, available lines of credit or other sources of immediately available funds to enable Buyer to pay the Cash Purchase Price (and any adjustments thereto), to satisfy all Cure Costs, and to consummate the transactions contemplated by this Agreement and the other Transaction Documents. Buyer acknowledges that its obligations under this Agreement are not in any way contingent or otherwise subject to Buyer's ability to obtain any financing. Buyer is the lender under, or Sponsor of, the DIP Facility provided to Seller in the Bankruptcy Case, and Buyer has fully complied (and will continue to comply) with its funding and other obligations under the DIP Facility and related DIP Orders.

**ARTICLE V**
**COVENANTS**

**Section 5.01    Conduct of Business Until Closing.** During the period from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with Article VIII, except (x) as required by applicable Law or order of the Bankruptcy Court, (y) as otherwise expressly contemplated by this Agreement or the DIP Facility (including compliance with the DIP budget and any operational covenants or limitations in the DIP Orders), or (z) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall (a) conduct the Business in the ordinary course consistent with past practice in all material respects, including by maintaining the core business operations, key personnel and relationships with customers and suppliers, (b) maintain the Purchased Assets in their current condition (normal wear and tear excepted), and (c) use commercially reasonable efforts to preserve intact its business organization and the goodwill of the Business. Without limiting the generality of the foregoing, from the date hereof until the Closing (unless Buyer shall otherwise consent in writing or except as otherwise expressly contemplated by this Agreement or required by the DIP Facility or Bankruptcy Court orders), Seller shall not: (i) sell, transfer, lease, license or otherwise dispose of any material Purchased Assets, other than sales of Inventory or collection of Accounts Receivable in the ordinary course of business; (ii) terminate, amend, reject or grant any material waiver under any Assigned Contract, other than with Bankruptcy Court approval and with Buyer's prior written consent; (iii) incur any new indebtedness or guaranty any indebtedness, other than unsecured trade payables incurred postpetition in the ordinary course of business and liabilities under the DIP Facility; (iv) grant any Liens (other than Permitted Liens and liens granted under the DIP Facility) on any Purchased Asset; (v) make any loans or advances to, guarantees for the benefit of, or any investments in, any Person (other than advancement of expenses to employees in the ordinary course); (vi) institute or settle any material Action involving or affecting the Business or the Purchased Assets, other than the compromise of accounts receivable in the ordinary course; (vii) enter into any material new Contract that would be an

Assigned Contract, or terminate or materially amend any Assigned Contract, outside the ordinary course of business; (viii) increase the compensation or benefits payable to any employee, officer or director of Seller (other than bonuses or other payments in connection with retention programs approved by the Bankruptcy Court); (ix) assume, reject or assign any material executory contract or unexpired lease under Section 365 of the Bankruptcy Code without Buyer's prior written consent (not to be unreasonably withheld), except as required by this Agreement; or (x) agree or commit to do any of the foregoing.

**Section 5.02   Access to Information.** Buyer acknowledges that it has conducted substantial diligence on the Business and the Purchased Assets prior to the date of this Agreement. Buyer shall be entitled to continue limited confirmatory diligence through the date of the Sale Hearing, focused primarily on verifying that the Debtor has good and marketable title to its intellectual property, technology, and other material assets, and that such assets will transfer to Buyer free and clear of any asserted or potential third-party liens, claims, or encumbrances. Completion of such diligence shall not be a condition to Closing, except in the event Buyer reasonably determines, based on credible evidence, that the Debtor does not own, or cannot lawfully transfer, material intellectual property or assets necessary for continued operations, or that there exists a material adverse claim that cannot be resolved through the Sale Order. Notwithstanding the foregoing, Seller shall not be required to provide access to any information if doing so is prohibited by applicable Law or could reasonably be expected to result in a loss of privilege (provided that Seller shall use commercially reasonable efforts to provide such information in a manner that does not result in such a loss). All information provided to Buyer or its Representatives pursuant to this Agreement shall be kept confidential in accordance with the Non-Disclosure Agreement dated as of October 2025 between Buyer (or its Affiliate) and Seller, which remains in full force and effect and is incorporated herein by reference. Seller shall use commercially reasonable efforts to deliver: (i) core diligence items identified by Buyer within 24 hours of request, and (ii) all other requested items within 48 hours, subject to the foregoing privilege and confidentiality limitations. The parties shall confer in good faith to prioritize and triage urgent items designated by Buyer.

**Section 5.03   Buyer's Diligence; Diligence Period.** Buyer's right to conduct legal, financial, commercial, operational, tax, technology and intellectual property diligence with respect to the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby shall continue through the period commencing on the Commencement of Process Date and ending at 5:00 p.m. New York time on the date that is twenty-eight (28) days thereafter, as such period may be extended by Buyer one or more times by written notice to Seller (the "**Diligence Period**"). Seller shall reasonably cooperate with Buyer in connection with Buyer's diligence during the Diligence Period, consistent with the access covenants set forth above. Buyer may waive or shorten the Diligence Period at its discretion.

**Section 5.04   No Solicitation of Other Bids.** From and after the execution of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall not, and shall not authorize or permit any of its Affiliates or any of its or their respective directors, officers, employees, attorneys, investment bankers, accountants or other advisors or representatives (collectively, "**Representatives**") to, directly or indirectly, solicit, initiate, encourage or facilitate any inquiries or the submission of any proposals or offers from any Person (other than Buyer and its Affiliates) relating to any transaction involving the direct or indirect sale,

transfer or other disposition of the Purchased Assets or the Business (an "**Alternative Transaction**"), or enter into or continue any discussions or negotiations regarding any Alternative Transaction, or furnish any information to any Person in connection with or in response to an inquiry regarding an Alternative Transaction. Seller shall, and shall cause its Representatives to, immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than Buyer) conducted heretofore with respect to any Alternative Transaction. **Seller shall promptly (and in any event within one Business Day) notify Buyer if any proposal or offer for an Alternative Transaction is received by, or any inquiries or contacts in regard thereto are made to, Seller or any of its Representatives, and shall provide Buyer with a copy of any such written proposal or inquiry (or a written summary of any oral proposal or inquiry).** Seller acknowledges that any breach of the restrictions set forth in this Section 5.04 would result in irreparable injury to Buyer for which monetary damages would not be an adequate remedy, and therefore Buyer shall be entitled, in addition to any other rights and remedies, to seek injunctive relief to enforce the terms of this Section 5.04 without the necessity of posting a bond or proving actual damages. Notwithstanding the foregoing, Section 5.04 is subject to Seller's Fiduciary Out in Section 8.01(h).

Section 5.05   **Notice of Certain Events.** From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of: (a) any event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect; (b) any notice or communication received by Seller from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (c) any written notice or communication received by Seller from any Governmental Authority in connection with the transactions contemplated by this Agreement or the Bankruptcy Case; and (d) any Actions commenced or, to Seller's Knowledge, threatened, against Seller, the Business or the Purchased Assets that, if pending on the date of this Agreement, would have been required to be disclosed pursuant to Section 3.12 or that relate to the consummation of the transactions contemplated by this Agreement. **Buyer's receipt of information pursuant to this Section 5.05 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement**.

Section 5.06   **Public Announcements.** Seller shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of Buyer, except as may be necessary to comply with applicable Law or the requirements of the Bankruptcy Court (including the filing of this Agreement with the Bankruptcy Court and information contained in the motions seeking the DIP Order, Sale Procedures Order or Sale Order). Seller and Buyer shall cooperate on the content and timing of any press releases or public statements announcing the consummation of the transactions contemplated by this Agreement.

Section 5.07   **Bankruptcy Court Matters.** Seller shall use its best efforts to obtain entry of the following orders of the Bankruptcy Court in accordance with the specified timing:

(a)    **DIP Order.** No later than 5 days after the November 3, 2025 (the "**Commencement of Process Date**"), Seller shall file a motion (the "DIP Motion") with the Bankruptcy Court seeking entry of interim and final orders authorizing the DIP Facility on the terms attached as **Exhibit [D]** (the "**DIP Term Sheet**") and otherwise acceptable to

Buyer. Seller shall use commercially reasonable efforts to obtain entry of an interim DIP financing order (the "Interim DIP Order") within 10 days after the Commencement of Process Date, and a final DIP financing order (the "**Final DIP Order**") within 30 days after the Commencement of Process Date (or as soon thereafter as the Bankruptcy Court's schedule permits). The Interim DIP Order and Final DIP Order (collectively, the "**DIP Orders**") shall be in form and substance acceptable to Buyer in its sole discretion. Without limiting the generality of the foregoing, the DIP Orders shall provide, among other things, that (i) Buyer (as DIP lender) has the right, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the DIP Obligations (as defined in the DIP Orders) in connection with any sale of the Purchased Assets, (ii) the DIP Obligations shall be credit bid (to the fullest extent elected by Buyer) as consideration for the Purchased Assets if Buyer is the successful purchaser at the Sale (as defined below), and (iii) the Break-Up Fee (as defined in Section 8.02) are approved and shall be payable as set forth in this Agreement, and shall constitute allowed superpriority administrative expenses of Seller's estate. Seller shall not seek or consent to any modification or amendment to the DIP Orders or any DIP financing documentation without Buyer's prior written consent. Seller shall promptly provide Buyer and its counsel with draft copies of all proposed DIP Motions, DIP Orders and other material pleadings or documents related to the DIP Facility for Buyer's review and comment in advance of filing, and such documents shall be acceptable to Buyer in all material respects.

