UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Firstbase.io, Inc. | : | Case No. 24-11647(LGB) |
| | : | |
| Debtor. | : | |
| | : | |

# BENCH MEMORANDUM REGARDING CONFIRMATION OF CHAPTER 11 PLAN

**APPEARANCES**
KIRBY AISER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, NY 10583
By:   Dawn Kirby
        Dana Patricia Brescia
        Khyati Tuli

ROYER COOPER COHEN BRAUNFELD LLC
*Attorneys for Harbor Business Compliance Corporation*
1120 Avenue of the Americas, 4th Floor
New York, NY 11102
By:   Matthew Faranda-Diedrich
        Mark F. Skapof
        Marc E. Hirschfield

HUSCH BLACKWELL
*Attorneys for Novel Capital, Inc.*
4801 Main Street
Kansas City, MO 64112
By:   Jennifer Kriss Pollan

ALSO APPEARING:
    Filipe Senna, *Chief Operating Officer of Debtor*
    Mark Milastsivy, *Founder & CEO of Debtor*

## RELEVANT BACKGROUND AND EVIDENCE CONSIDERED

Before the Court is the confirmation of creditor Harbor Business Compliance Corporation's ("Harbor" or "Plan Proponent") proposed chapter 11 plan and objections thereto. In lieu of issuing an oral ruling, the Court has decided to publish its decision through this bench memorandum.

The evidence provided by Harbor includes the declarations submitted by Robert Castle [ECF No. 255], David Greenblatt [ECF No. 253] and Jeffrey R. Manning [ECF Nos. 254 and 266] in support of confirmation and the declaration prepared by Alexandra Pittinsky [ECF No. 251] regarding the ballot tabulation.  In addition, Harbor filed a plan of reorganization (the "Original Plan") and accompanying disclosure statement, the latter of which was approved by this Court [ECF No. 194].  Harbor also filed a plan supplement [ECF No. 216] and an amended plan supplement [ECF No. 222]. Harbor also filed a reply to various objections and a supporting brief regarding confirmation of the plan [ECF No. 262]. Finally, Harbor filed an amended plan (the "Plan") [ECF Nos. 268 and 269] in clean and redlined form.

Objections were filed by Firstbase.io, Inc., the debtor and debtor-in-possession (the "Debtor") [ECF No. 232], and Novel Capital, Inc. ("Novel") [ECF No. 231].  A joinder was filed by Cmprssr, LLC to the Debtor's objection.  In support of its objection, the Debtor submitted declarations of Mark Milastsivy [ECF No. 233], Jacob Sheldon [ECF No. 258] and Brett Dixon [ECF No. 256].  The Debtor also filed a plan of reorganization [ECF No. 235], a disclosure statement [ECF No. 236] and a Letter of Intent [ECF No. 234].[1]

In addition to the declarations all being admitted into evidence, the parties agreed to the admission by the Court of 63 exhibits submitted by Harbor and four exhibits submitted by the Debtor.

A confirmation hearing was held before me on October 20 and 21, 2025.  All of the declarants appeared at the hearing and six of the declarants were subject to cross-examination. Closing argument was held before me on October 23, 2025.

## REQUIREMENTS FOR PLAN CONFIRMATION

The Bankruptcy Code sets forth the statutory requirements for confirmation of a plan of reorganization in Section 1129. The bankruptcy court must confirm a plan only if the plan satisfies all of the requirements of Section 1129.

---

[1] The Debtor and Harbor have made certain additional filings since the conclusion of the confirmation which were not filings authorized by the Court and were made after the evidentiary record was closed for the confirmation hearing.  Accordingly, this decision does not address those filings.

2

**Section 1129(a)(1)**

Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." The phrase "applicable provisions" has been interpreted to include sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a chapter 11 plan. *See Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.* ), 843 F.2d 636, 648-49 (2d Cir. 1988).

**Section 1122**

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The substantial similarity requirement does not mean that claims or interests within a particular class must be identical or that all similarly situated claims receive the same treatment under a plan.

Courts that have considered classification, including the Court of Appeals for the Second Circuit and numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a *reasonable* (or "rational") justification for separate classification. *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) (collecting cases); *see also In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010); *Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"). Courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan*." In re Heritage Org., L.L.C*., 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007).

