DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for Mark Milastsivy*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400
Robert L. Rattet, Esq.
Craig M. Price, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In re:                                                                   Chapter 11 Case

Firstbase.io, Inc.,                                                  Case No.: 24-11647 (LGB)

      Debtor.
_____

# DECLARATION OF MARK MILASTSIVY IN SUPPORT OF
# MOTION FOR RECONSIDERATION OF ORDER
# CONFIRMING PLAN OF REORGANIZATION

      I, Mark Milastsivy, founder and CEO of the above-captioned Chapter 11 debtor (the "Debtor"), respectfully submit this declaration (this "Declaration")[1] in support of the *Motion For Reconsideration of The Bench Memorandum Regarding Confirmation of Chapter 11 Plan* (the "Motion") [ECF Docket No. 290] filed by Novel Capital, Inc. ("Novel"), regarding the Confirmation Order of the Chapter 11 plan of Habor Business Compliance Corporation ("Harbor" and its plan the "Harbor Plan"), and hereby state as follows:

**I.    INTRODUCTION**

      1.    I am the founder and Chief Executive Officer of Firstbase.io, Inc. ("Firstbase" or the "Debtor").

      2.    The purpose of this Declaration is to join in and support the Motion as well as clarify and supplement the factual record concerning: (i) why a sale process or competing plan could not practically be pursued earlier, (ii) the adverse impact of Harbor's litigation tactics and procedural maneuvers on the Debtor's ability to reorganize, (iii) the Scaleworks Offer (as described below), and (iv) the significant operational and financial progress achieved during the Chapter 11 case that now enables a superior recovery for all creditors through an active sale process.

---

[1] Nothing in this Declaration is intended to constitute a legal conclusion. All statements herein are based on my personal knowledge, information reasonably available to me in my capacity as Chief Executive Officer, or opinions formed in the ordinary course of managing the Debtor's business.

## II.   CIRCUMSTANCES AFFECTING THE TIMING OF A SALE OR PLAN

3. Since the Petition Date, I have engaged in extensive discussions with industry peers, venture investors, investment bankers, and private-equity professionals about possible strategic paths for Firstbase. Across these conversations, the feedback was remarkably consistent: you can only have one "red flag" when marketing a distressed technology company, and Chapter 11 itself is already that one.

4. An unresolved, high-stakes judgment on appeal represented a *second* red flag that virtually every serious buyer or institutional investor would refuse to touch. As long as both the bankruptcy case and the pending appeal remained open issues, no credible buyer would be willing to engage.

5. The uncertainty surrounding the Third Circuit's possible decision—not merely the size of Harbor's claim—was therefore a complete impediment to any sale or capital transaction. Multiple investment bankers emphasized that a Chapter 11 filing could be explained to investors, but the results of the appeal would first need to be known. As they consistently put it, "you're only allowed one red flag." Chapter 11 was already one; the unresolved appeal was another. With two red flags, there was no realistic path to attract credible buyers or institutional investors.

6. Anticipating that the appellate decision might arrive in the summer of 2025, I began laying the groundwork for a transaction immediately after the Debtor's exclusivity expired in June 2025. We spoke with more than a dozen investment banks we believed could be a strong fit to represent the Debtor in a sale process. The feedback from the vast majority of them was consistent with the views I had already heard from industry experts earlier in the case: that no credible transaction could advance until at least one of the "red flags" — either the unresolved appeal or the bankruptcy itself — was removed. I focused on identifying a firm with the sophistication to navigate the unique complexity of a sale involving both pending litigation and an ongoing Chapter 11 case. By July 2025, the Debtor had selected G2 Capital Partners ("G2"), a firm with relevant experience in distressed and growth-technology transactions. G2 began preliminary diligence and engaged with us on a detailed retention structure designed to protect their substantial time investment given the uncertainties surrounding the case.

7. However, in early August 2025, before the Third Circuit issued its decision, Harbor filed its own plan of reorganization and disclosure statement. That development introduced a new layer of procedural risk: any sale process could be rendered moot if Harbor's plan were confirmed. G2 understandably viewed this as a material obstacle, requiring significant revisions to its engagement terms to account for that new uncertainty. While the Debtor and G2 worked cooperatively to address those concerns, the Court's subsequent approval of Harbor's Disclosure Statement increased G2's perceived risk dramatically. G2 therefore chose to monitor the case rather than finalize its formal engagement.

2

8. Shortly thereafter, in late August 2025, the Third Circuit issued its ruling, reducing Harbor's judgment by approximately $11 million and finally removing one of the two red flags that had made a sale impossible for so long. By that time, however, G2's engagement had been effectively paused pending developments in the confirmation process. Even so, G2 verbally expressed its belief—based on preliminary diligence—that it could identify a transaction capable of paying unsecured creditors in full and even providing recovery to SAFE and equity investors.