(b)    **Sale Procedures Order.** No later than 5 days after the Commencement of Process Date, Seller shall file a motion (the "**Sale Procedures Motion**") with the Bankruptcy Court seeking entry of an order (the "**Sale Procedures Order**"), in form and substance acceptable to Buyer, which, among other things, schedules a hearing to approve the sale of the Purchased Assets to Buyer pursuant to this Agreement (the "**Sale Hearing**") to be held by no later than 10 days after the Commencement of Process Date. Seller shall give Buyer reasonable opportunity to review and comment upon all motions, proposed orders, notices and other documents that Seller proposes to file with the Bankruptcy Court in connection with or that might reasonably affect approval of the Sale Procedures Order, and such documents shall be in form and substance reasonably acceptable to Buyer.

(c)    **Sale Order.** Seller shall use its best efforts to seek and obtain entry of an order of the Bankruptcy Court at or following the Sale Hearing approving this Agreement and authorizing Seller to consummate the sale of the Purchased Assets to Buyer pursuant to Section 363(b), free and clear of all Liens, claims and interests pursuant to Section 363(f) of the Bankruptcy Code, and authorizing the assumption and assignment of the Assigned Contracts pursuant to Section 365 (the "**Sale Order**"). The Sale Order shall be in form and substance acceptable to Buyer in its sole discretion, and shall, without limitation: (i) approve this Agreement and the transactions contemplated hereby; (ii) find that Buyer is a "good faith" purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iii) provide that the sale of the Purchased Assets to Buyer shall be free and clear of all Liens, claims, encumbrances and interests of any kind or nature whatsoever (except for Assumed Liabilities and Permitted Liens), with any such interests to attach to the sale proceeds with the same validity, priority and extent as existed immediately prior to the sale; (iv) confirm that the Purchased Assets are transferred free and clear of any claims of copyright, trade secret, or other intellectual-property infringement arising prior to the

Closing (including any asserted or potential rights, licenses, or claims relating to the Debtor's intellectual property, technology, data, software, or platforms, whether known or unknown, including those asserted by Harbor Business Compliance Corporation), with any such claims or interests to be deemed extinguished and to attach to the proceeds of the sale with the same priority and extent as existed immediately prior to the sale, pursuant to Section 363(f) of the Bankruptcy Code; (v) authorize the assumption and assignment to Buyer of each of the Assigned Contracts, and fix the Cure Costs for each Assigned Contract (with Buyer responsible for payment of such Cure Costs at Closing); (vi) permanently bar and enjoin each counterparty to an Assigned Contract from asserting against Buyer any default, claim, breach or condition arising prior to the Closing (other than the Cure Costs); (vii) exempt the sale and transfer of the Purchased Assets from any stamp, transfer, sales, use or similar Tax under Section 1146(a) of the Bankruptcy Code; (viii) include findings that adequate notice of the Sale and Sale Hearing was given in accordance with the Bankruptcy Code and applicable rules, and that Buyer is not a successor to Seller or its estate by reason of any theory of law or equity and Buyer shall not have any successor or transferee liability for any Liabilities of Seller other than the Assumed Liabilities; (ix) order that the provisions of the Sale Order shall remain in effect in the event of any conversion or dismissal of the Bankruptcy Case. Seller agrees that it will promptly take such actions as may be reasonably requested by Buyer to assist in obtaining Bankruptcy Court approval of the Sale Order and all other orders necessary or appropriate to consummate the transactions contemplated by this Agreement; and (x) expressly provide that the Purchased Assets are transferred free and clear of any and all claims and causes of action of Harbor Business Compliance Corporation, with any such claims to attach to the proceeds with the same validity, priority and extent as existed immediately prior to the Sale. **Seller shall give Buyer and its counsel reasonable opportunity to review and comment upon all motions, proposed orders, notices or other documents that Seller proposes to file with the Bankruptcy Court in connection with the Sale (including the Sale Procedures Motion and the proposed Sale Order), and such documents shall be in form and substance acceptable to Buyer.** If the Sale Order or another relevant order of the Bankruptcy Court shall be appealed by any party (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller shall take all reasonable steps as may be necessary to defend against such appeal or petition and to endeavor to obtain an expedited resolution of any such appeal or petition.

(d)      **Consultation and Support.** Seller shall keep Buyer reasonably informed of the status of the Bankruptcy Case and promptly notify Buyer of any material motions, applications, objections or other pleadings or documents served, filed or entered in the Bankruptcy Case relating to the Purchased Assets, the DIP Facility or the transactions contemplated by this Agreement. Seller shall consult with Buyer and its Representatives in good faith regarding the strategy for obtaining (and in connection with any hearing to consider approval of) the DIP Orders, the Sale Procedures Order and the Sale Order. **Seller shall not take any action, file any motion, pleading or plan, or seek any relief, that is inconsistent with or could reasonably be expected to prevent or materially impede the transactions contemplated by this Agreement, the DIP Facility, or the stalking-horse bid status of Buyer (including any agreement to grant bid protections to any third party).** Seller shall diligently prosecute the entry of the DIP Orders, the Sale Procedures Order and the Sale Order and shall use commercially reasonable efforts to satisfy all

milestones or deadlines relating to the Sale and DIP process that are established in the DIP Facility or by Order of the Bankruptcy Court (including those set forth in this Section 5.07).

**Section 5.08   Assigned Contracts; Adequate Assurance.** Seller shall use commercially reasonable efforts to provide notice under the Bankruptcy Code and the Bankruptcy Rules to all counterparties to executory contracts and unexpired leases of the proposed assumption and assignment of the Assigned Contracts to Buyer and the proposed Cure Costs with respect thereto, such that the Sale Order can authorize the assumption and assignment of the Assigned Contracts to Buyer on the Closing Date. Buyer shall provide adequate assurance of the future performance of the Assigned Contracts by Buyer, as reasonably required by the Bankruptcy Court or under the Bankruptcy Code, including by furnishing information or executing affidavits or declarations reasonably requested by Seller to be filed with the Bankruptcy Court. Buyer shall have the right, by written notice to Seller at any time prior to the Closing, to remove any Contract from Schedule 1.01(d) (in which case such Contract shall be deemed an Excluded Asset and, if previously approved for assumption and assignment, Seller will withdraw such request with respect to such Contract), or to add any Contract (of Seller) to Schedule 1.01(d) as an "Assigned Contract" (provided Buyer agrees to pay all Cure Costs with respect to such Contract and such Contract was not previously rejected or terminated). Seller shall cooperate with Buyer in good faith to establish at the Sale Hearing (or such other hearing as the Bankruptcy Court may schedule) the applicable Cure Costs for all Assigned Contracts and to address any objections or other issues raised by counterparties to any Assigned Contract. Promptly following execution hereof, Seller shall issue all required notices to counterparties identified on Buyer's initial Assigned Contracts schedule, and Seller shall obtain and deliver current account statements from key vendors to confirm balances and any Cure Costs. Buyer may add or remove contracts from its Assigned Contracts schedule up to the Closing in accordance with this Agreement.

**Section 5.09   Further Assurances.** Following the Closing, each of the parties shall, and shall cause their respective affiliate, meaning any Person that directly or indirectly controls, is controlled by, or is under common control of the respective party ( "**Affiliate**"), to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents. Without limiting the foregoing, if after the Closing Buyer or Seller discovers any asset, right or property that should have been transferred to Buyer as a Purchased Asset but was not so transferred (including any refund, credit or rebate in respect of any utility deposit or other prepaid expense included in the Purchased Assets), the parties shall cooperate and execute and deliver any instruments or documents of transfer necessary to transfer and convey such asset or right to Buyer for no additional consideration. Seller shall deliver to Buyer copies of, and assign to Buyer the benefit of, Seller's employee and contractor confidentiality, invention-assignment and non-disclosure agreements and any other instruments necessary to evidence and enforce Seller's ownership of the Intellectual Property and Digital Assets included in the Purchased Assets. Following the Closing, Buyer shall use commercially reasonable efforts to retain key employees and maintain uninterrupted service to existing customers and partners, consistent with preserving the going-concern value of the Business

**Section 5.10   Use of Buyer's Name.** Seller shall not file, serve or submit any pleading, notice or paper with the Bankruptcy Court or any Governmental Authority that purports to bind,

obligate or speak on behalf of Buyer (including using Buyer's name or signature block) without Buyer's prior written consent.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01    Conditions to Obligations of Buyer and Seller.** The respective obligations of each party to consummate the Closing shall be subject to the fulfillment (or waiver by the applicable party in writing) of all the following conditions as of the Closing Date:

(a)    **Bankruptcy Court Approval.** The Bankruptcy Court shall have entered the Sale Order (and, to the extent not already obtained at the time of the Sale Hearing, the Final DIP Order) and all other orders necessary to approve and authorize Seller's performance of this Agreement and the consummation of the transactions contemplated hereby, and each such order shall be an order or judgment of the Bankruptcy Court that (i) has not been stayed, modified, or vacated, (ii) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and (iii) as to which no appeal, motion, or petition is pending or, if any appeal, motion, or petition has been filed, such order has been affirmed and no further appeal or review is available ("**Final Order**"), and in full force and effect as of the Closing. No order staying, reversing, modifying or amending the Sale Order (or the Final DIP Order) shall be in effect on the Closing Date.