The Debtor and Novel both objected to the classification of unsecured claims into three separate classes (including a convenience class). The reason that the claims in Class 3 were separately classified from the claims in Class 4 and Class 5 was not gerrymandering.  Rather, it was because Class 5 is for convenience in distribution by dealing with creditors with small claims who want to accept a certain small cash payment.  Harbor offered claims in Class 3 the alternative of receiving equity in the Reorganized Debtor, or to receive cash and to participate in the plan trust which will control the prosecution of various causes of action.  Harbor will not participate in the plan trust and was not afforded the opportunity to receive cash and proceeds from the plan trust; such differential treatment provides a sufficiently rational justification for Class 4's separate classification.

As such, the classification set forth in the Plan complies with the requirements of section 1122.  The Court overrules the Debtor and Novel's objection to classification.

3

**Section 1123**

Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions, classes of claims and interests subject to section 1122 of the Bankruptcy Code.

Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."

Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."

Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.

Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."

The Plan satisfies each of these requirements as follows:

1. Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)). The Plan properly designates classes of claims and interests and thus satisfies the requirement of section 1123(a)(1) of the Bankruptcy Code.

2. Specification of Unimpaired Classes (§ 1123(a)(2)). Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying each class that is Unimpaired, which are Classes 1 and 2.

3. Treatment of Impaired Classes (§ 1123(a)(3)). Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." In Article III, the Plan meets this requirement by setting forth the treatment of the only classes that are Impaired, which are Classes 3, 4, 5 and 6.

4

   4. Equal Treatment Within Classes (§ 1123(a)(4)). Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because holders of allowed claims or interests will receive the same treatment as other holders of allowed claims or interests in the same class.

   5. Means for Implementation (§ 1123(a)(5)). Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because the provisions in Articles IV, V and elsewhere in the Plan, and in the exhibits and attachments to the Plan, including the Plan Supplement and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including terms regarding: (i) the settlement and discharge of claims and interests; (ii) the issuance of new equity; (iii) the vesting of estate assets in the Reorganized Debtor; (iv) authorizing the Debtor and/or the Reorganized Debtor to take all actions necessary to effectuate the Plan; (v) the formation of the plan trust; and (vi) the appointment of the initial directors and officers of the Reorganized Debtor.

   6. Issuance of Non-Voting Securities (§ 1123(a)(6)). Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate governance documents prohibit the issuance of non-voting equity securities. This provision has been satisfied, as the Debtor's new corporate governance documents must incorporate such a prohibition.

   7. Directors and Officers (§ 1123(a)(7)). Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any director, officer or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy . . . ." The corporate governance documents contain provisions regarding the manner of selection of the Reorganized Debtor's directors and officers that are consistent with the interests of all holders of claims and interests and with public policy. The Plan Supplement further provides a list of the Reorganized Debtor's proposed initial directors and officers.

  Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11. *In re I. Appel Corp.*, 300 B.R. 564, 567 (S.D.N.Y. 2003), *aff'd*, 104 F. App'x 199 (2d Cir. 2004) (generally discussing section 1123(b)).

  Section 1123(d) of the Bankruptcy Code states that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the

underlying agreement and applicable nonbankruptcy law." Subject to certain limitations, Article VI of the Plan provides for the satisfaction of monetary defaults, if any, under each Executory Contract and Unexpired Lease (as defined in the Plan) to be assumed pursuant to the Plan, by payment of the default amount on the Plan Effective Date or as soon as reasonably practicable thereafter. Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

**Section 1129(a)(2)**

Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure. The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code."). Thus, to comply with section 1129(a)(2), the debtor must comply with sections 1125 and 1126.

As previously discussed, the Plan Proponent complied with sections 1125 and 1126. The Court approved the Disclosure Statement as containing adequate information and certain solicitation procedures [ECF No. 196]. The docket contains evidence that the Plan Proponent complied with the solicitation procedures approved by the Court [ECF No. 197].

**1129(a)(3)**

Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996). The Second Circuit has construed this good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'" *Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. at 901-07 ("[I]n the context of a chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (citations and quotations omitted). Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation. *See, e.g., In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

The Debtor and Novel argue that the Plan was not proposed in good faith because, among other things, there was no robust marketing process of the business. The Court finds it a little ironic that the Debtor is making this argument. The Debtor had more than a year to retain an investment banker and market the Debtor's business for sale and it chose not to do to that. Only

6

now, in *October 2025* and facing impending change-of-control, has the Debtor filed a motion to retain a financial adviser, signed a non-binding letter of intent with a possible buyer, and filed its own plan of reorganization.