### III.    HARBOR'S LITIGATION TACTICS CREATED A "THIRD RED FLAG"

9. Unfortunately, even as the Debtor sought to navigate the first two red flags—Chapter 11 itself and the unresolved judgment—Harbor introduced a third red flag. In February 2025, Harbor commenced Adversary Proceeding No. 25-01032, asserting ownership over core Debtor assets—including software expressly found by the District Court to remain the Debtor's property—and asserting personal claims against myself and COO Filipe Senna. Harbor's commencement of the Adversary Proceeding was designed to chill other bidders.

10. This adversary proceeding made an already-complex situation extraordinarily difficult to finance. From an investor's perspective, Firstbase was now a distressed company (first red flag), with a pending appellate judgment (second red flag), and an active dispute over ownership of its intellectual property (third red flag). Multiple investment bankers and investors told me directly that three concurrent risk factors of this magnitude would eliminate any possibility of underwriting or acquisition interest, no matter the company's underlying performance.

11. Harbor's allegations were facially baseless and contrary to established rulings. Our counsel at Quinn Emanuel promptly moved to dismiss and issued a sanctions letter (which the Court later acknowledged was at least partially justified). The adversary proceeding, however, created significant uncertainty over the Debtor's assets, which the Court itself recognized in footnote 2 of its Memorandum Decision Opinion, noting that any sale "would first need to determine the dispute brought by Harbor over the rightful ownership of certain assets," rendering a sale impracticable.

12. Harbor's tactic was the functional equivalent of the Debtor filing a meritless adversary proceeding against Harbor and then insisting that, until that proceeding was resolved, Harbor's own plan could not be confirmed. In other words, Harbor created an obstacle of its own making and then relied on that obstacle to argue that only its plan was feasible. That approach turns the Chapter 11 process on its head: it uses litigation as both the *weapon* and the *excuse*. No court would permit the Debtor to preclude Harbor's confirmation efforts in this way, and Harbor should not be permitted to profit from the same conduct in reverse.

13. While Harbor's adversary proceeding and repeated threats of further litigation initially chilled investor interest—causing several parties to pause diligence—the deterrent effect was situational, not permanent. With the Third Circuit's ruling clarifying the judgment, the

3

Debtor's strengthened financial performance, and the ability to conduct a court-supervised sale that insulates acquirers from Harbor's claims, those barriers have now been materially reduced. The fact that credible buyers such as Scaleworks and Recruiter.com have engaged notwithstanding Harbor's continuing posture demonstrates that a fundable, executable transaction is now achievable.

14. The resulting administrative insolvency cited by the Court was, in part, a direct consequence of Harbor's aggressive tactics: the Debtor was forced to incur substantial legal costs defending against meritless claims that served only to obstruct reorganization.

15. In short, Harbor's litigation posture created precisely the conditions that it then cited to argue that only its own plan was "feasible." That self-created impossibility should not now prejudice the Debtor or its creditors.

IV. **EFFORTS TO ENGAGE AN INVESTMENT BANK AND PURSUE A SALE PROCESS**

15. After the Third Circuit reduced Harbor's claim, the Debtor continued pursuing a sale process. G2 remained engaged informally and maintained its conviction about the value of the Debtor's business.

16. While G2 elected to pause formal engagement due to the procedural risks created by Harbor's plan filing, the Debtor did not stop its efforts. Between September and October 2025, we intensified direct outreach to potential strategic and financial acquirers. Those efforts culminated in a serious letter of intent from Scaleworks Fund III, L.P. ("Scaleworks"), a respected software as a service ("SaaS") focused investor, and the filing of a motion to approve its DIP financing and plan-sponsor proposal.

17. Around the same time, the Debtor also received a letter of intent from Recruiter.com, another strategic acquirer operating in the technology and professional-services sector. While that transaction remains under discussion, Recruiter.com was not able to move as quickly as Scaleworks in advancing to a definitive purchase agreement—something that was critical for the Debtor to demonstrate to the Court that a sale could be executed promptly and credibly. Nonetheless, the Debtor continues to engage with Recruiter.com, and it is expected that Recruiter.com will participate as a potential bidder under a modified plan if the Debtor is afforded the opportunity to proceed with an orderly sale process.

18. Harbor's principal, however, declined to engage with Scaleworks, stating in a sworn declaration that Harbor was "focused on confirming and implementing the Plan as soon as practicable" rather than considering a transaction that would provide substantially higher recoveries for all creditors.

4

19. This refusal was particularly striking given Harbor's own disclosures in its plan. Harbor represented that it was an impaired creditor, projecting recovery for itself at a "speculative but no less than $0.03 on the dollar," and that unsecured creditors as a class would receive no more than $0.19 on the dollar. Critically, even that upper-end estimate of $0.19 per dollar is derived solely from Harbor's assertion that additional funds *might* flow from recoveries in its own adversary proceeding — the same litigation it filed in bad faith. In other words, the only way Harbor reaches the 19-cent projection for others is by assuming its own lawsuit somehow succeeds.