(b)    **No Prohibition.** No temporary restraining order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the sale of the Purchased Assets or the other transactions contemplated by this Agreement shall be in effect. No Law shall have been enacted or become effective that makes the consummation of the transactions illegal or otherwise prohibited.

**Section 6.02    Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the Closing shall be subject to the satisfaction or (to the extent permissible under applicable Law) waiver by Buyer, at or prior to the Closing, of each of the following additional conditions:

(a)    **Representations and Warranties.** The representations and warranties of Seller contained in Article III shall be true and correct on and as of the Closing Date with the same force and effect as if made on the Closing Date (except to the extent that any such representation or warranty is expressly made as of an earlier date, in which case such representation or warranty need only be true and correct as of such earlier date).

(b)    **Covenants.** Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date (including all obligations and milestones in Section 5.07 required to be performed or achieved by the Closing).

(c)     **Officer Certificate.** Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, signed by an executive officer of Seller, certifying that the conditions set forth in Sections 6.02(a) and 6.02(b) have been satisfied.

(d)     **Sale Order Provisions.** The Sale Order as entered by the Bankruptcy Court shall (i) contain all of the provisions (and only the provisions) described in Section 5.07 required to be included therein, and (ii) not have been amended, supplemented or otherwise modified in any manner adverse to Buyer without Buyer's consent.

(e)     **No Material Adverse Effect.** Since the date of this Agreement, there shall not have occurred any change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Purchased Assets, the Business or Seller's ability to consummate the transactions contemplated hereby (a "**Material Adverse Effect**").

(f)     **No Trustee/Conversion.** No trustee or examiner with expanded powers shall have been appointed in the Bankruptcy Case, and the Bankruptcy Case shall not have been converted to a case under Chapter 7 or dismissed.

(g)     **Deliveries.** Seller shall have delivered (or be ready, willing and able to deliver at Closing) all of the documents and other items required to be delivered by Seller pursuant to Section 2.02(a).

(h)     **DIP Obligations.** Buyer (or its Affiliate) shall not have breached or failed to fund any of its obligations as DIP lender under the DIP Facility, and the DIP Facility and DIP Orders shall remain in full force and effect. No event of default (as defined in the DIP Orders or DIP credit agreement) shall have occurred and be continuing under the DIP Facility that would permit Buyer (as DIP lender) to cease making further advances under the DIP Facility or to accelerate the DIP Obligations (unless such default is waived by Buyer in its capacity as DIP lender).

(i)     **Diligence.** On or prior to the expiration of the Diligence Period, Buyer shall have completed its due diligence review of the Business, the Purchased Assets and the Assumed Liabilities, and the results of such review shall be in form and substance acceptable to Buyer in its sole discretion.

Any condition specified in this Section 6.02 may be waived by Buyer, in whole or in part, in writing.

**Section 6.03  Conditions to Obligations of Seller.** The obligations of Seller to consummate the Closing shall be subject to the satisfaction or (to the extent permissible under applicable Law) waiver by Seller, at or prior to the Closing, of each of the following additional conditions:

(a)     **Representations and Warranties.** The representations and warranties of Buyer contained in Article IV shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of an

earlier date, in which case such representation or warranty need only be true and correct as of such earlier date).

(b)    **Covenants.** Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)    **Officer Certificate.** Buyer shall have delivered to Seller a certificate, dated as of the Closing Date, signed by a duly authorized officer of Buyer, certifying that the conditions set forth in Sections 6.03(a) and 6.03(b) have been satisfied.

(d)    **Purchase Price and Deliveries.** Buyer shall have delivered (or be ready, willing and able to deliver at Closing) the Cash Purchase Price and all of the documents and other items required to be delivered by Buyer pursuant to Section 2.02(b).

Any condition specified in this Section 6.03 may be waived by Seller, in whole or in part, in writing.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01   Survival.** None of the representations or warranties of Seller or Buyer contained in this Agreement or in any certificate or other instrument delivered pursuant to this Agreement shall survive the Closing, and from and after the Closing no party shall have any liability to the other for any breach of any representation or warranty, except in the case of fraud. All covenants and agreements of the parties contained herein that by their terms contemplate performance prior to or at the Closing shall likewise terminate at the Closing. **All covenants and agreements that expressly contemplate performance by either party after the Closing (including Section 5.01 (Confidentiality), Section 5.09 (Further Assurances), Buyer's obligations under the Assigned Contracts and Assumed Liabilities, and any payment or reimbursement obligations of Buyer or Seller that are to be performed after Closing) shall survive the Closing in accordance with their terms.** Notwithstanding the foregoing, nothing in this Section 7.01 shall limit any party's rights or remedies for fraud or willful misconduct by the other party.

**Section 7.02   Indemnification by Seller.** Effective as of the Closing, and except as expressly provided in this Agreement, Seller shall have no obligation to indemnify, defend or hold harmless Buyer or any other Person for any breach of this Agreement or for any losses or liabilities arising out of or relating to the Business or the Purchased Assets. Buyer, on behalf of itself and its Affiliates, hereby waives and releases any claims or causes of action against Seller or its estate arising under this Agreement or related to the transactions contemplated hereby, except for claims to enforce the terms of this Agreement or for fraud.

**Section 7.03   Indemnification by Buyer.** Subject to the other terms and conditions of this Article VII, from and after the Closing, Buyer shall indemnify and defend Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities,

costs or expenses (including reasonable attorneys' fees) (collectively, "**Losses**") incurred or sustained by, or imposed upon, any Seller Indemnitee based upon, arising out of or with respect to:

> (a)    any inaccuracy in or breach of any representation or warranty of Buyer contained in this Agreement or in any certificate or document delivered by Buyer pursuant hereto, as of the date such representation or warranty was made or as of the Closing Date (except for representations and warranties made as of a specified date, which need only be true as of such date);

> (b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any other Transaction Document; or

> (c)    any Assumed Liability or the ownership or operation of the Purchased Assets or the Business by Buyer from and after the Closing (other than Losses for which Seller is expressly responsible under the terms of this Agreement).

**Section 7.04  Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder (under Section 7.03), the Seller Indemnitee (the "**Indemnified Party**") shall promptly provide written notice of such claim to Buyer (the "**Indemnifying Party**"). The failure to give such prompt notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except to the extent (if any) that the Indemnifying Party shall have been materially prejudiced by such failure. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person that is not a party to this Agreement (a "Third-Party Claim"), the Indemnifying Party may, upon written notice to the Indemnified Party, assume the defense of any such Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party assumes the defense of any such Third-Party Claim, it shall conduct the defense of the Third-Party Claim actively and diligently at its own expense and the Indemnified Party shall cooperate with the Indemnifying Party in such defense. The Indemnified Party shall have the right to employ separate counsel in any such Third-Party Claim and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (i) the Indemnifying Party has failed to assume or diligently conduct the defense and employ counsel in a timely manner, in which case the Indemnified Party may assume the defense and be reimbursed for its reasonable attorneys' fees and expenses, or (ii) in the reasonable opinion of counsel to the Indemnified Party, a conflict exists between the interests of the Indemnified Party and the Indemnifying Party that would make such separate representation advisable (in which case, the Indemnifying Party shall not have the right to assume the defense of such Third-Party Claim on behalf of the Indemnified Party). If the Indemnifying Party assumes the defense of a Third-Party Claim, no compromise or settlement of such claims may be effected by the Indemnifying Party without the Indemnified Party's consent unless (x) there is no finding or admission of any violation of Law or any violation of the rights of any Person and no effect on any other claims that may be made against the Indemnified Party, (y) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, and (z) the compromise or settlement includes an unconditional release of the Indemnified Party from all liability arising out of such claim. If the Indemnifying Party does not assume the defense of a Third-Party Claim for which it has an indemnification obligation, the Indemnified Party may continue to defend the claim in such manner as it may deem appropriate, and the Indemnifying

Party shall remain responsible for all Losses the Indemnified Party may incur as a result of such Third-Party Claim to the extent subject to indemnification under this Article VII. The Indemnified Party shall not settle or compromise any such Third-Party Claim without prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

**Section 7.05    [Intentionally Omitted.]**

## ARTICLE VIII
## TERMINATION

**Section 8.01    Termination.** Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by mutual written consent of Seller and Buyer;