Furthermore, the Debtor's operations are not sufficient to fund the costs of this chapter 11 case for another two to three months to enable a separate sale process. The Debtor has $240,000 of cash, as opposed to the $900,000 it was projected to have. The Debtor's receipts were less than projected in August and September. Comparatively, the total allowed professional fees through August 30, 2025 alone are $1.963 million, and the Debtor does not have sufficient cash on hand to pay them, even after taking into account the previously allocated fee escrow. Simply put, the Debtor is administratively insolvent.

The Court realizes that none of this is Novel's fault. Novel would like to see a sale process instead of confirmation of the Plan.[2] It thinks that the Debtor should be worth more than the consideration provided by Harbor under the Plan. However, if the sale process were to proceed and were to be unsuccessful, given the administrative insolvency of the Debtor, the Debtor would inevitably end up in a chapter 7 liquidation, or might run out of cash pursuing the sale process and have to shut down operations – in either case, ultimately providing no recovery to unsecured creditors such as Novel.

Although Class 3 voted against the Plan, the Plan provides for the payment in full of administrative expenses and priority claims, and allows some recovery for unsecured creditors. Harbor is funding the Plan, along with Novel. There is no assurance that, if the Debtor's administrative insolvency or cash situation worsens while it pursues a sale process, Harbor will remain willing to provide funding for a plan.

The Court does not find the Plan to be proposed in bad faith. Even though there may be possible other alternatives, the Debtor simply does not have the cash to fund this case for another two to three months to explore them – and even if it did have the cash, there is no certainty that the result would be better, and there is a reasonable chance that it could be worse.

Accordingly, the Court finds that the Plan satisfies the requirements of section 1129(a)(3).

---

[2] If a sale process were to proceed, the Court would first need to determine the dispute brought by Harbor over the rightful ownership of certain assets of the Debtor in Adversary Proceeding No. 25-01032 prior to any final disposition. Additionally, the Debtor would likely incur additional litigation costs in connection with Harbor's right to a new trial for lost profits arising from trade secret misappropriation and/or the currently stayed appeal regarding the avoidance of Harbor's judgment lien, in addition to a possible appeal regarding any order approving a sale of the Debtor's assets. These litigation costs would have to be funded from sale proceeds.

**Section 1129(a)(4)**

Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan be subject to approval by the bankruptcy court as reasonable. Courts have construed this section to require that all payments of claims to professionals paid out of estate assets be subject to review and approval by the court as to their reasonableness. Specifically, section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).

Under § 1129(a)(4), first there must be disclosure of the proposed payment, and second, the court must approve the reasonableness of such proposed payments. *See In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009).

Here, the Bankruptcy Court authorized the Debtor to retain and employ certain professionals during the pendency of the chapter 11 case. All retained professionals' fees and expenses are subject to final review for reasonableness by the Bankruptcy Court under section 330 of the Bankruptcy Code. Article II.A.2 of the Plan further provides that Professionals shall file all final requests for payments of Professional Claims no later than sixty (60) days after the Plan Effective Date. Accordingly, the Plan complies with section 1129(a)(4).

**Section 1129(a)(5)**

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and that such appointment be consistent with the interests of creditors and equity security holders and with public policy. *See* 11 U.S.C. § 1129(a)(5)(A).

As set forth in the Plan Supplement, the Plan Proponent has disclosed the identity and affiliations of the individuals proposed to serve as the initial directors and officers of the Reorganized Debtor. Accordingly, the Plan complies with section 1129(a)(5).

**1129(a)(6)**

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan. This provision is inapplicable to the Plan.

8

**Section 1129(a)(7): the "Best Interests" Test**

Under Section 1129(a)(7), every impaired creditor and interest holder must either (1) accept the plan, or (2) receive at least as much value as the creditor or interest holder would receive in a chapter 7 liquidation of the debtor.

The "best interests of creditors" (or the "best interests") test applies to individual dissenting holders of impaired claims and interests rather than entire classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under the proposed plan of reorganization. As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests. The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the proposed plan of reorganization that rejects the plan.