20. Moreover, if $0.19 truly represents the maximum potential recovery for unsecured creditors, then, under basic bankruptcy principles of equal treatment and *pari passu* distribution, that same ceiling would necessarily apply to Harbor's own recovery within the class. Yet Harbor rejected the Scaleworks proposal, which would have provided it and other creditors with a much higher recovery—far above its own projected maximum. Any rational creditor acting in good faith would have embraced such an outcome.

21. Harbor's conduct demonstrates that its motives are control-oriented, not value-maximizing, and that the Harbor Plan was structured to seize ownership of the reorganized Debtor rather than to maximize recoveries for the creditor body. The result is not fair and equitable to the Debtor's unsecured creditors.

## V. OPERATIONAL TURNAROUND DURING CHAPTER 11

22. Contrary to the Court's observations, Firstbase achieved exceptional financial and operational improvements during this Chapter 11 case:

- Subscription revenue increased by approximately 50 percent year-to-date — the category of revenue that receives the highest valuation multiple in any sale or investment transaction.

- For the period commencing on the Petition Date (September 24, 2024) through the present, the Debtor became profitable overall (while not every month has been profitable, the total post-petition period reflects a net profit), representing a sharp reversal from prior years of heavy burn. Compare this to prior periods:

    – For the period September 25, 2023 – September 23, 2024, the Debtor incurred over $1.5 million in cash burn and over $2.2 million in accrual burn.

    – For the period September 25, 2022 – September 24, 2023, the Debtor incurred over $3 million in cash burn and over $6 million in accrual burn.

Other results the Debtor accomplished while in Chapter 11:

5

- Customer lifetime value rose by over 80 percent.
- Net Dollar Retention exceeded 100 percent.
- Subscriber churn fell by more than 30 percent.
- Customers paying over $2,000 per year grew by more than 500 percent.
- Two new products successfully launched during the case.
- The Debtor is also in the final stages of obtaining SOC 2 Type II compliance certification, a process that has taken multiple quarters of preparation and independent auditing.[2]

23. These metrics are leading indicators — measurable metrics that tend to change *before* the general economy or a business's overall performance shifts, allowing for early predictions about future trends. In this case, the indicators point decisively upward: customer value, retention, recurring revenue, and compliance readiness are all accelerating. While the full valuation effects of these trends take time to materialize, they are well-recognized precursors of enterprise growth. As such, they validate the reasonableness of Bennett Thrasher's valuation analysis and confirm that Firstbase's enterprise value is rising materially.

## VI. THE DEBTOR HAS THE CASHFLOW NECESSARY TO SUSTAIN OPERATIONS DURING A SALES PROCESS

24. I believe that the Debtor has the necessary cashflow required to sustain operations through a sale process. The Debtor's forward-looking cash flow projection for the period November 2025 through March 2026 (the "Projection Period") is attached hereto as **Exhibit A** (Cash Flow Projection Spreadsheet).

25. While operating under Chapter 11 protection, the Debtor has continued normal operations, retained customers, and produced revenue growth.

| Period (Actuals Filed with MORs; CASH BASIS)* | Revenue |
|---|---|
| September 2024 | $527,000 |
| October 2024 | $547,000 |
| December 2024 | $705,000 |

---

[2] SOC 2 compliance is an information-security standard developed by the American Institute of CPAs that evaluates a company's controls for data integrity, confidentiality, and privacy. In simple terms, it is the certification that an organization securely manages customer data in line with industry best practices. This milestone is often a table-stakes requirement for enterprise buyers and strategic partners who may wish to integrate Firstbase's technology into their own offerings but require verified assurance of data protection and operational reliability. Completing SOC 2 compliance further enhances the Debtor's marketability and supports a higher valuation in any sale process.

6

|  |  |
|---|---|
| September 2025 | $726,000 |
| October 2025 | $806,000 |

26. This represents an average **40% year-over-year revenue increase** during active bankruptcy operations.

27. To avoid speculation, the Debtor applied **the same 40% year-over-year growth rate already realized** to the same period in the prior year.

| Prior Period (Actuals) | Annualized growth Applied | Forecasted Revenue (Projection Period) |
|---|---|---|
| November 2024 – $640,000 | +40% | **$900,000** |
| December 2024 – $705,000 | +40% | **$1,000,000** |
| January 2025 – $982,000 | +40% | **$1,400,000** |
| February 2025 – $1,010,000 | +40% | **$1,400,000** |
| March 2025 – $838,000 | +40% | **$1,200,000** |