(b)    by either Buyer or Seller, upon written notice to the other party, if the Closing has not occurred by December 31, 2025 (the "**Outside Date**"); provided that the right to terminate this Agreement under this Section 8.01(b) shall not be available to any party whose breach of this Agreement (or failure to fulfill any obligation hereunder) has been the principal cause of, or principally resulted in, the failure of the Closing to occur by such date;

(c)    by Buyer, by written notice to Seller, if there has been a material violation or breach by Seller of any covenant, representation or warranty contained in this Agreement, which violation or breach (i) would result in a failure of a condition set forth in Section 6.02, and (ii) is not cured by Seller within **five (5)** Business Days after written notice thereof from Buyer (or, if the Outside Date is fewer than five Business Days from the date of such notice, by the Business Day immediately preceding the Outside Date);

(d)    by Seller, by written notice to Buyer, if there has been a material violation or breach by Buyer of any covenant, representation or warranty contained in this Agreement, which violation or breach (i) would result in a failure of a condition set forth in Section 6.03, and (ii) is not cured by Buyer within **five (5)** Business Days after written notice thereof from Seller (or, if the Outside Date is fewer than five Business Days from the date of such notice, by the Business Day immediately preceding the Outside Date);

(e)    by Buyer, by written notice to Seller, if (i) the Bankruptcy Court has not entered the Sale Procedures Order within **35** days after the Commencement of Process Date, or the Sale Procedures Order (once entered) is later stayed, vacated, or modified without Buyer's consent; (ii) the Sale Hearing is not conducted within **35** days after the Commencement of Process Date (or such later date as the Bankruptcy Court may establish with Buyer's written consent); or (iii) the Bankruptcy Court has not entered the Sale Order within **35** days after the Commencement of Process Date;

(f)    by Buyer, by written notice to Seller, if any of the following shall occur: (i) Seller withdraws the Sale Procedures Motion or otherwise refuses to pursue approval of

the transactions and this Agreement as the "stalking horse" bid; (ii) the Bankruptcy Court or another court of competent jurisdiction enters an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee or examiner with expanded powers in the Bankruptcy Case; or (iii) the Bankruptcy Court enters an order approving or authorizing an Alternative Transaction;

(g)   by Buyer, by written notice to Seller, if the DIP Facility or any DIP Order is terminated or ceases to be in full force and effect for any reason, or if a default or Event of Default by Seller has occurred and is continuing under the DIP Facility that permits Buyer (as DIP Lender) to cease making further advances or to accelerate the DIP Obligations, or if Seller materially breaches any obligation under the DIP Facility or DIP Orders;

(h)   by Seller, by written notice to Buyer, at any time prior to the entry of the Sale Order, if Seller's board of directors (or similar governing body) has determined in good faith, based on the advice of its legal counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such fiduciary duties under applicable Law (a "**Fiduciary Out**"); provided that Seller may not terminate this Agreement under this Section 8.01(h) unless (i) Seller has complied in all material respects with Section 5.03 and provided Buyer with written notice of its intent to terminate pursuant to this Section 8.01(h) (including a summary of the material terms of the proposed Alternative Transaction to be accepted) at least **three (3)** Business Days in advance of such termination, and (ii) Seller concurrently pays to Buyer the Break-Up Fee, to the extent and as provided in Section 8.02; or

(i)   automatically, if Seller consummates a sale or disposition of any of the Purchased Assets in one or more transactions with one or more Persons other than Buyer.

(j)   by Buyer, by written notice to Seller delivered at any time on or prior to the expiration of the Diligence Period, if Buyer determines, in its sole discretion, that the results of its due diligence review are not satisfactory.

**Section 8.02   Break-Up Fee.** In recognition of Buyer's expenditure of time, energy and resources, and the benefits conferred on Seller's estate by this Agreement, if this Agreement is terminated under the circumstances described below, Seller shall pay Buyer (to the extent not already paid pursuant to the DIP Orders) a break-up fee in the amount of **$300,000** (the "**Break-Up Fee**"). The Break-Up Fee shall be payable by Seller (A) if Seller terminates this Agreement pursuant to Section 8.01(h) in order to consummate an Alternative Transaction, (B) if Buyer terminates this Agreement pursuant to Section 8.01(c) or 8.01(e) due to Seller's material breach or failure to satisfy conditions and an Alternative Transaction is consummated within **six (6)** months thereafter, or (C) if this Agreement is terminated automatically pursuant to Section 8.01(i) as a result of the closing of an Alternative Transaction. In the case of a termination by Seller under Section 8.01(h), the Break-Up Fee shall be paid concurrently with such termination as a condition to the effectiveness thereof; in all other cases, the Break-Up Fee shall be paid no later than two (2) Business Days following the closing of the applicable Alternative Transaction (and shall be paid only in the event the Alternative Transaction is actually consummated). **The Break-Up Fee, to the extent payable pursuant to this Section 8.02, shall constitute allowed administrative**

**expenses of Seller's bankruptcy estate under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall be payable by Seller without further order of the Bankruptcy Court.** Seller's obligation to pay the Break-Up Fee shall survive any termination of this Agreement, and Buyer's right to receive the Break-Up Fee shall be in addition to, and not in limitation of, any other rights or remedies of Buyer under this Agreement or applicable Law. This Section 8.02 applies only if the Bankruptcy Court requires an auction or bidding process or if an Alternative Transaction closes.

Section 8.03    **Effect of Termination.** In the event of termination of this Agreement pursuant to this Article VIII, this Agreement shall forthwith become void and of no further force or effect, without any liability or obligation on the part of any party hereto, and the transactions contemplated hereby shall be abandoned; **provided that (a) Section 5.01 (Confidentiality), Section 8.02 (Break-Up Fee) (to the extent applicable), this Section 8.03, and Article IX (Miscellaneous) shall survive such termination and remain in full force and effect, (b) any claim for Buyer's fraud or willful breach of this Agreement prior to termination shall survive, and (c) the termination of this Agreement shall not affect the rights and obligations of the parties under the DIP Facility or any Order of the Bankruptcy Court (and all rights and remedies of Buyer as DIP Lender are fully preserved).** If this Agreement is terminated under Section 8.01(d) due to a willful and material breach by Buyer, then Seller shall have the right to seek damages (including reimbursement of its professional fees) against Buyer, *provided* that Seller's aggregate monetary damages for Buyer's breach shall not exceed an amount equal to the Break-Up Fee. If this Agreement is terminated under Section 8.01(c) due to a willful and material breach by Seller, then Buyer shall have the right to pursue all rights and remedies available at law or in equity (including specific performance to require Seller's assumption of this Agreement as the "stalking horse" bid and/or to compel consummation of the Sale in the Bankruptcy Case, and/or the right to seek reimbursement of Buyer's actual expenses).

## ARTICLE IX
## MISCELLANEOUS

Section 9.01    **Expenses.** Except to the extent otherwise provided in Section 8.02, all costs and expenses (including legal, accounting and financial advisory fees) incurred in connection with this Agreement, the DIP Facility and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses. For the avoidance of doubt, all fees and expenses of Seller's attorneys, investment bankers and other advisors in connection with the transactions shall be borne by Seller as administrative expenses in the Bankruptcy Case (subject to Bankruptcy Court approval), and Buyer shall have no responsibility therefor.

Section 9.02    **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed given: (a) when delivered personally by hand (with written confirmation of receipt); (b) when sent by email (with confirmation of receipt, or if sent after normal business hours, on the next Business Day); (c) one (1) Business Day following the day sent by a nationally recognized overnight courier (with written confirmation of delivery); or (d) three (3) Business Days following the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses or email addresses set forth below (or at such other address

or email address for a party as shall be specified in a notice given in accordance with this Section 9.02):

| | |
|---|---|
| **If to Seller:** | Firstbase.io, Inc. (Debtor)<br>447 Broadway, Unit 187, Floor 2<br>New York, NY 10013<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Kirby Aisner & Curley LLP<br>700 Post Road, Suite 237<br>Scarsdale, New York 10583<br>Email: dkirby@kacllp.com<br>Attention: Dawn Kirby, Esq. |
| **If to Buyer:** | Scaleworks Associates III, LLC<br>122 East Houston Street, Suite 105<br>San Antonio, Texas 78205<br>Email: ed@scaleworks.com<br>Attention: Edward Byrne |
| with a copy to: | Kane Russell Coleman Logan PC<br>401 Congress Avenue, Suite 2100<br>Austin, Texas 78701<br>Email: MWeiss@krcl.com<br>Attention: Morris D. Weiss |

**Section 9.03   Interpretation; Headings.** For purposes of this Agreement, (a) whenever the context requires, the singular number includes the plural and vice versa, and (b) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." When reference is made in this Agreement to a Section, Article, Exhibit or Schedule, such reference shall be to a Section or Article of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring a party by virtue of authorship.

**Section 9.04   Severability.** If any term or provision of this Agreement is held by a court of competent jurisdiction or the Bankruptcy Court to be invalid, illegal or unenforceable under any present or future Law, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such invalid, illegal or unenforceable provision had never constituted a part hereof, and (c) the remaining provisions of this Agreement shall remain in full force and effect and not be affected by such invalid, illegal or unenforceable provision. Upon such determination, the parties shall negotiate in good faith to modify this Agreement to effect the parties' original intent as closely as possible.