Classes 3, 4, 5 and 6 are the only Impaired classes of Claims or Interests under the Plan. All Holders of Claims in Classes 4 and 5 voted in favor of the Plan so the best interests test is not applicable to any Holders of Claims in those classes. Claims in Class 3 voted against the Plan. So, the issue is whether the recovery under the Plan exceeds that under the hypothetical liquidation analysis.

Reviewing Harbor Ex. 25, which is the Plan Proponent's liquidation analysis, and after hearing the testimony of Mr. Greenblatt and the other witnesses at the confirmation hearing, there are evidently some flaws in the liquidation analysis. First, the cash balance is $950,000 but the testimony is that the cash on hand is approximately $240,000 as of September 30, 2025. So, cash amount would need to be reduced. The Debtor questioned the $500,000 for chapter 5 causes of action as whether it would be recoverable in a liquidation. But the Debtor has not provided a better estimate of the value of the chapter 5 causes of action. Furthermore, if the Court were to remove them from the liquidation analysis but leave them as a source of possible recovery in the Plan, that would be somewhat inconsistent.

The Debtor has asserted that there is no value attributable in the liquidation analysis to the Debtor's software or two trademarks and URLs that the Debtor owns. The Court found Mr. Greenblatt's reasoning as to why he did not include any value for the software in a liquidation to be persuasive: the lack of an ongoing business, as well as the trade secret litigation. The Court did not find the Debtor's argument that there could be a going-concern sale in a hypothetical chapter 7 to be persuasive. However, the Court believes that some value should be attributable to the two trademarks and URLs. The Court will add the midpoint of Mr. Manning's liquidation valuation for such assets to the liquidation analysis or $350,000. So, that means a reduction of $660,000 for cash but an increase of $350,000 in assets. That is net negative of $310,000.

9

In terms of Claims, the administrative claims are higher than estimated in the liquidation analysis by at least $330,000 (the amount of allowed professional fees awarded on October 20 in excess of the professional fee escrow). Additionally, in Class 3 Claims, no rejection damages claims were included in the liquidation analysis, which seems unlikely. The Court will add ten percent of the Debtor's asserted total Class 3 Claim value which is $5 million, instead of $4 million because of the Graphene Ventures claim dispute. Thus, Class 3 Claims would be $5,500,000 for liquidation purposes. Based on my analysis, there would be no distribution available for unsecured creditors or equity in a hypothetical chapter 7 liquidation. But there is under the Plan. Thus, the best interests test has been satisfied as Class 3 will receive at least as much as they would receive under the Plan as they would in a hypothetical chapter 7 liquidation.

Accordingly, the Court finds that the Plan complies with the requirements of section 1129(a)(7).

**Section 1129(a)(8)**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired thereunder. A class of claims accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class vote to accept the plan, and a class of interests accepts a plan if holders of at least two-thirds in amount of the allowed interests in that class vote to accept the plan. A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is conclusively presumed to have accepted the plan. Conversely, a class is deemed to have rejected a plan that provides that the claims or interests of that class do not entitle the holders thereof to receive or retain any property under the plan on account of such claims or interests.

Notwithstanding the failure to meet subsection (a)(8), the court may still confirm a plan under the "cram down" provisions of section 1129(b) if "all of the applicable requirements of subsection (a) are met," and the plan "does not discriminate unfairly, and is fair and equitable[.]" *See* 11 U.S.C. § 1129(b)(1)-(2).

To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. Generally, courts have held that a plan unfairly discriminates in violation of section 1129(b) only if similarly situated claims receive materially different treatment without a reasonable basis for the disparate treatment. For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2). Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest. *See generally In re Genco Shipping &*

10

*Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014); *In re Charter Commc'ns*, 419 B.R. 221, 267 (Bankr. S.D.N.Y. 2009).

Classes 4 and 5 voted unanimously in favor of the proposed plan of reorganization. But, the Court will have to proceed to confirm this Plan through cram down with respect to Classes 3 and 6 which will be discussed later.