28. The projection excludes all future or speculative revenue sources, even though they are expected to contribute materially:

| Revenue Source | Status |
|---|---|
| Firstbase One yearly renewals (first renewal cycle begins November 2025) | Customers from last year are renewing their subscription, with the price higher than the first-year discounted price. $3500 and up renewal price for many of those customers, representing a significant increase in potential revenues. |

7

| | |
|---|---|
| Sales Tax product (launched October 2025, higher ASP than existing products) | In market |
| OS product (major platform release) | In development, expected to launch in Q1 2025 but before March |

29. The revenue used in the cash-flow model is therefore below the Debtor's expected run rate.

30. <u>Operating Expense and COGS Assumptions</u>:

**A. Professional services reduced to essential functions only**

- No non-essential agency/vendor relationships.

- No additional professional services or consulting spend is projected.

**B. Marketing spend reduced strategically, not eliminated**

- Spend now targets high-intent leads that convert immediately.

- Historical spend already generated lagging leads, which continue to convert during the Projection Period without incremental spend.

- This reduction preserves cash today and does not impact forecasted revenue through March 2026.

I recognize this efficiency decision may affect revenue after April 2026, but it enables sustainable operation within the Chapter 11 period.[3]

31. <u>Liquidity & Financing</u>: The Debtor's liquidity includes:

- Beginning cash balance as of November 2025: approximately $100,000 in operational account (excludes legal escrow).

- The projection includes a $500,000 DIP Loan from Scaleworks (discussed below).

- No additional financing, equity, or contingent revenue assumptions are included.

---

[3] Ongoing legal fees have been excluded from the current projection due to the indeterminate nature of future legal expenses and any potential escrow arrangements. Notwithstanding such exclusions, the projection demonstrates adequate capital availability to satisfy any additional legal obligations that may arise.

8

32.  <u>Expected Results</u>: Based on demonstrated revenue performance and reduced operating expenses:

- The company expects to generate approximately $600,000 in positive cash flow during November 2025 – March 2026.

- The attached projection shows weekly cash balances throughout the period.

## VII. THE SCALEWORKS OFFER WILL PROVIDE RECOVERIES TO UNSECURED CREDITRORS FAR EXCEEDING THOSE IN THE HARBOR PLAN

33.  The Court confirmed the Harbor Plan in the absence of a superior alternative transaction from the Debtor and a "robust marketing process", which did not occur on account of the events described above.[4] The Debtor is now, however, in possession of a fully funded, materially higher offer from Scaleworks (the "<u>Scaleworks Offer</u>").[5] See Letter, attached hereto as **Exhibit B**. Scaleworks is a successful fund that has the cash and ability to close a transaction of this type.[6] Importantly, and unlike the Harbor Plan, the Scaleworks Offer will deliver a significant and meaningful return to unsecured creditors far in excess of the Harbor Plan.[7] I understand that the Scaleworks has amended the Scaleworks Offer to, among other things, provide for a $17 million purchase price.

34.  While the Court had previously suggested that the Debtor conduct a sale process, without any alternative available, I understand that the Court moved forward with confirmation of the Harbor Plan. The Harbor Plan is, however, deeply unpopular as it provides unsecured creditors with only the barest hope of any recovery. Unsurprisingly, given the economics of the Harbor Plan, it was overwhelmingly rejected by unsecured creditors – with Class 3 voting uniformly against the Harbor Plan. In fact, the only party supporting the Habor Plan was Harbor itself.[8]

35.  Rather than the miniscule recovery to unsecured creditors found in the Harbor Plan, the Scaleworks Offer provides approximately $17 million in immediate total value to the Debtor's estate. *See* Chapter 11 Waterfall Distribution Analysis ("<u>Waterfall Analysis</u>") attached hereto as **Exhibit C**. As shown in the Waterfall Analysis, unsecured creditors will obtain **at least three**

---

[4]  *See* Bench Memorandum Regarding Confirmation of a Chapter 11 Plan [ECF Docket No. 287], at p. 6-7.
[5]  *See* Scaleworks' *Statement of Interest and Status Report* ("<u>Status Report</u>") [ECF Docket No. 284], at p. 2-3.
[6]  Scaleworks has closed approximately $400 million in transactions over the past ten years in the B2B software sector, and its principals have run similar type of businesses as the Debtor.
[7]  The Debtor asserts that not only is the Scaleworks Offer a better alternative than the Harbor Plan, but the Debtor also believes that there may be additional bidders for the Debtor's assets at auction.
[8]  *See Declaration of Alexandra Pittinsky of Royer Cooper Cohen Braunfeld LLC Regarding Voting and Tabulation of Ballots Cast on the Chapter 11 Plan of Firstbase.io, Inc. Proposed by Harbor Business Compliance Corporation* [ECF Docket No. 251]. A $3,000 claim in Class 5 Convenience Claims also voted to approve the Plan.