**Section 9.05   Entire Agreement.** This Agreement (together with the DIP Facility documents and all exhibits and schedules hereto, including the DIP Term Sheet and other schedules delivered in connection herewith) constitutes the sole and entire agreement of the parties

with respect to the subject matter hereof, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any conflict or inconsistency between the terms of this Agreement and any Order of the Bankruptcy Court (or the DIP Facility documents), the parties acknowledge and agree that, as between themselves, the terms of this Agreement shall govern and control (except to the extent that Buyer may elect to enforce any additional or supplemental rights and remedies arising under any such Order or DIP document).

**Section 9.06   Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns (including any trustee or estate representative acting on behalf of Seller or its estate). No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller without the prior written consent of Buyer. Buyer may assign or transfer its rights (in whole or in part) under this Agreement to any Affiliate or designee of Buyer without Seller's consent, *provided* that no such assignment or transfer shall relieve Buyer of its obligations hereunder to the extent not performed by such assignee. Any purported assignment or delegation of rights or obligations in violation of this Section 9.06 shall be null and void.

**Section 9.07   Amendment and Waiver.** This Agreement may not be amended or modified except by an instrument in writing signed by each of the parties hereto (or their respective successors or permitted assigns). No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the waiving party, and no waiver shall operate as a waiver of or estoppel with respect to any failure, breach or default not expressly identified by such written waiver.

**Section 9.08   Governing Law; Jurisdiction; Waiver of Jury Trial.** This Agreement (and any Action or controversy arising out of or relating to this Agreement or the transactions contemplated hereby) shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to its principles of conflicts of law. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or relating to this Agreement or the transactions contemplated hereby. Each party hereby irrevocably submits to the jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Case is no longer pending, to any federal court sitting in the Southern District of New York, or if such court lacks jurisdiction, any New York state court) for the adjudication of any dispute or controversy arising out of or relating to this Agreement. The parties hereby waive, to the fullest extent permitted by Law, any objection or defense that they may now or hereafter have based on inconvenient forum or lack of personal jurisdiction. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY** in respect of any Action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 9.09   Counterparts.** This Agreement may be executed in counterparts (including by facsimile or email transmission), each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission (in PDF or similar format) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

**Firstbase.io, Inc.**

By_____
[NAME]
[TITLE]

**Scaleworks Associates III, LLC**

By_____
Edward Byrne
General Partner

**EXHIBIT B**

**<u>DIP FINANCING TERM SHEET</u>**

**Debtor-in-Possession Financing Term Sheet**
**Firstbase.io, Inc. – $500,000.00 Superpriority DIP Term Loan Facility**
*(Summary of Terms and Conditions)*

**Borrower:** Firstbase.io, Inc. ("**Debtor**" or "**Borrower**"), as debtor and debtor-in-possession in the Bankruptcy Case defined below.

**Bankruptcy Case:** The Borrower's Chapter 11 case commenced on September 25, 2024 (the "**Petition Date**") in the Bankruptcy Court (as defined below) and pending as Case No. 24-11647 (the "**Bankruptcy Case**"). "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York presiding over the Bankruptcy Case.

**DIP Lender:** Scaleworks Associates III, LLC, or its designee (together with any participating or successor lenders, the "**DIP Lender**").

**DIP Facility:** A senior secured, superpriority debtor-in-possession term loan facility in an aggregate principal amount of **$500,000.00** (the "**DIP Commitment**"). The loans under the DIP Facility (the "**DIP Loans**") shall be made available to Borrower in multiple draws (each, a "**Draw**") as set forth herein. The DIP Facility is referred to herein as the "**DIP Facility**" or "**DIP Loan Facility**." All funded and outstanding DIP advances will be credited dollar-for-dollar against the APA purchase price at the Sale closing, or, at DIP Lender's election, credit-bid in whole or in part under 11 U.S.C. §363(k). All obligations arising under or relating to the DIP Facility, including all principal, accrued interest (including any default interest), fees (including any commitment, draw, or exit fees), costs, expenses, indemnities, and other amounts owing by the Debtor to the DIP Lender under this Term Sheet, the related loan documentation, or any DIP Orders, are referred to herein as the "**DIP Obligations**."

**Use of Proceeds:** The proceeds of the DIP Loans shall be used by the Debtor exclusively in accordance with the Approved Budget (subject to permitted variances as described below) and the DIP Orders (defined below) to: (i) fund the Debtor's postpetition working capital needs and operating expenses in the ordinary course of business (including payroll, rent and other overhead, and vendor costs), (ii) fund transition-related expenses (including retention efforts, transition consulting, and technology continuity measures) required to preserve the going-concern value of the business and facilitate an orderly sale and post-closing handoff, and (iii) following entry of the Final Order, fund any other amounts expressly authorized under the DIP Loan documentation and the DIP Orders. No portion of the DIP Facility or the Collateral may be used to investigate or pursue any claims adverse to the DIP Lender or to finance any plan or transaction adverse to the DIP Lender's rights or that is not otherwise acceptable to the DIP Lender. For the avoidance of doubt, no proceeds of the DIP Loans may be used to pay or satisfy any professional fee payables or other administrative expense arrears outside the amounts expressly set forth in the Approved Budget's monthly legal escrow.

**Interest Rate: 16%** per annum, payable in cash on the Maturity Date (defined below) or such earlier date as the DIP Loans become due. Upon the occurrence and during the continuance of any Event of Default, all DIP Loans and obligations shall bear interest at a rate equal to **5.0%** per annum above the rate otherwise applicable.

**Fees and Charges:** The DIP Lender shall be entitled to the following fees (collectively, the "**DIP Fees**"):

- **Commitment/Closing Fee:** An upfront fee equal to **2%** of the DIP Commitment, fully earned on entry of the Interim Order and payable (to the DIP Lender or its designee) upon the first funding of DIP Loans (which fee may, at DIP Lender's option, be funded from the initial DIP Loan and netted from the proceeds thereof).

- **Exit Fee:** An exit fee equal to **2%** of the total amount of DIP Loans actually funded (excluding any portion credit-bid) shall be earned and payable upon the repayment of the DIP Facility in cash (or, if credit-bid, such fee shall be added to the credit bid amount) and shall be paid in kind by capitalizing such fee to the DIP Obligations unless paid in cash at repayment.

All DIP Fees shall be approved in the DIP Orders and shall be non-refundable and fully earned upon the dates and terms described above. All interest and DIP Fees shall be paid in kind and capitalized to the DIP Obligations until the Maturity Date or earlier repayment.

**Budget and Reporting:** The Debtor has prepared an initial 13-week cash flow forecast for the use of cash and DIP Loan proceeds in the form attached hereto as **Exhibit A** (as updated or supplemented from time to time with the consent of the DIP Lender, the "**Approved Budget**"). The Approved Budget shall be updated by the Debtor (with prior review and approval by the DIP Lender) every week and when otherwise required (subject to the DIP Lender's approval of any material changes). The Debtor shall at all times comply with the Approved Budget, subject to permitted variances. The Debtor shall not permit (i) total cumulative disbursements for any rolling weekly period to exceed the budgeted amounts by more than **5%**, or (ii) actual total receipts for any week period to be less than the budgeted amounts by more than **5%** (the foregoing being the "**Permitted Variances**"). The Permitted Variances shall be tested weekly, commencing with the first full calendar week following the Commencement of Process Date (as defined below), and reported to the DIP Lender in the Budget Compliance Report (defined below).

**Financial Reporting:** The Debtor shall provide to the DIP Lender: (i) on or before Tuesday of each calendar week, a rolling 13-week cash flow forecast (updated Approved Budget) in form satisfactory to DIP Lender, (ii) on or before Tuesday of each week, a budget compliance report for the prior week and on a cumulative basis (the "**Budget Compliance Report**") showing actual cash receipts and disbursements and detailing any variances from the Approved Budget, with an officer's certification as to the accuracy of the report and compliance with Budget (subject to Permitted Variances), (iii) monthly operating reports and such other financial or operational reports as required by the Bankruptcy Court or U.S. Trustee, (iv) promptly upon request, such other financial information, operating data and metrics regarding the Debtor or the Business as the DIP Lender may reasonably request, and (v) reasonable access, during normal business hours, to the Debtor's senior management, books and records, assets and properties, and to the Debtor's financial advisors, for purposes of monitoring the Business and the progress of the Chapter 11 Case.

**Availability; Escrow Account:** Upon entry of the Interim Order (defined below), a portion of the DIP Facility (in the amount approved by the Bankruptcy Court on an interim basis) shall be made

available in a Draw to the Debtor. All DIP Loan proceeds shall be funded into a dedicated DIP escrow or controlled account (the "**Escrow Account**") subject to a deposit account control agreement (or other control mechanism) in favor of the DIP Lender. Amounts in the Escrow Account shall be disbursed to the Debtor (or directly to vendors or other payees, as DIP Lender may direct) solely for purposes permitted under the DIP Orders and in accordance with the Approved Budget. The funding of any subsequent Draws (including the final Draw following entry of the Final Order) shall be subject to satisfaction of all conditions precedent and shall occur on dates (each, a "**DIP Draw Date**") to be agreed upon by the Debtor and DIP Lender consistent with the Approved Budget. Subsequent Draws shall be limited to funding weekly Budget shortfalls and shall not be available if, after giving effect to the requested Draw, Debtor's unrestricted cash would exceed $1,000,000; Debtor shall maintain a minimum unrestricted cash balance of $500,000 (exclusive of amounts in the Escrow Account).