### Section 1129(a)(9)

In accordance with section 1129(a)(9)(A) of the Bankruptcy Code, Article II of the Plan provides that Holders of Allowed Administrative Expense Claims will receive Cash equal to the amount of such Allowed Administrative Expense Claims: (i) on the Effective Date, or as soon as reasonably practicable thereafter; (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, as soon as reasonably practicable after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order; or (iii) if the Allowed Administrative Expense Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claims without any further action by the Holders of such Allowed Administrative Expense Claims. The Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) were Impaired under the Plan and they have been or will be paid in the ordinary course of business. Finally, the Plan's treatment of Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code satisfies section 1129(a)(9)(C) of the Bankruptcy Code. Article II.B of the Plan provides that Holders of Allowed Priority Tax Claims shall receive: (i) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim equal to the amount of such Allowed Priority Tax Claim or (ii) satisfy and discharge such Allowed Priority Tax Claim on such other terms and conditions as may be agreed between the holder of such Allowed Priority Tax Claim and the Debtor or the plan trustee. Thus, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

### Section 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider" as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan. *See generally In re Charter Commc'ns*, 419 B.R. 221, 264 (Bankr. S.D.N.Y. 2009).

The holders of Claims in Classes 4 and 5 have overwhelmingly voted to accept the Plan with no votes of insiders. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**Section 1129(a)(11)**

Section 1129(a)(11) of the Bankruptcy Code contains the so-called "feasibility test," which requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan. *See* 11 U.S.C. § 1129(a)(11). In applying the feasibility test, the Court must determine whether the plan may be implemented and whether it has a reasonable likelihood of success. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Johns-Manville Corp.*, 843 F.2d at 649.

In determining standards of feasibility, courts in this jurisdiction and others have identified the following probative factors:

a. the adequacy of the capital structure;
b. the earning power of the business;
c. the economic conditions;
d. the ability of management;
e. the probability of the continuation of the same management; and
f. any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

The Plan Proponent and their advisors have analyzed the Plan Proponent's ability to meet its obligations under the Plan and allow the Reorganized Debtor to continue as a going concern. As part of this analysis, GlassRatner prepared financial projections through October 2026 [Harbor Ex. 26] (the "Financial Projections"). We know that the actual performance for the Debtor has been worse in August and September but is improving in October. The Debtor's cash balance is substantially lower – by $660,000 – and receipts were lower than projected in both August and September.

The expert report prepared by Jeffrey Manning from Silver Birch in support of the Plan is based on the Financial Projections [Harbor Ex. 61].

In contrast, the expert report prepared by the Debtor's expert, Brett Dixon from Bennett Thrasher LLP [Debtor Ex. 3B] relied upon projections provided to him by Filipe Senna, the Debtor's chief operating officer [Harbor Ex. 63].

Each of the expert reports have their respective weaknesses. With respect to comparable transactions, Mr. Manning used only one comparable, which was a private transaction. Mr. Dixon testified that this transaction would not be available to the market so a willing buyer would be unaware of it. Additionally, Mr. Dixon questioned the use of traded-over-the-counter companies and the overall selection of the public peer group by Mr. Manning. However, the

12

transactions Mr. Dixon identified – while public[3] – were much larger transactions and involved companies which had positive EBITDA, something that the Debtor did not have for 2022-2024. Mr. Dixon's smallest comparable had revenues of $172 million as opposed to the Debtor's $10 million of revenue. So, neither expert's comparable company analysis is without flaws.

Additionally, Mr. Manning's discounted cash flow analysis was critiqued by Mr. Dixon as being mathematically incorrect, and for the applied revenue multiple being flawed based on the public peer group selected. My calculation is that the present-value discounted cash flow is $1.255 million. Mr. Dixon also pointed out that revenue multiple was mathematically wrong because the median multiple among the sample selected should have been 1.8, since Reklaim Ltd.'s revenue multiple was not zero as listed, but rather approximately 1.8. If 1.8 was substituted as the revenue multiple, it appears that the present-value terminal value would be $15.554 million in one year at WACC and that this would change the high end of Mr. Manning's valuation range (perhaps to something like $16.809 million).

Turning now to Mr. Dixon's valuation, there are also significant concerns. First, the valuation is heavily weighted to the capitalization of earnings method because of the projected growth of the Debtor's business. However, the Debtor's revenue shrank from 2023 to 2024, and when using the last twelve months of revenue, has grown less than $1 million over 2023. So, the Debtor has not demonstrated consistent revenue growth for nearly three years of operations, and its growth rate when compared to 2023 is modest: less than 10%.