**times more under a proposed liquidating plan by the Debtor** than they otherwise would receive under the Harbor Plan.

36. I understand that Scaleworks is ready, and possesses the necessary capital, to close this transaction in the near term, and is confident that it can finalize the acquisition on an expedited basis in approximately a one-month time frame with minimal required diligence and contingencies after the proposed solicitation and sale pursuant to a liquidating plan.

37. In addition, while I believe, as discussed above, that the Debtor believes that it has more than sufficient financing to fund operations through a sales process, the Scaleworks Offer provides $500,000 in DIP financing to fund the Debtor's operations and pay administrative expenses to ensure the Debtor's continued operations during the expedited sale process. I believe the proposed DIP financing alleviates the Court's concerns regarding the implementation of a sale process at this time.[9] All necessary terms of the DIP facility have been fully negotiated and agreed to in principle, subject to Court approval.[10] Lastly, I understand that an asset sale also eliminates Harbor's ongoing IP litigation as a cloud over the business, and ends the forced and acrimonious relationship between Harbor and current management.

38. As Novel makes clear in its Motion, unsecured creditors believe that other offers will supply them with greater returns than the Harbor Plan provides. I therefore join in Novel's request that the Court defer entry of the Confirmation Order and stay its effectiveness, and authorize a parallel sale process under § 363 to permit evaluation of the higher and better offers in the interest of maximizing creditor recoveries.

39. I understand that the ultimate goal in any delay granted by the Court (should the Court agree to provide it), is to deliver a transaction that provides maximum recoveries to unsecured creditors. I also believe that implementing a marketing process also accords with the overarching principles of providing maximum distributions to unsecured creditors, and complies with the cramdown provisions of section 1129(b) which require that any confirmed plan be fair and equitable to the unsecured creditors. The Scaleworks Offer ensures a maximum recovery for the unsecured creditors.

40. During this requested delay in the Effective Date of the Harbor Plan's Effective Date – which could be as short as thirty days – I believe the Debtor could, subject to Court approval: (i) enter into a stalking horse asset purchase agreement with Scaleworks pursuant to the Scaleworks Offer, subject to higher and better offers, (ii) engage an investment bank to conduct

---

[9] *See* Bench Memorandum Regarding Confirmation of a Chapter 11 Plan [ECF Docket No. 287], at p. 6-7.
[10] The DIP financing is available to the Debtor immediately and will be credited dollar-for-dollar against the purchase price at closing or, at Scaleworks' election, credit-bid under 11 U.S.C. § 363(k) in the sale. *See* Status Report at 2.

10

an expedited auction process,[11] and (iii) draft a competing liquidating plan. When those items are accomplished, the Debtor could move before this Court to set aside the Confirmation Order and establish a process by which this Court may determine the best alternative for the benefit of unsecured creditors. Once accomplished, unsecured creditors and the Court may then judge which plan provides the best alternative for the benefit of unsecured creditors.

41. To the extent that the Harbor Plan becomes effective, I understand that the mootness doctrine will make any further attempts to obtain a superior transaction that benefits unsecured creditors all but impossible. As such, I believe a short window to effectuate the Scaleworks Offer and conduct a sale process now is the only remedy available.

### VIII. WHY RECONSIDERATION OR STAY IS NECESSARY

42. The Court's conclusion that the Debtor "had more than a year to retain an investment banker and chose not to do so" did not fully account for the timing realities described above — particularly the necessity of appellate clarity, the chilling effect of Harbor's adversary litigation, and the Debtor's continuous preparation for a sale once those impediments lifted.

43. Under Bankruptcy Rule 9023 and Rule 60(b)(2)–(3), reconsideration is warranted where new evidence or circumstances demonstrate that material facts were misunderstood or where misconduct impeded a fair process. The developments described herein — including the Scaleworks Offer, ongoing buyer diligence, and proof of post-confirmation sale viability — constitute precisely such new and material facts.

44. The present sale proposals confirm that the deterrent effects previously caused by Harbor's litigation no longer prevent a transaction — they have been overtaken by new facts, improved performance, and the Court's ability to supervise a fair process.

45. Setting aside, or at minimum staying the effectiveness of the Confirmation Order for an additional thirty (30) days, would allow completion of the current sale diligence and engagement of G2 Capital Partners to conduct a formal, court-supervised process expected to deliver far superior recoveries for all creditor classes, including Harbor.

46. There is no personal financial benefit to me in this request. As an equity holder, I receive no recovery from the currently proposed sale. My sole motivation is to preserve the Debtor's business, protect its 12,000 customers, and ensure that creditors receive the maximum possible value — objectives squarely aligned with my fiduciary duties.