**Maturity Date:** The DIP Facility shall mature, and all DIP Loans and obligations shall become due and payable in full in cash (except to any extent credit bid) upon the earliest of: (i) 60 days after November 3, 2025 (the "**Commencement of Process Date**") (unless extended by the DIP Lender in writing); (ii) the effective date of any confirmed Chapter 11 plan in the Bankruptcy Case; (iii) the closing date of any sale or other disposition of a material portion of the Debtor's assets, including any sale of the Purchased Assets under the APA (as defined herein), under Section 363 of the Bankruptcy Code (except to the extent the DIP Loans are credit bid by the DIP Lender with respect to such sale); and (iv) the acceleration of the DIP Loans and termination of the DIP Facility following an Event of Default (as defined below) (the earliest of such dates, the "**Maturity Date**"). The Debtor shall have no right to refinance or repay the DIP Facility except in connection with an express obligation to repay in full in connection with an authorized sale or plan process that provides for Payment in Full (as defined below) of the DIP Facility or as otherwise agreed by DIP Lender.

**Security and Priority:** All DIP Loans, together with all interest, fees, costs and other obligations in respect thereof, shall at all times: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Bankruptcy Case, having priority over all other administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, be secured by valid, perfected first-priority Liens on and security interests in all tangible and intangible prepetition and postpetition property and assets of the Debtor and its estate that are not otherwise subject to valid, perfected and non-avoidable Liens as of the Petition Date (including all cash, deposit accounts, inventory, equipment, accounts and other receivables, contracts and general intangibles, instruments, investment property, intellectual property, patents, copyrights, trademarks, licenses, chattel paper, interests in leaseholds, real property, fixtures, and proceeds of all of the foregoing), subject only to any Permitted Prior Liens (as defined in the DIP Orders); and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by valid, perfected senior priming Liens on and security interests in all assets of the Debtor that are subject to any valid, perfected and non-avoidable prepetition Liens, which priming Liens shall be senior in all respects to such prepetition Liens including any prepetition Liens of Harbor Business Compliance Corporation ("**Harbor**") or any other creditor, provided that such priming shall be subject to any adequate protection granted to prepetition secured parties under the DIP Orders and acceptable to DIP Lender. The collateral described above, together with all proceeds and products thereof, shall be referred to as the "**Collateral**." The Collateral shall include, upon

entry of the Final Order, the proceeds or property recovered in respect of any claims or causes of action under Sections 544, 545, 547, 548 or 550 of the Bankruptcy Code (collectively, "**Avoidance Actions**"). In the event the Sale does not close, all DIP Obligations shall remain allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code.

**Milestones:** The Debtor shall comply with the following sale and case milestones (collectively, the "**Milestones**"), which shall be included in the DIP Orders and any sale/bidding procedures orders, in form and dates acceptable to DIP Lender:

- No later than **5** days after the Commencement of Process Date, the Debtor shall file a motion (the "**DIP Motion**") seeking entry of interim and final DIP Orders and attaching this Term Sheet; and shall also file a motion (the "**Sale Procedures Motion**") adjourning plan confirmation for 30 days, authorizing the integrated DIP to sale path contemplated herein, preserving Buyer's section 363(k) credit bid rights, setting a status or conclusion hearing after the diligence period for the approval of the sale of all or substantially all of the Debtor's assets to Buyer pursuant to Section 363 of the Bankruptcy Code (the "**Sale**").

- No later than **10** days after the Commencement of Process Date, the Bankruptcy Court shall have entered the Interim DIP Order.

- No later than **10** days after the Commencement of Process Date, the Bankruptcy Court shall have entered an order approving sale procedures (the "**Sale Procedures Order**") which are acceptable to DIP Lender. Such Sale Procedures Order shall also approve DIP Lender's right to credit bid the DIP Obligations as provided in the Asset Purchase Agreement between the Debtor and Buyer dated on or about the Commencement of Process Date (the "**APA**").

- No later than **20** days after the Commencement of Process Date, the Bankruptcy Court shall have entered the Final DIP Order.

- No later than **28** days after the Commencement of Process Date, Buyer shall have completed its diligence of the Debtor, the Business and the Purchased Assets (the "**Diligence Period**"), with results in form and substance acceptable to DIP Lender/Buyer in its sole discretion. The Diligence Period may be extended only with DIP Lender's written consent. If Buyer confirms in writing during the Diligence Period that it has approved diligence, the Debtor shall promptly seek to have the Sale Hearing set on the earliest practicable date, and, upon entry of the Sale Order, the closing of the Sale shall occur no later than two (2) Business Days thereafter (or such earlier date as Buyer may elect), subject to satisfaction of customary closing conditions. If, on or before the expiration of the Diligence Period, Buyer delivers written notice that it will not proceed with the Sale (a "**Diligence Termination Notice**"), then within seven (7) days after such notice the Debtor shall file an amended chapter 11 plan, in form and substance acceptable to DIP Lender, that provides for Payment in Full of the DIP Obligations on the plan effective date; and no later than **45** days after delivery of the Diligence Termination Notice, the Bankruptcy Court shall have held the confirmation hearing on such plan.

- No later than **30** days after the Commencement of Process Date, the Bankruptcy Court shall have held the Sale Hearing and entered the Sale Order (as defined below) approving the Sale to Buyer.

- No later than December 3, 2025, the closing of the Sale shall occur (the "**Outside Date**").

The dates in the Milestones may be extended or modified only with the prior written consent of the DIP Lender (in its sole discretion) or by order of the Bankruptcy Court with DIP Lender's consent. The failure of the Debtor to satisfy any Milestone (as may be extended or modified with DIP Lender's consent) shall constitute an immediate Event of Default under the DIP Facility.

**Conditions Precedent to Initial Funding:** The availability of the DIP Facility and the obligation of the DIP Lender to make the initial DIP Loan shall be subject to satisfaction (or waiver by DIP Lender) of conditions precedent customary for financings of this type, including, without limitation: (i) the Debtor's execution and delivery of a DIP credit agreement and other Definitive Documents consistent with this Term Sheet and acceptable to DIP Lender in all respects; (ii) the entry by the Bankruptcy Court of the Interim DIP Order, in form and substance acceptable to DIP Lender in its sole discretion, authorizing and approving the DIP Facility and granting the liens and superpriority claims described herein (with such order remaining in full force and effect and not being stayed, reversed or subject to any pending appeal); (iii) delivery of an Approved Budget acceptable to DIP Lender; (iv) delivery of customary closing certificates, notices of borrowing and funding instructions; (v) execution and delivery of the APA (or a mutually agreeable sale term sheet) by the Debtor and Buyer, provided that failure to finalize the APA shall not preclude funding if all other conditions are satisfied and DIP Lender consents in its sole discretion; and (vi) no trustee, examiner with expanded powers or receiver having been appointed in the Bankruptcy Case. For the avoidance of doubt, Buyer's confirmatory diligence shall not be a condition to the initial funding of the DIP Facility.

**Conditions Precedent to Each Draw:** The obligation of DIP Lender to fund any subsequent Draw (including the final Draw) shall be subject to conditions customary in debtor-in-possession financings and otherwise appropriate to the transaction, including, without limitation: (i) the absence of any Default or Event of Default; (ii) the representations and warranties of the Debtor in the DIP credit agreement and other DIP documents being true and correct in all material respects on and as of the date of such Draw (subject to materiality and other qualifiers to be set forth in the DIP credit agreement); (iii) the Debtor's cash balances (including available cash and cash equivalents on hand) as of the date of such Draw (after giving effect to the requested borrowing and the use of proceeds thereof) not exceeding $1,000,000; (iv) the Debtor's compliance with the Approved Budget subject to Permitted Variances; (v) since the Commencement of Process Date, no event shall have occurred that has had, or could reasonably be expected to have, a material adverse effect on the Debtor's business, assets, or prospects or on the value of the Collateral; (vi) no breach by the Debtor of (or failure to perform) any of its obligations or covenants under the APA or the Sale Order (as defined below) shall have occurred; (vii) no "Termination Event" under the APA shall have occurred, and the APA shall not have been terminated; (viii) the Sale Order (defined below) shall have been entered and shall not have been reversed, stayed, vacated, or amended without DIP Lender's consent; (ix) receipt by DIP Lender of a timely Draw request (with a certificate confirming the conditions); (x) if the request is made after the Diligence Period, Buyer shall have confirmed that the results of its diligence are in form and substance acceptable to Buyer

in its sole discretion; and (xi) if a Diligence Termination Notice has been delivered, all Draws thereafter shall be limited to amounts necessary to fund the Approved Budget for the plan toggle path (including costs to prosecute confirmation) through the earlier of the plan effective date or the Maturity Date, and only so long as the plan toggle Milestones are being met.