Additionally, Mr. Senna's optimistic projections – upon which Mr. Dixon's valuation relies – depend in part on launches of new products, particularly "OS". The Court is mindful of the testimony of Mr. Jacob Sheldon and Mr. Mark Milastsivy about new product launches. The witnesses acknowledged that the Debtor has not always been successful with new product launches. Moreover, neither Mr. Sheldon or Mr. Milastsivy reviewed and provided comments on Mr. Senna's projections. Mr. Senna's projections assume $11.4 million in revenue from OS in the first year. But, they also assume that the other products revenues double or more in the twelve-month period. The projections also assume a marketing budget which begins at $100,000 per month and ramps up to $700,000 per month during the twelve-month period.

This does not seem to jibe with the Debtor's current performance. The Debtor has a significantly reduced amount of cash on hand as-of the date of the confirmation hearing, such that there was even a concern expressed by the Plan Proponent as to whether the Debtor had enough cash on hand for its next payroll. Mr. Senna's projections do not provide a source of funding for the increased marketing budget. The Debtor's receipts were lower than projected for

---

[3] The Court notes that there is no database of comparable company transactions of this size in the Debtor's industry because the comparable companies are largely start-ups (i.e. privately held, small companies primarily funded by venture capital).

13

August and September. The Debtor's annual revenues were $9.198 million in 2023 and $8.069 million in 2024.

Even if Mr. Manning's $11.6 million revenue estimate for 2026 based on existing products of the Debtor did not seem optimistic, which it does, the 280% short-term growth rate used by Mr. Dixon seems *very* optimistic. The Debtor's average year-to-year growth rate for the last three years has been 29%. It is hard to reconcile that historical performance with a 280% growth rate in the capitalization of earnings method employed by Mr. Dixon, even with a WACC of 73%. The Court understands that Mr. Dixon prepared his valuation using Mr. Senna's optimistic projections, and assumed that it took five years to reach the long-term growth rate of 3%.
In essence, the short-term growth rate used by Mr. Dixon assumes a rate of *9.65 times* the Debtor's average year-to-year growth rate. While that is possible, it seems unlikely. Additionally, it assumes a normalized free cash flow before tax of greater than three times the last 12 months' free cash flow. While achieving this is not impossible, it is *certainly* not likely. Therefore, the Court thinks that Mr. Dixon's capitalization of earnings method produced a valuation which is too high, even using a 73% WACC, because they are based on Mr. Senna's very optimistic projections which are not consistent with Debtor's past financial performance or available cash to invest in growing the business.

Using Mr. Senna's projections, Mr. Dixon values the enterprise at $28.640 million. The Court thinks that the valuation is overstated by approximately a third, given the optimistic projections. This would result in an enterprise valuation of $18.9 million. Even if this Court were to pick the mid-point between Mr. Dixon's valuation in its overstated form and Mr. Manning's valuation as corrected, the enterprise valuation would be $22.72 million. The Court believes that a more believable range for the enterprise valuation of the Debtor is likely between $16.8 million and $18.9 million.[4]

In order for the equity to have any conceivable value, the enterprise valuation would have to exceed the $25.7 million in administrative, priority and unsecured claims without including any rejection damages claims. Unless the Court were to adopt Mr. Dixon's asserted valuation as the correct enterprise value of the Debtor, such a threshold could not be met. For the reasons stated above, the Court does not believe that the enterprise value of the Debtor exceeds that threshold (or even comes close to it).

In addition to the valuation dispute, the Debtor and Novel objected to the feasibility of the Plan based upon the ability of Harbor's management to operate the Debtor's business. However, Harbor's management is in a similar business which has, at the very least, some

---

[4] The Court notes that, for purposes of the enterprise valuation, it is not attributing ownership of any of the Debtor's assets to Harbor. In the adversary proceeding pending before the Court, Adversary Proceeding No. 25-01032, Harbor has asserted ownership interests in certain of the Debtor's assets which, if proven correct, would reduce the enterprise valuation.

14

overlap. Harbor has taken over at least one entity with a similar business to the Debtor's business, according to Mr. Manning's testimony.

It is certainly true that there is a lot of bad blood between Harbor's management team and the Debtor's management team caused by several years of litigation. And as Novel's counsel argued at the confirmation hearing, it probably would be easier if anyone but Harbor were taking over the business through a plan of reorganization or a sale. But bad blood between the management teams and Harbor management's team lack of experience with certain parts of the business does not rise to the level of making the plan infeasible. Similarly, the fact that some (or even most) of the Debtor's management may not choose to continue working for the Debtor does not mean that the plan is not feasible.