---

[11] The Debtor is ready, subject to Court approval, to execute a negotiated agreement with G2 Capital Advisors to provide such services.

## IX.   CONCLUSION AND RESERVATION OF RIGHTS

47.   For the reasons stated herein, I respectfully submit that:

(a)   The timing of the Debtor's sale efforts was appropriate in light of the constraints and uncertainties then facing the estate;

(b)   Harbor's conduct materially interfered with reorganization efforts and created a "third red flag" that made any sale impossible;

(c)   The Scaleworks Offer present an opportunity to achieve maximum recoveries for unsecured creditors;

(d)   New, material facts — including SOC 2 compliance readiness, credible buyer interest, and post-petition performance — warrant reconsideration; and

(e)   Equity and the interests of all creditors strongly favor allowing a short, supervised sale process before Harbor's plan becomes effective.

48.   Despite the obstacles created by Harbor's conduct, the Debtor has now achieved what was previously impossible — a fundable transaction supported by credible counterparties. With appellate clarity, SOC 2 readiness, and sustained profitability, the Debtor's business is now transactable. Further, ongoing conversations with additional buyers suggest that additional proposals are likely if given a short window to proceed.

49.   I also note that Harbor's confirmed Plan purports to settle and release all litigation except the adversary proceeding it filed against myself and Filipe Senna individually, leaving that action pending even though the Plan otherwise invokes broad releases. If that adversary proceeding is ultimately determined to be baseless—as we firmly believe it will be—such a finding will further reduce recoveries available to creditors by eliminating a purported litigation asset that Harbor has used to justify its plan valuations. In that event, we expressly reserve all rights to pursue appropriate remedies, including potential claims for malicious prosecution, abuse of process, or sanctions for bad-faith litigation conduct, whether directly or derivatively on behalf of the estate. Those remedies would be pursued irrespective of any change in Harbor's ownership or its apparent acquisition by a private equity firm, as the harm to the estate and its stakeholders arises from conduct already undertaken in this case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of November 2025,
New York, New York

                                                    **/s/ Mark Milastsivy**
                                                    Mark Milastsivy
                                                    Chief Executive Officer, Firstbase.io, Inc.

| | | Nov 10 | Nov 17 | Nov 24 | Dec 1 | Dec 8 | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 | Feb 2 | Feb 9 | Feb 16 | Feb 23 | Mar 2 | Mar 9 | Mar 16 | Mar 23 | Mar 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Opening balance | $ 100,000.00 | $ 668,400.00 | $ 793,400.00 | $ 550,200.00 | $ 558,200.00 | $ 718,200.00 | $ 819,600.00 | $ 977,600.00 | $ 690,400.00 | $ 898,400.00 | $ 1,049,800.00 | $ 1,307,800.00 | $ 1,083,600.00 | $ 1,168,600.00 | $ 1,288,000.00 | $ 1,534,000.00 | $ 1,197,800.00 | $ 1,245,800.00 | $ 1,366,800.00 | $ 1,456,200.00 | $ 1,602,200.00 |
| **Cash inflow** | Revenue | $ 225,000.00 | $ 225,000.00 | $ 225,000.00 | $ 225,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 250,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 350,000.00 | $ 240,000.00 | $ 240,000.00 | $ 240,000.00 | $ 240,000.00 | $ 240,000.00 |
| | DIP Loan | $ 500,000.00 | | | | | | | | | | | | | | | | | | | | |
| **Outflow Cost of Goods** | Filing fees | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (50,000.00) | $ (50,000.00) | $ (50,000.00) | $ (50,000.00) | $ (50,000.00) |
| | Mailroom Vendor | | | $ (40,000.00) | | | | | $ (40,000.00) | | | | | $ (40,000.00) | | | | $ (40,000.00) | | | | $ (40,000.00) |
| | Tax filing vendor | | | | $ (50,000.00) | | | | | $ (50,000.00) | | | $ (40,000.00) | $ (100,000.00) | | | | $ (100,000.00) | | | | $ (150,000.00) |
| | Total | $ (35,000.00) | $ (35,000.00) | $ (75,000.00) | $ (85,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (75,000.00) | $ (85,000.00) | $ (35,000.00) | $ (35,000.00) | $ (75,000.00) | $ (135,000.00) | $ (35,000.00) | $ (35,000.00) | $ (35,000.00) | $ (175,000.00) | $ (50,000.00) | $ (50,000.00) | $ (50,000.00) | $ (240,000.00) |
| **Outflow Operating Exp** | Accounting | | | | $ (1,500.00) | | | | $ (1,500.00) | | | | | $ (1,500.00) | | | | $ (1,500.00) | | | | $ (1,500.00) |
| | Domain & Hosting | | | | $ (8,000.00) | | | | $ (8,000.00) | | | | | $ (8,000.00) | | | | $ (8,000.00) | | | | $ (8,000.00) |
| | Insurance | | | | $ (2,500.00) | | | | $ (2,500.00) | | | | | $ (2,500.00) | | | | $ (2,500.00) | | | | $ (2,500.00) |
| | Office Rent | | | | $ (16,000.00) | | | | $ (16,000.00) | | | | | $ (16,000.00) | | | | $ (16,000.00) | | | | $ (16,000.00) |
| | Professional Services - Agencies | | | | $ (35,000.00) | | | | $ (35,000.00) | | | | | $ (35,000.00) | | | | $ (35,000.00) | | | | $ (35,000.00) |
| | Sales Commissions | | | | $ (10,000.00) | | | | $ (10,000.00) | | | | | $ (10,000.00) | | | | $ (10,000.00) | | | | $ (10,000.00) |
| | Sales Tax Expense | | | | $ (4,000.00) | | | | | | | | $ (4,000.00) | | | | $ (4,000.00) | | | | | $ (4,000.00) |
| | Marketing advertsing budget | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) | $ (20,000.00) |
| | Software Subscription | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | $ (25,000.00) | | | |
| | Stripe Fees | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (12,000.00) | $ (12,000.00) | $ (12,000.00) | $ (12,000.00) | $ (12,000.00) | $ (12,000.00) | $ (12,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) | $ (14,000.00) |
| | International team + Wages and Salaries | $ (50,000.00) | | $ (300,000.00) | | | $ (50,000.00) | | $ (300,000.00) | | $ (100,000.00) | | $ (410,000.00) | | $ (120,000.00) | | $ (410,000.00) | | $ (50,000.00) | | $ (300,000.00) |
| | Filipe Senna | | | | | | | | | | | | | $ (21,600.00) | | | | $ (21,600.00) | | | | $ (21,600.00) |
| | Mark Milastsivy | $ (6,600.00) | | $ (6,600.00) | | | $ (6,600.00) | | | $ (6,600.00) | | | $ (6,600.00) | | | $ (6,600.00) | | | $ (6,600.00) | | | $ (6,600.00) |
| | Misc | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) |
| | Total | $ (121,600.00) | $ (65,000.00) | $ (393,200.00) | $ (132,000.00) | $ (55,000.00) | $ (113,600.00) | $ (57,000.00) | $ (462,200.00) | $ (57,000.00) | $ (163,600.00) | $ (57,000.00) | $ (499,200.00) | $ (130,000.00) | $ (195,600.00) | $ (69,000.00) | $ (511,200.00) | $ (142,000.00) | $ (69,000.00) | $ (100,600.00) | $ (44,000.00) | $ (449,200.00) |
| | Ending balance | $ 668,400.00 | $ 793,400.00 | $ 550,200.00 | $ 558,200.00 | $ 718,200.00 | $ 819,600.00 | $ 977,600.00 | $ 690,400.00 | $ 898,400.00 | $ 1,049,800.00 | $ 1,307,800.00 | $ 1,083,600.00 | $ 1,168,600.00 | $ 1,288,000.00 | $ 1,534,000.00 | $ 1,197,800.00 | $ 1,245,800.00 | $ 1,366,800.00 | $ 1,456,200.00 | $ 1,602,200.00 | $ 1,153,000.00 |

**FirstBase.io, Inc.**
447 Broadway
Unit 187, Floor 2
New York, NY 10013

November 9, 2025

Re: Firstbase.io, Inc. – Scaleworks Offer

This letter confirms the offer of Scaleworks Fund III, L.P. ("Scaleworks") to purchase the assets of Firstbase.io, Inc. (the "Debtor") on the terms described herein.

As you know, over the past several weeks, Scaleworks has engaged extensively with the Debtor's management and counsel in connection with a potential acquisition of substantially all of the Debtor's assets. On October 22, 2025, Scaleworks executed a Letter of Intent proposing a transaction consisting of three installments ($10 million + $2 million + $5 million). Following execution, Scaleworks conducted intensive diligence covering the Debtor's financials, operations, and products.

After completing this diligence, Scaleworks delivered a definitive Asset Purchase Agreement (filed on the Court's docket at Number 284 on November 2, 2025) offering $12 million in cash, together with a 10 percent equity allocation intended to provide unsecured creditors with future upside in lieu of the $5 million performance-based installment contemplated in the original LOI. This revised structure was accompanied by an offer to fund a $500,000 debtor-in-possession ("DIP") financing facility to fund operations pending closing.

Since the filing of Novel Capital's *Motion to Reconsider*, Scaleworks has conferred with the Debtor regarding its intent to commence a § 363 sale process, under which Scaleworks would serve as the stalking-horse bidder. We have been working with Scaleworks to define appropriate stalking-horse protections and procedural milestones.

To align with this potential plan structure, I understand that Scaleworks presently intends to revert to the economics contemplated in the original LOI—a $17 million purchase price consisting of $12 million payable at closing and a $5 million additional installment, with no equity component—and to work over the next few days to finalize the necessary adjustments to the APA in the event the Court agrees to stay the effective date of the recently approved plan filed by Harbor Business for approximately 30 days. The revised APA, which Scaleworks will file on the docket, will remain fully fundable, with committed capital in place. I understand that the anticipated revisions will primarily adjust the purchase price to $17 million, remove the equity component, and incorporate limited changes to reflect that the Debtor now intends to structure a plan around a § 363 sale and invite competing bids.

**Consistent with the APA currently on the Court's docket, I understand that Scaleworks' diligence is substantially complete and that the remaining review is limited to confirming the Debtor's ownership and the transferability of certain intellectual property assets. In the original APA, Scaleworks estimated that this review could be completed within approximately one month, leading to a prompt closing. Depending on developments in the case—such as the Court's resolution of the adversary proceeding in which Harbor asserts ownership over certain Firstbase assets—I understand that Scaleworks is prepared to accelerate both its diligence and closing timeline significantly.**

I also understand that Scaleworks remains willing to provide the $500,000 DIP facility immediately upon Court approval to ensure stability during this process.

We appreciate Scaleworks continued consideration and stand ready to cooperate with all parties to advance a value-maximizing outcome for this estate.

/s/ **Mark Milastsivy**
Mark Milastsivy
Chief Executive Officer, Firstbase.io, Inc.

AGREED AND ACCEPTED BY:

_____
Scaleworks Fund III, L.P.

# Chapter 11 Waterfall Distribution Analysis

The chart below is intended to demonstrate the differing recoveries under a liquidating Chapter 11 plan to be proposed in accordance with Scaleworks Offer of $17,000,000 (the "Debtor Plan"), as compared to the Chapter 11 plan proposed and confirmed by Harbor Business Compliance Corporation (the "Harbor Plan").

| | Claim Amount Under Debtor Plan | Amount recovered under Debtor Plan | Recovery under Debtor Plan | Recovery under Harbor Plan |
|---|---|---|---|---|
| Superpriority DIP | $500,000.00 | $500,000.00 | **100%** | N/A |
| Admin | $1,872,674.00* | $1,872,674.00 | **100%** | 100% |
| Priority Tax | $4,215.00 | $4,215.00 | **100%** | 100% |
| UST | $96,000.00** | $96,000.00 | **100%** | 100% |
| Secured | $0 | N/A | **N/A** | N/A |
| Priority Non-Tax Claims | $0 | N/A | **N/A** | N/A |
| General Unsecured creditors who agreed to a reduction under Debtor Plan | $1,577,067.00*** | $630,826.80 | **40% – full amount agreed to in the stipulation with the Debtor signed by these creditors** | 5%-19%***** |
| Other General Unsecured Creditors | $2,553,515.00 | $1,609,012.00 | **63%** | 5%-19%***** |
| HC's Judgement | $19,500,000.00**** | $12,287,272.20 | **63%** | Per Harbor: "Speculative, but not less than $0.03 per $1.00 pursuant to the Put Option" |

| SAFE note holders | $5,622,000.00 | N/A | **Possible*****  | NONE |

*The amount is calculated based on: $1,966,549.00 in approved fees, $470,701.00 in paid fees, current legal escrow balance of $137,174.00, and an estimate of $514,000 in additional fees for the period between Sep 2025 and March 2025.

** .8% of the initial disbursement of $12M.

*** The judgment should no longer include either the $11,068,044 reduction or the percentage of pre/post-judgment interest attributable to that number. The damages that were reduced are 41.3% for unfair competition and trade secret damages, and 39.6% of total damages. The estimate, then, is that it reduces prejudgment interest by $557,272.92, and reduces the principal against which post-judgment interest will ultimately be measured. This is how we've arrived at $19.5M for the purposes of this analysis.

**** Dilworth, Jurislogic, and Stenn have agreed in a stipulation to a reduction if provided at least 40% of claim value under Debtor's plan. Debtor is listing full amounts (pre discount) in the second column of the table.

**** While no recovery exists for Safe holders and equity under the Scaleworks proposal, the Debtor proposes to have Scaleworks serve as a stalking horse bidder in a Plan based on a § 363 sale process. This may lead to full recoveries for general unsecured creditors and at least some recovery for SAFE note holders.

*****The Debtor respectfully submits that the upper range of potential recoveries for general unsecured creditors projected under the Harbor Plan is speculative and contingent upon the outcome of an adversary proceeding, the merits of which the Debtor expressly disputes. Accordingly, the Debtor believes that the probable recoveries for general unsecured creditors are more accurately reflected by the lower end of the stated range.