**Sale Order:** The "**Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to DIP Lender, approving the sale of the Purchased Assets to DIP Lender's designee (or another purchaser acceptable to DIP Lender) pursuant to Section 363 of the Bankruptcy Code and the APA. The Sale Order shall, inter alia, (i) authorize the sale free and clear of all Liens, claims and interests, with any such interests to attach to the proceeds, (ii) approve the assumption and assignment to Buyer of all desired executory contracts and unexpired leases, with Buyer to provide adequate assurance of future performance, (iii) include a finding that Buyer is a good-faith purchaser under Section 363(m), (iv) provide that the transfer of the assets is exempt from stamp or similar taxes under Section 1146(a), and (v) contain other customary provisions reasonably required by DIP Lender, including provisions limiting successor liability and releasing DIP Lender and Buyer from any claims, including any claims asserted or assertable by Harbor. All DIP advances funded and outstanding at the Sale closing shall be credited dollar-for-dollar against the APA purchase price or, at DIP Lender's election, credit-bid in whole or in part under Section 363(k) of the Bankruptcy Code.

**Representations and Warranties:** The DIP credit agreement and related documentation (collectively, the "**Definitive Documents**") shall include representations and warranties by the Debtor customary for financings of this type and appropriate to the Debtor's situation (which shall be applicable to the Debtor and its subsidiaries, if any), including, without limitation, representations as to: corporate or organizational status; requisite authority and corporate power; due authorization, execution and delivery of the DIP documents; enforceability of the DIP documents; no conflicts with organizational documents, material agreements or law; Governmental approvals; accuracy of financial information; absence of material undisclosed liabilities; ownership of properties; title to Collateral; status and validity of intellectual property; the Debtor's representation that, to its knowledge, it owns or has valid rights to use all intellectual property material to the operation of the Business, and that no party other than Harbor Compliance Corporation has asserted any ownership claim over such intellectual property in these proceedings; environmental matters; compliance with laws (including OFAC, FCPA and anti-money laundering laws); absence of material litigation; payment of taxes; validity, perfection and priority of DIP Liens (as defined below); validity and priority of prepetition liens (if any); validity and binding effect of the DIP Orders; and accuracy and completeness of disclosure.

**Affirmative Covenants:** The Definitive Documents shall include affirmative covenants customary for financings of this type, including, without limitation, covenants requiring the Debtor to: (i) deliver core diligence items (as identified in writing by DIP Lender) to DIP Lender within 24 hours of request, and (ii) deliver all other requested items, including financial statements, budgets, variance reports, status updates and other information to the DIP Lender as described above or as otherwise reasonably requested within 48 hours, in each case subject to reasonable confidentiality and privilege protections, (iii) maintain appropriate insurance (with loss payable to the DIP Lender); (iv) maintain good standing and all requisite corporate authority, intellectual property and rights necessary for the conduct of its business; (v) comply in all material respects with applicable laws and regulations (including ERISA, environmental and labor laws) except as

permitted by the Bankruptcy Code; (vi) comply with the Approved Budget (subject to Permitted Variances) and maintain cash management in accordance with the DIP Orders; (vii) comply with the Bankruptcy Court's orders (including the DIP Orders and Sale Order); (viii) promptly provide notice to DIP Lender of the occurrence of any Event of Default or any other condition or event that has had or could reasonably be expected to have a material adverse effect on the Debtor or its business; (ix) permit the DIP Lender and its advisors full access to the Debtor's premises, books and records, and reasonably cooperate in furnishing information; (x) use commercially reasonable efforts to obtain entry of the Final Order and Sale Order by the deadlines set forth in the Milestones; (xi) comply with all Milestones; (xii) remit to DIP Lender (for application to the DIP Obligations) any net proceeds received from asset sales or other Extraordinary Receipts not contemplated in the Budget; (xiii) pay all postpetition taxes, fees and other obligations when due, except those being contested in good faith; and (xiv) take such actions as may be reasonably requested by DIP Lender to better assure and confirm the validity, perfection and priority of the DIP Liens.

**Negative Covenants:** The Definitive Documents shall include negative covenants customary for financings of this type (subject to negotiated exceptions and materiality thresholds), including covenants prohibiting the Debtor or its estate (or any trustee or successor, by stipulation in the DIP Orders) from: (i) creating or permitting to exist any Liens or security interests on any Collateral, except for (A) DIP Liens and (B) any Permitted Prior Liens and other liens and encumbrances expressly permitted under the DIP documents or DIP Orders; (ii) incurring or sustaining any debt or other obligations outside the ordinary course except as expressly provided in the Budget and DIP Orders (including any other postpetition financing or adequate protection debt, other than unsecured trade payables incurred in the ordinary course or as authorized by the DIP Orders); (iii) consolidating, merging or selling all or substantially all assets (except pursuant to the Sale Order and APA); (iv) disposing of any Collateral or other assets, except for sales of inventory or use of cash in the ordinary course consistent with the Budget, or as authorized by the DIP Orders; (v) making any investments in, or loans or advances to, any Person, except in the ordinary course and consistent with the Budget; (vi) paying any dividends or distributions or other payments in respect of equity interests (except as authorized by the Bankruptcy Court in connection with a plan that provides for Payment in Full of the DIP Obligations or otherwise with DIP Lender's consent); (vii) making any payment or prepayment of principal or interest on account of any prepetition indebtedness or other prepetition claims, except as specifically authorized by the DIP Orders or with DIP Lender's consent; (viii) engaging in any other business or lines of business other than the Business conducted as of the Commencement of Process Date; (ix) altering its legal or organizational status, existence or governing documents in any way adverse to DIP Lender; (x) entering into any transactions with Affiliates, other than on fair and arm's-length terms in the ordinary course (and disclosed to DIP Lender); (xi) amending or modifying any organizational documents or material contracts to which the Debtor is a party in a manner that is adverse to DIP Lender; (xii) modifying or terminating any Assigned Contract identified by Buyer (except as permitted by the APA); (xiii) permitting any Debtor subsidiary or non-debtor affiliate to hold any material assets or operations (if applicable); (xiv) filing any motion or other request with the Bankruptcy Court seeking to use or sell any Collateral outside the ordinary course, or incurring any indebtedness, or granting any Liens or administrative expense claims senior to or pari passu with the DIP Liens and superpriority claims (other than as expressly permitted in the DIP Orders or approved by DIP Lender); (xv) proposing or supporting any Chapter 11 plan or sale process that is not conditioned on Payment in Full of the DIP Obligations (unless otherwise agreed by DIP Lender); (xvi) rejecting any material executory contract or lease without DIP Lender's consent

(except as provided in the APA); (xvii) seeking or consenting to any relief from stay by any secured creditor (except as permitted by DIP Lender); or (xviii) using or seeking to use any proceeds of the DIP Loans or any cash collateral for any purpose or in any manner inconsistent with the Approved Budget or DIP Orders.

**Events of Default:** The DIP Facility shall include Events of Default customary for financings of this type and other Events of Default deemed appropriate by DIP Lender, including, without limitation: (a) failure to make any payment when due under the DIP Facility; (b) failure to achieve any of the Milestones by the required dates; (c) failure to comply with the Approved Budget (subject to Permitted Variances); (d) any non-compliance by the Debtor with any covenant, obligation or provision of the Definitive Documents (subject, in the case of certain affirmative covenants, to a grace period to be agreed); (e) any representation or warranty of the Debtor in any DIP document proves to have been incorrect in any material respect when made; (f) conversion of the Bankruptcy Case to a case under Chapter 7 or dismissal of the Bankruptcy Case; (g) appointment of a Chapter 11 trustee or an examiner with expanded powers, or appointment of a receiver or responsible officer in the Bankruptcy Case; (h) the filing or support of any plan of reorganization or liquidation by the Debtor or any other party that does not provide for Payment in Full (as defined below) of the DIP Obligations (unless otherwise agreed by DIP Lender in writing), or the entry of any order approving disclosure or confirmation of any such plan; **(i)** the entry of an order granting relief from the automatic stay to permit foreclosure on any assets of the Debtor (with a value exceeding $200,000), or to permit other actions that could reasonably be expected to have a material adverse effect on the Debtor or its estate, without DIP Lender's consent; **(j)** the Debtor's cessation of operating its business or the conversion of the Bankruptcy Case to a liquidation proceeding (other than through a Sale contemplated by the APA); **(k)** the Debtor's failure to obtain entry of the Final Order or Sale Order by the required dates, or any attempt by the Debtor to withdraw, amend or modify the DIP Orders or Sale Order without DIP Lender's consent; **(l)** the Sale Order or any DIP Order (Interim or Final) is reversed, stayed, vacated, or otherwise modified without DIP Lender's consent; **(m)** the Debtor's filing or support of any motion or proceeding adverse to DIP Lender or its rights, or any challenge by the Debtor or its estate to the validity, priority or extent of DIP Liens or DIP Obligations; **(n)** the Debtor's use of DIP proceeds or cash collateral to investigate or pursue claims against DIP Lender; **(o)** the Debtor's filing or support of any motion or application to approve payment of claims not provided for in the Budget (other than claims subject to priority under Section 507(a) of the Bankruptcy Code or allowed professional fees up to the Budget amounts); **(p)** the allowance of any claim or administrative expense in the Bankruptcy Case (or entry of an order granting an administrative expense claim) with priority equal or superior to the DIP superpriority claim without DIP Lender's consent; **(q)** entry of any order granting relief from stay to permit any holder of a prepetition security interest to foreclose on any Collateral or exercise other remedies; **(r)** the granting of any Lien on Collateral (other than Permitted Liens and DIP Liens) without DIP Lender's consent; **(s)** the Debtor's failure to comply with any term of the DIP Orders; **(t)** the Debtor's failure to support or pursue diligently approval of the Sale Procedures Order and Sale Order or any attempt by the Debtor to withdraw or modify the Sale Procedures Motion, Sale Procedures Order, Sale Order or APA without Buyer's consent; **(u)** a breach or termination of the APA by the Debtor, or any failure of any closing condition of Buyer's obligations under the APA due to Debtor's breach or failure to satisfy conditions; **(v)** confirmation of any Chapter 11 plan that is not conditioned on Payment in Full of the DIP Obligations (unless otherwise agreed by DIP Lender); **(w)** the Debtor's filing of any motion or proceeding seeking to challenge or recharacterize the Prepetition Lender's claims

or liens (if any) or to pursue any claims against the Prepetition Lender (except to enforce the terms of any prepetition subordination or intercreditor agreement to which the Prepetition Lender is a party), if DIP Lender is also the Prepetition Lender; **(x)** failure to timely achieve any plan toggle Milestone following delivery of a Diligence Termination Notice; and **(y)** the occurrence of any other specific Event of Default to be defined in the Definitive Documents (including, without limitation, termination or material breach by the Debtor of the APA, or the appointment of any third party with authority to run or oversee the Debtor's sale process, etc.).

For purposes of the foregoing, "**Payment in Full**" means the indefeasible repayment in full in cash of all DIP Obligations, including all principal, interest, fees, costs, and expenses (including any applicable early termination or exit fees), or other obligations or amounts due under the DIP Facility, in each case, unless otherwise agreed by DIP Lender.

**Remedies:** Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender may, by written notice to Borrower (with a copy to counsel for any official committee and the U.S. Trustee) declare (i) all or any portion of the unpaid principal amount of the DIP Loans, interest and any other obligations owing by the Debtor to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit under the DIP Facility, (iii) the termination of the DIP Facility and the DIP Orders as to any future liability or commitment of the DIP Lender, but without affecting any of the DIP Liens or the obligations of the Debtor, and/or (iv) a termination of the Debtor's right to use Cash Collateral (each of the foregoing, a "**Termination Declaration**"). Following the giving of a Termination Declaration, the Debtor's authority to use any further proceeds of DIP Loans or any cash collateral shall automatically terminate, and the DIP Lender shall be entitled to exercise any and all rights and remedies available under the DIP Documents or applicable law, including (A) foreclosing upon and selling all or a portion of the Collateral, (B) credit bidding the DIP Obligations in any sale of Collateral (subject to entry of the Final Order), (C) seeking relief from the automatic stay to foreclose on or otherwise exercise its remedies against the Collateral, and (D) setting off any amounts held in any accounts of the Debtor against the DIP Obligations owed. The Debtor (and any official committee) shall be entitled to an emergency hearing before the Bankruptcy Court within seven (7) days after the Termination Declaration to contest whether an Event of Default has occurred or is continuing, and the Debtor hereby waives any right to or requirement of further notice or hearing as to the DIP Lender's exercise of rights and remedies after such period. The automatic stay under Section 362 of the Bankruptcy Code shall be automatically and irrevocably lifted (without further action by the Court) at the end of such seven-day period unless the Bankruptcy Court determines that no Event of Default has occurred or is continuing.

**Indemnification:** The Debtor shall indemnify and hold harmless the DIP Lender, its affiliates and their respective officers, directors, employees, advisors, attorneys and agents (collectively, "**Indemnified Parties**") from and against all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs and expenses of any kind (including, without limitation, the reasonable and documented fees and disbursements of counsel) which may be imposed on, incurred by or asserted against any Indemnified Party in connection with or arising out of the DIP Facility, the DIP Orders, the Debtor's chapter 11 case, the proposed or actual use of proceeds of DIP Loans, or any claims, proceedings or actions arising from such matters, in all cases, except to the extent caused by the gross negligence or willful misconduct of such Indemnified Party (to be determined by final non-appealable judgment of a court of competent jurisdiction).

**Expenses:** The Debtor shall pay on demand all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, without limitation, the fees and expenses of DIP Lender's outside counsel, local counsel, financial advisors, auditors, appraisers, consultants and other experts, and all fees and expenses associated with any post-closing or default enforcement work) in connection with the negotiation, documentation, court approval and administration of the DIP Facility and DIP Orders, the monitoring of Collateral and budgets, and the enforcement of any rights and remedies under the DIP Facility (collectively, the "**DIP Expenses**"). The DIP Expenses (including estimated fees through closing) may, at DIP Lender's option, be net funded from the initial DIP Loan or any subsequent Draws or included in subsequent Draws and capitalized to the DIP Obligations. The DIP Expenses shall be secured by the DIP Liens and afforded superpriority status as DIP Obligations.

**Bankruptcy Court Orders:** The Interim and Final DIP Orders shall be in form and substance acceptable to DIP Lender and the Debtor, and shall include, without limitation, the provisions and findings described herein and other terms acceptable to DIP Lender, including usual and customary findings as to good faith under Section 364(e) of the Bankruptcy Code, the Debtor's stipulations to the validity and amount of any Prepetition Loan obligations, releases of any claims against DIP Lender and/or Prepetition Lender, "no marshaling" and Section 552(b) "equities of the case" waivers (effective upon entry of the Final Order), and the automatic perfection and validity of the DIP Liens without the need for further filings. The DIP Orders shall provide that the Liens granted herein (the "**DIP Liens**") are valid, binding, perfected and enforceable without further filing. The DIP Orders shall also approve the terms of this Term Sheet (with such changes as DIP Lender and Debtor may agree) as binding and enforceable against the Debtor, its estate and all parties in interest. The Debtor shall provide draft copies of all proposed motions, orders and other pleadings related to the DIP Facility to DIP Lender and its counsel for review with reasonable time to comment, and all such documents must be acceptable to DIP Lender in all respects. The Final Order shall be entered within 30 days after the Commencement of Process Date (or such later date as DIP Lender may agree).

**Appeals; No Stay:** The DIP Orders shall be immediately effective upon entry and shall not be stayed (absent DIP Lender's consent). If any DIP Order is appealed, the Debtor shall oppose any stay pending appeal.

**Jurisdiction:** The Debtor shall submit to the exclusive jurisdiction and venue of the Bankruptcy Court (or any other court exercising jurisdiction over the Chapter 11 Case or any proceeding therein) and shall waive any right to trial by jury. The laws of the State of New York shall govern the DIP Facility and any related documents, except as governed by the Bankruptcy Code.

**Additional Provisions:** The Definitive Documents shall contain such other terms, conditions and provisions as DIP Lender may reasonably request and are customarily included in debtor-in-possession financing agreements of this type, including without limitation: (i) provisions for the payment of the DIP Obligations and termination of the DIP Lender's commitments upon the Maturity Date (or earlier upon acceleration), (ii) provisions for the automatic and irrevocable payment of the DIP Obligations from the proceeds of any sale or other disposition of Collateral (including from the sale of the Purchased Assets under the Sale Order and APA) and for the indefeasible Payment in Full of the DIP Facility as a condition to the Debtor's entry into any alternate debtor-in-possession financing arrangement (unless otherwise agreed by DIP Lender),

(iii) a requirement that the Debtor's Chapter 11 plan, if any, shall be acceptable to DIP Lender or provide for Payment in Full of the DIP Obligations on the effective date of such plan, (iv) provisions (to be included in the Final Order) granting the DIP Lender the right to credit bid the DIP Obligations (in whole or in part) in any sale of Collateral, including any sale conducted under Section 363, Section 1129 or by a Chapter 7 trustee, (v) provisions deeming DIP Lender's claims to be allowed pursuant to the DIP Orders, without the necessity of filing proofs of claim or other pleadings, and (vi) usual and customary protective provisions regarding the DIP Lender's consent rights to Debtor's use of cash collateral or pursuit of other financing, no third party beneficiary rights, etc.

This Term Sheet is intended to summarize certain basic terms of a proposed financing and is not intended to be a commitment to lend or a complete list of all of the provisions to be included in the Definitive Documents. This Term Sheet and the provisions herein are subject in all respects to the negotiation, execution and delivery of the Definitive Documents in form and substance acceptable to the DIP Lender, and to the approval of the Bankruptcy Court in the DIP Orders.