Harbor took on those risks when it proposed the Plan. Harbor has not even had the chance to speak to most of the Debtor's management team – much less extend job offers – because the Court has precluded them from doing so. And this is often true of acquirers or plan proponents who must make a binding offer to acquire a business without having certainty about who from the current workforce will come and work for them after the acquisition.

While the Court agrees that Harbor will not be as well liked as another acquirer, the testimony at the confirmation hearing was that Harbor's business has similar products to certain of the Debtor's products, so it is hard to understand the Debtor's argument that Harbor's management is incapable of taking over the Debtor's business, even if there is a steep learning curve. The Court notes that the case law is somewhat sparse as to the competency of management of the plan proponent as a basis for finding a plan infeasible. Indeed, where the debtor had been unprofitable[5], courts have held that a change in management under a plan of reorganization can be evidence that the plan is feasible. *See In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 411 (Bankr. E.D. Pa. 1991). The Court does not find Harbor's management to be incompetent or incapable, despite the fact that they do not have all of the experience of the Debtor's management with respect to the Debtor's business. Thus, the Court does not find that the plan is infeasible because of Harbor's management team.

As the acquirer, Harbor (and to a lesser degree Novel) is bearing the risk of a successful transition, along with the Debtor's work force, vendors and customers. **The Court expects the Debtor's management to acquit their fiduciary duties with the transition process.**

Accordingly, the Court rules that the Plan satisfies the feasibility test.

**Section 1129(a)(12)**

Section 1129(a)(12) of the Bankruptcy Code requires the payment of statutory fees, specifically "[a]ll fees payable under section 1930 of title 28, as determined by the court at the

---

[5] Here, the Debtor has had negative EBITDA for the past three years (although, the trailing twelve months' EBITDA has been slightly positive).

hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Article II of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until the chapter 11 case is converted, dismissed, or a Final Decree is issued, whichever occurs first. Thus, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**Section 1129(a)(13)**

Section 1129(a)(13) of the Bankruptcy Code requires all retiree benefits to continue post-confirmation in accordance with section 1114 of the Bankruptcy Code. Such treatment meets the requirements of §§ 1114 and 1129(a)(13). The Debtor has no retiree benefits.

**Section 1129(a)(14)-(16)**

These sections of the Bankruptcy Code do not apply to the Plan.

**Section 1129(b)**

Holders of Claims in Class 3 voted to reject the Plan. Holders of Interests in Class 6 are deemed to reject the Plan.

For the reasons discussed with respect to classification under section 1122 and Class 3, the Plan does not discriminate unfairly with respect to Class 3. Every member in Class 3 had the option to select equity – which is what Class 4 is receiving under the Plan – or to select a cash distribution. Indeed, one of the two objectors, Novel, exercised its option and elected to receive equity. Accordingly, there is no unfair discrimination with respect to Class 3.

The "fair and equitable" rule is satisfied as to the Holders of Claims in Class 3 as no Holders of Claims and Interests junior to Class 3 will receive or retain any property under the Plan.[6] The rule is also satisfied as to Interests in Class 6, as no Interests junior to such class will receive or retain any property under the Plan on account of such Interests. Moreover, based on the valuation analysis as previously discussed, Holders of unsecured Claims will not receive in excess of the full value of their Claims under the Plan.

**Section 1129(c)**

Section 1129(c) of the Bankruptcy Code provides that "the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144" of the

---

[6] Classes 4 and 5 are not junior to Class 3.

16

Bankruptcy Code. No other plan has been confirmed in the chapter 11 Case and therefore section 1129(c) is satisfied.

**Section 1129(d)**

Section 1129(d) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**HOLDING**

For all of these foregoing reasons, the Court overrules the Debtor's and Novel's objections to confirmation of the Plan and confirms the Plan. The Court requests that the Plan Proponent submit a proposed order consistent with this decision. However, the Court will not grant the Plan Proponent's request for a waiver of the 14-day stay of the confirmation order.

DATED:     November 3, 2025
           New York, New York

*/s/ Lisa G. Beckerman*
HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE